UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- x
UNITED STATES OF AMERICA, :
 :
 -against- :
 :
MICHAEL ROMANO AND WILLIAM :
KEARNEY, :
 :
 Defendants. :
 :
------------------------------------------------------- x

**REPORT AND RECOMMENDATION**

09-CR-168 (SJ)(VMS)

**Scanlon, Vera M., United States Magistrate Judge:**

## I. Introduction

Defendants Michael Romano and William Kearney have been convicted of conspiracy to

commit mail or wire fraud in violation of 18 U.S.C. § 1349, and conspiracy to commit money

laundering in violation of 18 U.S.C. §§ 1956(h), 1956(a)(1)(A)(i), 1957(d)(1). Docket Nos. 168,

295. The government now seeks, pursuant to Federal Rule of Criminal Procedure 32.2 and in

conjunction with Mr. Romano and Mr. Kearney's upcoming sentencing before District Judge

Sterling Johnson, Jr., the entry of an order of forfeiture in the amount of $32,220,617 against Mr.

Romano and Mr. Kearney. Docket Nos. 355, 358, 362. The government first claims that this

amount of money is forfeitable because it represents the gross proceeds of Mr. Romano and Mr.

Kearney's conspiracy to commit mail or wire fraud through a scheme. Docket No. 355. Mr.

Romano and Mr. Kearney counter that the law only permits the forfeiture of net proceeds, and

further, that forfeiture should be limited to the net proceeds stemming from the nine customers'

transactions specifically discussed in detail at trial. Docket Nos. 356, 357. Next, the government

claims that this amount of money is forfeitable because these funds facilitated Mr. Romano and

Mr. Kearney's conspiracy to commit money laundering. Docket No. 355. Mr. Romano and Mr.

Kearney argue that any forfeiture ordered stemming from their conviction for conspiracy to commit money laundering should be limited to the property actually transferred during money laundering transactions. Docket Nos. 356, 357.

In the event that the Court rules in favor of the government and enters a general forfeiture order, the government requests an order directing the forfeiture of specific property seized from Mr. Romano and Mr. Kearney which would serve as partial satisfaction of the $32,220,617 money judgment. Docket No. 355.

District Judge Johnson referred the government's forfeiture motion to the undersigned for a report and recommendation. Docket Entry 1/23/2013. The undersigned respectfully recommends that the District Judge **grant** the government's request for an order of forfeiture in the amount of $32,220,617. A forfeiture order in this amount can be justified on two grounds. First, under 18 U.S.C. § 981(a)(2)(A), the $32,220,617 constitutes gross proceeds "obtained directly or indirectly" as a result of Mr. Romano and Mr. Kearney's commission of wire and mail fraud conspiracy. Second, under 18 U.S.C. § 982(a)(1), the same $32,220,617 is property "involved in" Mr. Romano and Mr. Kearney's conspiracy to commit money laundering. Accordingly, although the undersigned believes that 18 U.S.C. § 981(a)(2)(A) and 18 U.S.C. § 982(a)(1) provide a concurrent justification for $32,220,617 in forfeiture, the undersigned also believes that if the District Judge declines to adopt this Court's recommendation as to the forfeitability of the $32,220,617 under either one of those statutes, forfeiture of the same amount would still be proper under the other.

In addition, the undersigned respectfully recommends that the District Judge **grant** the government's request for a forfeiture order naming specific property seized from Mr. Romano and Mr. Kearney in this case and identified by the government at Docket No. 355. The reasons

for the undersigned's recommendation are explained below.

In the next section of this report and recommendation, this Court provides a factual summary necessary to understand its legal analysis. <u>See</u> Section II. In the subsequent sections of this report and recommendation, this Court will (1) discuss civil forfeiture law 18 U.S.C. § 981(a)(2) and determine what amount of forfeiture that statute allows as a result of Mr. Romano and Mr. Kearney's convictions for conspiracy to commit mail and wire fraud, <u>see</u> Section III.b.; (2) discuss criminal forfeiture law 18 U.S.C. § 982(a)(1) and determine what amount of forfeiture that statute allows as a result of Mr. Romano and Mr. Kearney's convictions for conspiracy to commit money laundering, <u>see</u> Section III.c.; and (3) discuss what specific assets were either "involved in" or "traceable to" Mr. Romano and Mr. Kearney's convictions for conspiracy to commit mail and wire fraud, and for conspiracy to commit money laundering such that they should be forfeited under the statutes corresponding to those respective crimes, <u>see</u> Section III.e. The final sections will briefly summarize all Orders the undersigned respectfully recommends that the District Judge make regarding forfeiture in this sentencing. <u>See</u> Section IV. What follows is a table of contents for the entire report and recommendation.

### Table of Contents

I. Introduction ........................................................................................................................... 1
II. Factual Background ............................................................................................................. 6
   a. Synopsis Of The Case And What Happened At Trial ..................................................... 6
   b. Trial Testimony Regarding The Fraud Scheme .............................................................. 7
   c. Trial Testimony Regarding Money Laundering ............................................................ 10
   d. Current Procedural Posture Of The Case ...................................................................... 11
III. Discussion .......................................................................................................................... 13
   a. Forfeiture Procedure Generally .................................................................................... 13
   b. The Government's Motion For A Forfeiture Order Under 18 U.S.C. § 981(a)(1)(C) Arising From Defendants' Mail And Wire Fraud Convictions ...................................... 15
      i. Civil Forfeiture Law Applicable To Mail And Wire Fraud Convictions ................... 15

1. Whether Fraud-Related Civil Forfeiture Requires Gross-Proceeds Forfeiture Under 18 U.S.C. § 981(a)(2)(A) Or Net- Proceeds Forfeiture Under 18 U.S.C. § 981(a)(2)(B) Depends On Case-Specific Facts ................................................................ 15

2. Mr. Romano and Mr. Kearney's Argument That Any Forfeiture Order Be Limited To Net Proceeds Under 18 U.S.C. § 981(a)(2)(B) ............................................ 17

3. The Government's Argument That The Court Should Order Gross-Proceeds Forfeiture Under 18 U.S.C. § 981(a)(2)(A) ................................................ 18

4. The Court's Analysis Of Whether 18 U.S.C. § 981(a)(2)(A) Mandates Gross-Proceeds Forfeiture Or 18 U.S.C. § 981(a)(2)(B) Provides For Net-Proceeds Forfeiture In This Case .................................................................... 19

   a. Mr. Romano And Mr. Kearney Were Convicted Of A Telemarketing Scheme..... 19

   b. The Plain Language Of 18 U.S.C. § 981(a)(2)(A) Shows That Any Forfeiture Order Premised On the Telemarketing Fraud Scheme Convictions Should Be Calculated From Gross Proceeds ............................................................ 21

   c. Legislative History Shows That 18 U.S.C. § 981(a)(2)(A) Requires Gross-Proceeds Forfeiture For Telemarketing Fraud Scheme Convictions..................................... 21

5. This Court Recommends That The District Judge Enter A Forfeiture Order Calculated From The Gross Proceeds Obtained Directly Or Indirectly As A Result Of The Mail And Wire Fraud ........................................................................ 25

ii. Whether Forfeiture Order Must Be Limited To Property Obtained From The Nine Specific Fradulent Transactions Discussed At Trial Or Whether It May Include Property Obtained From The Broader Telemarketing Scheme................................... 25

   1. Mr. Romano and Mr. Kearney's Argument That The Forfeiture Order Must Be Limited To Gross Proceeds Obtained From The Nine Victims Who Testified At Trial ....................................................................................25

   2. The Government's Argument That The Forfeiture Order Must Include Property Obtained From The Broader Telemarketing Scheme Proven By A Preponderance Of The Evidence ............................................................................ 26

   3. The Court's Analysis Of The Parties Dispute Over The Scope Of The Forfeiture Order ................................................................................. 26

      a. Mr. Romano And Mr. Kearney Stand Convicted Of A Scheme ........................... 26

      b. The Fact That Mr. Romano And Mr. Kearney Stand Convicted Of A Scheme Means That Forfeiture Under 18 U.S.C. § 981(a)(1)(C) Need Not Be Limited To Property Constituting Proceeds Of Individual Transactions Proven At Trial, But May Include Property Constituting Scheme Proceeds .......................................... 28

      c. The Court Finds By A Preponderance Of The Evidence That Mr. Romano And Mr. Kearney Knew That The Three Companies' Operations Were A Corrupt Fraudulent Scheme Beyond The Nine Specific Victims Who Testified At Trial .. 30

   4. This Court Recommends That The District Judge Enter A Forfeiture Order In The Amount Of $32,220,617, Which Represents Property Obtained From The Defendants' Entire Telemarketing Scheme ............................................... 32

4

c.  The Government's Motion For A Forfeiture Order Under 18 U.S.C. § 982(a)(2) Arising From Defendants' Money Laundering Convictions ........................................... 32

   i.  Criminal Forfeiture Law Generally Applicable To Money Laundering ..................... 32

   ii.  The $32,220,617 That Cycled Through The Three Companies' Bank Accounts Was "Involved In" The Money Laundering Offense Because Its Presence In the Bank Accounts Where the Money Laundering Took Place Facilitated The Crime ............. 33

      1.  Mr. Romano And Mr. Kearney's Argument That Only Property Actually Laundered Was "Involved In" The Money Laundering Conspiracy And Therefore Forfeitable . 33

      2.  The Government's Argument That All $32,220,617 Present In The Three Companies' Bank Accounts Is Forfeitable As "Involved In" The Money Laundering Conspiracy That Took Place In Those Accounts Because It Facilitated The Money Laundering Conspiracy By Obscuring The Laundering ................................................................. 33

      3.  The Court's Analysis Of Facilitation Theory ........................................................... 34

         a. Facilitation Theory Permits Unlaundered Money To Be Forfeited As "Involved In" Money Laundering If Commingling With Laundered Funds Facilitated Offense………………………………………………………………………….. 34

         b. The Court Finds By A Preponderance Of The Evidence That $32,220,617 In The Three Companies' Operating Accounts Facilitated The Laundering Of $3,558,458.73 Occurring In Those Three Accounts ................................................ 36

      4.  This Court Recommends That The District Judge Enter A Forfeiture Order In The Amount Of $32,220,617, Which Represents Property "Involved In" The Defendants' Money Laundering Conspiracy Under A Facilitation Theory .................................... 37

d.  Mr. Romano And Mr. Kearney Need Not Have Had The $32,220,617 In Their Personal Possession For The Recommended Forfeiture Order To Enter ......................................... 37

e.  Specific Assets Seized By The Government Are Forfeitable As "Traceable To" Property "Involved In" The Offenses Of Which Mr. Romano And Mr. Kearney Stand Convicted  38

   i.  Forfeitability Of Specific Assets Traceable To Property Obtained As A Result Of The Conspiracy To Commit Wire Or Mail Fraud ............................................................. 39

   ii.  Forfeitability Of Specific Assets Traceable To Property Obtained As A Result Of The Conspiracy To Commit Money Laundering ................................................................. 39

   iii.  The Government Must Prove The Traceability Of A Specific Asset By A Preponderance Of The Evidence Under Both 18 U.S.C. § 981(a)(1) and 18 U.S.C. § 982(a)(2)(A) .................................................................................................................. 40

      1.  Mr. Romano's Forfeitable Specific Property ........................................................... 40

      2.  Mr. Kearney's Forfeitable Specific Property ........................................................... 44

      3.  Mrs. Kearney, As A Third Party, May Object To The Forfeiture Of Her Account If She Thinks She Qualifies As An Innocent Owner .................................................... 46

      4.  This Court Recommends That The District Judge Order Atlantic And Northeast's Operating Accounts Forfeited ................................................................................... 47

IV.  Conclusion .................................................................................................................... 47

V.    Objections………………………………………………………………………..49

## II.    Factual Background

### a.  Synopsis Of The Case And What Happened At Trial

Mr. Romano owned three rare coin companies known as Wall Street Rare Coins, Atlantic Coin Galleries, and Northeast Gold and Silver, Inc. ("the three companies"),[1] and Mr. Kearney worked at the three companies as a salesperson and manager. Docket No. 168.  Over the course of the three companies' operations, $32,220,617 in gross proceeds passed through their operating accounts.  Tr. 2518-2519, 2521-2522.   On June 13, 2011, after a one-month trial, Mr. Romano and Mr. Kearney were each convicted of conspiracy to commit mail or wire fraud in violation of 18 U.S.C. §§ 1341, 1343, 1349, and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h), 1956(a)(1)(A)(i), 1957(b), 1957(d)(1).  Docket No. 295. At trial, the government proved, inter alia, that Mr. Romano and Mr. Kearney played roles in devising and executing a telemarketing scheme whereby they called prospective purchasers and induced them to buy coins by representing that the coins were of a certain quality (which they were not), and that the three companies would aid any purchaser in reselling the coins at a profit (which they

---

[1] Mr. Romano and Mr. Kearney were tried before a jury from May 10, 2011 through June 8, 2011, and on June 13, 2011, they were convicted of conspiracy to commit mail and wire fraud and conspiracy to commit money laundering.  Docket No. 295. All record citations to trial testimony are drawn from the transcripts of that trial.  According to trial testimony, Mr. Romano and Mr. Kearney sequentially operated the three companies.  As soon as one store shut down, Mr. Romano and Mr. Kearney would open a new one. Docket No. 355-6; Trial Transcript 879:16 - 880:5 (hereinafter "Tr. [page]:[line]") (testimony detailing that Wall Street Rare Coins closed; that Atlantic Coin Galleries opened in its place; and that while the companies' names and locations were different, the sales model and the product remained the same). Wall Street came first; next Atlantic, from October or November 2004 until approximately June 2008; Northeast began operations in June 2008. Docket No. 355-6; see Tr. 2469:21-2472:16 (government witness postal inspector William Hessle testifying from bank records that Wall Street Rare Coins was in operation from May 2000 through October or November 2004, at which point Atlantic Coin Galleries began operations through June 2008, when Northeast Gold and Silver came into existence).

6

did not). Id.; Docket No. 168 (indictment containing charging language stating that Mr. Romano

and Mr. Kearney devised a scheme to defraud the three companies' customers: "the defendants

MICHAEL ROMANO, WILLIAM KEARNEY . . . together with others, did knowingly and

intentionally conspire to devise a scheme and artifice to defraud customers of the Subject

Companies"). The government also proved that Mr. Romano and Mr. Kearney laundered the

fraud proceeds through at least seventy-four money transfers of $10,000 or more from the three

companies' operating accounts to their own personal control. Docket Nos. 362-1, 362-2.

### b. Trial Testimony Regarding The Fraud Scheme

At trial, the government called nine victims of Mr. Romano and Mr. Kearney's mail and

wire fraud to testify about their experiences as Defendants' telemarketing scheme targets. While

these nine victims gave the jury perspective on the damages that Mr. Romano and Mr. Kearney's

offense caused them as individuals, the government's other witnesses—many of them employees

of the three companies—testified more broadly about the nature and scope of the offense beyond

those nine victims' experiences. What follows is a review of just some of the employee

testimony relating to the nature and scope of the three companies' operations.

On May 17, 2011, Patrick Coleman, who worked as a telemarketer for Mr. Romano and

Mr. Kearney at Wall Street Rare Coins and Atlantic Coin Galleries from 2002 through 2005, Tr.

843:18, 879:23, testified that he placed roughly 25,000 telemarketing calls during those three

years using a script provided by Mr. Kearney that misrepresented the quality of the coins being

sold, Tr. 846:22, 855:14. AUSA Gatz, one of the federal prosecutors working on the case, asked

Mr. Coleman to clarify what he meant when he testified that he did not believe that the grade of

MS 64 was accurate for the Morgan silver dollars that he "very often" sold. Tr. 843:23, 851:4-6.

Mr. Coleman responded, "Well, several factors. Customer complaints. Pretty constant customer

complaints about quality. The simple fact there was so much profit on a particular coin made me doubt they were accurately graded. It was basically kind of a running joke in the office the coins were over graded from all of the salespeople." Tr. 851:9-14.  Mr. Coleman also testified that he questioned Mr. Romano's grading practices on the coins he was charged with telemarketing because "[o]n a number of occasions, I overheard Mike [Romano] ordering rolls of Ben Franklin half dollars, which I know for a fact we only sold at MS 64-pluses. And I overheard him talking to the suppliers as UNCs, which was uncirculated. So it was—clearly, he was not ordering 64-plus but generic uncirculated coins, which I don't believe were 64 or better.  I couldn't see how they could be." Tr. 875:19-25.  Mr. Coleman said, "There was one instance I remember specifically I kind of figured out that the coins were being somewhat manipulated. I had tried to sell an MS-62 coin off the inventory, and the customer didn't want it because they wanted an MS-63. And Mike [Romano] specifically told me:  Call them back and sell it as an MS-63." Tr. 876:10-15.

Similarly, Daren Mutone, an employee of Atlantic Coin Galleries from 2006 to 2008, testified at trial on May 18 and 19, 2011. Tr. 1099:17-20, 1107:13.  Mr. Mutone shared a similar story about the regular provision of false information to customers.  Mr. Mutone recounted how Mr. Romano and Mr. Kearney urged their telemarketers to get customers interested in completing coin sets by touting the value of completed sets, then never permitting any customer to complete a set so that promised coin values were never realized.  Tr. 1128:5-1131:5.  Mr. Mutone testified that as a result of this organizational culture, which he stated was directly cultivated by Mr. Romano and Mr. Kearney, the non-completion of sets became a running joke among the telemarketers.  He testified that Mr. Romano and Mr. Kearney would have sing-alongs with the telemarketers with the lyrics "This is the set that never ends, yes, it goes on and

8

on my friends." Id.  Mr. Mutone also told the jury that the telemarketers joked on breaks and with Mr. Kearney that the customers were extremely "gullible" because elderly people "were easier to push around."  Tr. 1157:12-21, 1159:18-24, 1160:8-13.

Jarrett Stretch's May 24, 2011 testimony also revealed the breadth of the scheme beyond the nine victims Mr. Romano and Mr. Kearney now ask the Court to treat as their only victims. Mr. Stretch, who is also a co-Defendant in this case, worked as a telemarketer for Mr. Romano and Mr. Kearney for "three or so years" at Atlantic Coin Galleries and Northeast Gold and Silver. Tr. 1615:13, 1618:2-3, 1618:5, 1619:6, 1633:12-13.  Mr. Stretch testified that Mr. Romano and Mr. Kearney wrote all sales pitches and closes, Tr. 1632:18-21, and that Mr. Romano and Mr. Kearney would randomly listen in on the approximately two to three hundred telemarketing calls made daily to assure adherence to the scripts, Tr. 1640:21-1641:10.  Mr. Stretch told the jury that during celebrations for coin sales, Mr. Romano and Mr. Kearney commented that customers were "stupid," "morons," and "retards."  Tr. 1669:6, 1670:7-9, 1673.

Mr. Coleman, Mr. Mutone and Mr. Stretch's testimony showed Mr. Romano and Mr. Kearney's awareness of the extreme systemic inflation of coin prices because of the high commissions Mr. Romano and Mr. Kearney permitted Mr. Coleman, Mr. Mutone and Mr. Stretch to receive on the gross sales they made as the terms of their employment.  Mr. Coleman at one point received a twenty-percent commission on his gross sales, Tr. 861:24, and Mr. Mutone at one point made a sixteen-percent commission on his gross sales, Tr. 1163:18.  Mr. Stretch was also paid on his gross sales while working at Atlantic Coin Galleries and at Northeast Gold and Silver, which he noted was different than his experience at other telemarketing companies, where his commission was calculated from the net revenue. Tr. 1674:23-25.  By contrast, at Atlantic Coin Galleries and at Northeast Gold and Silver, Mr.

Stretch testified that he never had any information "about the cost of the coin." Tr. 1675:1-3. Mr. Mutone explained that this payment "on the gross of the sales" was "a lot of money [Mr. Romano] would make on a deal," implying that employees received a commission premium as payment for engaging in something untoward. Tr. 1148:16-19.

### c. Trial Testimony Regarding Money Laundering

The government's presentation at trial regarding Mr. Romano and Mr. Kearney's conspiracy to commit money laundering largely centered on the testimony of United States Department of Justice investigator William Hessle on June 2, 2011. Mr. Hessle spoke about his examination of bank transactions exceeding $10,000 involving the three companies' accounts. Mr. Hessle's testimony was summarized in two charts (hereinafter "Hessle money laundering chart for Mr. Romano" and "Hessle money laundering chart for Mr. Kearney") which were, along with cashed checks proving the movement of funds ("cashed checks"), entered in evidence at Govt Exh. 115 and Govt Exh. 116. Tr. 2500:15-23; Docket No. 362-1; Docket No. 362-2.

The Hessle money laundering chart for Mr. Romano illustrates the conspiracy to commit money laundering by tracing fifty-four cashed checks issued by and cashed by Mr. Romano for individual amounts exceeding $10,000 from the operating accounts of Wall Street Rare Coins, Atlantic Coin Galleries and Northeast Gold and Silver from the years 2001 through 2008. Id. These fifty-four checks moved a total of $2,700,357.23 from the three companies' bank accounts via checks made out to Mr. Romano or simply to cash. Id. Of these checks, eleven cashed checks made out to Mr. Romano or simply to cash for individual amounts exceeding $10,000 were cut from the operating accounts of Wall Street Rare Coins in the years 2001 through 2004, and those checks totaled $744,717.80. Id. Thirty-seven cashed checks made out to Mr. Romano or simply to cash for individual amounts exceeding $10,000 were cut from the operating accounts of

Atlantic Coin Galleries in the years 2004 through 2008, and those checks totaled $1,729,465.43. Id.  Finally, the Hessle money laundering chart for Mr. Romano details how five cashed checks for individual amounts exceeding $10,000 were paid from Northeast Gold and Silver to Mr. Romano in the years 2006 through 2008 totaling $226,174.00.  Id.

The Hessle money laundering chart for Mr. Kearney traces the conspiracy to commit money laundering by following twenty cashed checks involving Mr. Kearney for individual amounts exceeding $10,000 from the operating accounts of Atlantic Coin Galleries and Northeast Gold and Silver from the years 2005 through 2008. Docket No. 362-2.  These twenty checks moved a total of $858,101.50 from the two companies' bank accounts via checks made out to Mr. Kearney.  Id.  Of these checks, thirteen cashed checks for individual amounts exceeding $10,000 were cut from the operating accounts of Atlantic Coin Galleries in the years 2005 through 2008, and those checks, made out to Mr. Kearney or cash, totaled $716,343.50.  Id. The Hessle money laundering chart for Mr. Kearney showed seven cashed checks for individual amounts exceeding $10,000 were cut from the operating accounts of Northeast Gold and Silver in 2008; were made out to Mr. Kearney or cash; and those checks totaled $141,758.  Id.

### d.  Current Procedural Posture Of The Case

Mr. Romano and Mr. Kearney presently await sentencing for their convictions for conspiracy to commit wire and mail fraud, and for conspiracy to commit money laundering. In sentencing Mr. Romano and Mr. Kearney, the District Court must also decide the indictment's two criminal forfeiture counts, which were not decided by the jury at trial.  This is because, "[p]rior to trial, the defendants waived their right to have the amount of any forfeiture determined by a jury."  Docket No. 347.  Forfeiture Count One relates to their conviction for conspiracy to commit mail or wire fraud and seeks forfeiture in accordance with 18 U.S.C. §

981(a)(1)(C) and 28 U.S.C. § 2461(c).  Docket No. 168 ¶¶ 21-22.  For this count, the

government seeks forfeiture from Mr. Romano and Mr. Kearney of $32,220,617, and all

properties, real and personal, which constitutes or is derived from proceeds traceable to such

property.  Id.  Forfeiture Count Two relates to their conviction for conspiracy to commit money

laundering and seeks forfeiture in accordance with 18 U.S.C. § 982(a)(1).  Id. ¶¶ 23-24.  For this

count, the government seeks forfeiture from Mr. Romano and Mr. Kearney of $32,220,617 and

all properties, real or personal, involved in the offense or any property traceable to such property.

Id.  The indictment names specific properties which the government seeks to be forfeited to it in

partial satisfaction of a money judgment in the event that the $32,220,617 forfeiture order is

entered, including various bank accounts held by Mr. Romano and Mr. Kearney, as well as real

property owned by Mr. Romano (8154 Via Bolzano, Lake Worth, Florida) and Mr. Kearney (8

Valerie Place, East Islip, New York). Id.

On January 23, 2013, District Judge Johnson referred the forfeiture counts to the

undersigned for report and recommendation.  Docket Entry 1/23/2013.  During a February 25,

2013 status conference, the Parties told the Court that they were in the process of informally

negotiating the forfeiture amount in this case and did not believe that they would require the

Court's intervention in this regard.  Docket Entry 2/25/2013.  On March 28, 2013, Mr. Romano

and Mr. Kearney submitted a letter to the Court stating that the Parties were unable to reach an

agreement as to the amount of forfeiture.  Docket No. 354.  On April 17, 2013, the government

filed its forfeiture motion, related brief and exhibits.  Docket No. 355. On May 1, 2013, Mr.

Romano and Mr. Kearney filed their opposition.  Docket Nos. 356, 357. On May 6, 2013, the

government replied.  Docket No. 358.  On May 8, 2013, the undersigned held oral argument on

the government's forfeiture motion.  Docket Entry 5/8/2013. A transcript of the oral argument

was subsequently prepared.  Docket No. 366 (hereinafter "5/8/2013 Tr. [page number]:[line number]").  The government presented no additional evidence to Court that day, 5/8/2013 Tr. 5:17-18 ("Well, Your Honor, if you want to ask questions first, pretty much everything we have is contained in our submissions to the Court."), although the Court invited the Parties to submit additional exhibits if they wished, 5/8/2013 Tr. 5:2-24.  On May 14, 2013, the government filed a letter brief addressing certain issues raised during oral argument and appending additional exhibits. Docket No. 362.  On May 16, 2013, Mr. Romano and Mr. Kearney filed supplemental papers. Docket No. 363.

### III.   Discussion

#### a.  Forfeiture Procedure Generally

Pursuant to 28 U.S.C. § 2461(c), "[i]f a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment . . . pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to the Federal Rules of Criminal Procedure."  The government included notice of the forfeiture in the indictment in this case.  Docket No. 168 ¶¶ 21-24.

Some procedures governing criminal forfeiture are set forth in Federal Rule of Criminal Procedure 32.2(b)(1), which provides:

> As soon as practicable after a verdict or finding of guilty, or after a plea of guilty or nolo contendere is accepted, on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal

13

> money judgment, the court must determine the amount of money that the defendant will be ordered to pay. The court's determination may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable. If the forfeiture is contested, on either the party's request the court must conduct a hearing after the verdict or finding of guilty.

Fed. R. Crim. P. 32.2(b)(1). Sentencing courts may thus consider trial evidence in determining forfeiture. See U.S. v. Capoccia, 503 F.3d 103, 109 (2d Cir. 2007).

Second Circuit case law holds that once a defendant is convicted of an offense beyond a reasonable doubt, the government is thereafter only required to establish forfeiture by a preponderance of the evidence. See U.S. v. Bellomo, 176 F.3d 580, 595 (2d Cir. 1999) ("The Supreme Court . . . has determined that criminal forfeiture is part of the process of criminal sentencing. Fact-finding at sentencing is made by a preponderance of the evidence.") (citations omitted); U.S. v. Fruchter, 411 F.3d 377, 383 (2d Cir. 2005); U.S. v. Burden, 600 F.3d 204, 226 (2d Cir. 2010) ("The government had the burden to prove the facts supporting forfeiture by a preponderance of the evidence."); see also 18 U.S.C. § 983(c)(1) ("In a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property . . . the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture . . . ."). As to the amount forfeitable, the government is not required to provide a precise calculation, but at the same time, calculations may not be overly speculative. See U.S. v. Basciano, Case No. 3-CR-929, 2007 WL 29439, at *2 (E.D.N.Y. Jan. 4, 2007).

When multiple defendants have been convicted of a conspiracy offense, it is well established that they are all jointly and severally liable for the total amount of proceeds obtained by the conspiracy. See Fruchter, 411 F.3d at 384; U.S. v. Lemus, Case No. 04-CR-1228, 2008 WL 1944655, at *4 (S.D.N.Y. Apr. 28, 2008) (finding defendant convicted of drug possession

and distribution and conspiracy to possess and distribute to be jointly and severally liable with

his convicted co-defendants for $2,250,000 forfeiture order).

     **b.  The Government's Motion For A Forfeiture Order Under 18 U.S.C. § 981(a)(1)(C) Arising From Defendants' Mail And Wire Fraud Convictions**

          **i.  Civil Forfeiture Law Applicable To Mail And Wire Fraud Convictions**

               **1.  Whether Fraud-related Civil Forfeiture Requires Gross-Proceeds Forfeiture Under 18 U.S.C. § 981(a)(2)(A) Or Net-Proceeds Forfeiture Under 18 U.S.C. § 981(a)(2)(B) Depends On Case-specific Facts**

A jury convicted Mr. Romano and Mr. Kearney of conspiracy to commit mail and wire

fraud beyond a reasonable doubt. <u>Docket No. 295</u>. The government must now prove it is

entitled to the forfeiture it requests as a result of the mail and wire fraud conspiracy convictions

by a preponderance of the evidence under the applicable statutory standard.

Title 18, United States Code, Section 981(a)(1)(C) provides that the following property is

subject to forfeiture to the United States: "[a]ny property, real or personal, which constitutes or is

derived from proceeds traceable to a violation of . . . any offense constituting 'specified

unlawful activity' (as defined in section 1956(c) of [Title 18 of the United States Code]), or a

conspiracy to commit such offense." 18 U.S.C. § 981(a)(1)(C). Title 18, United States Code,

Section 1956(c)(7), in turn, defines a "specified unlawful activity" as an offense listed in Title

18, United States Code, Section 1961(1). <u>See</u> 18 U.S.C. § 1956(c)(7)(A). Mail and wire fraud

are both offenses listed in Title 18, United States Code, Section 1961(1). <u>See</u> 18 U.S.C. §

1961(1). Therefore, conspiracy to commit mail or wire fraud, which is one of the two offenses of

which Mr. Romano and Mr. Kearney have been convicted (the other being conspiracy to commit

money laundering), is a "specified unlawful activity" for the purposes of 18 U.S.C. §

981(a)(1)(C). <u>See</u> 18 U.S.C. § 981(a)(1)(C).

"While § 981(a)(1)(C) is a civil forfeiture provision, it has been integrated into criminal

proceedings via 28 U.S.C. § 2461(c)," which states that "[i]f a person is charged in a criminal

case with a violation of an Act of Congress for which the civil . . . forfeiture of property is

authorized, the Government may include notice of the forfeiture in the indictment . . . pursuant to

the Federal Rules of Criminal Procedure."  <u>U.S. v. Contornis</u>, 692 F.3d 136, 145 n.2 (2d Cir.

2012).  "This roundabout statutory mechanism allows a court to order [civil] forfeiture in

criminal . . . fraud proceedings."  <u>Id.</u>

The critical question—which is much disputed by the Parties—is what "any property . . .

which constitutes or is derived from proceeds traceable to" mail or wire fraud means in 18

U.S.C. § 981(a)(1)(C).  The United States Code establishes a two-pronged definition for the term

"proceeds" as it relates to 18 U.S.C. § 981(a)(1)(C):

(A) In cases involving illegal goods, illegal services, unlawful
activities, and telemarketing and health care fraud schemes, the
term "proceeds" means property of any kind obtained directly
or indirectly, as the result of the commission of the offense
giving rise to the forfeiture, and any property traceable thereto,
and is not limited to the net gain or profit realized from the
offense.

(B) In cases involving lawful goods or lawful services that are sold
or provided in an illegal manner, the term "proceeds" means
the amount of money acquired through the illegal transactions
resulting in the forfeiture, less the direct costs incurred in
providing the goods or services.  The claimant shall have the
burden of proof with respect to the issue of direct costs.  The
direct costs shall not include any part of the overhead expenses
of the entity providing the goods or services, or any part of the
income taxes paid by the entity.

18 U.S.C. §§ 981(a)(2)(A) and (B) (stating that the definitions relate to 18 U.S.C. § 981(a)(1)).

Case 2:09-cr-00168-DMVMS   Document 373   Filed 07/26/43   Page 47 of 49 PageID 12
Case 2:09-cr-00168-SJ-VMS   Document 373   Filed 07/26/13   Page 17 of 49 PageID #: 2612
#: 2661

## 2.  Mr. Romano and Mr. Kearney's Argument That Any Forfeiture Order Be Limited To Net Proceeds Under 18 U.S.C. § 981(a)(2)(B)

Mr. Romano and Mr. Kearney argue that 18 U.S.C. § 981(a)(2)(B)'s definition of "proceeds" applies, which would limit the property forfeitable to "the amount of money acquired through the illegal transactions . . . less the direct costs incurred in providing the goods or services," also known as net proceeds.  Docket No. 356 (citing 18 U.S.C. § 981(a)(2)(B)).  Mr. Romano and Mr. Kearney's net-proceeds theory of forfeiture, if adopted by the Court, would significantly limit their liability in this case.  See id.; see, e.g., Docket Nos. 355-6 (witness testifying that Mr. Romano and Mr. Kearney paid approximately $13,000,000 for their coin inventory, which under a net proceeds calculation would be among the amounts set off against the $32,220,617), and 357-3 (submitting Gov't Trial Exh. 120 to show the Court that Mr. Romano and Mr. Kearney paid coin suppliers $13,621,296.73 for the coins that were the goods sold in the fraud scheme).

Mr. Romano and Mr. Kearney argue that 18 U.S.C. § 981(a)(2)(B) applies because they claim that their offense, which dealt with the sale of "lawful goods"—in this case, coins—is precisely the sort of offense that Congress contemplated would trigger net proceeds forfeiture. As to the facts, they argue that coin experts who testified at trial showed that collectible coins are a lawful commodity.  Docket No. 356.  As to the law, Mr. Romano and Mr. Kearney rely on United States v. Mahaffy, 693 F.3d 113, 137 (2d Cir. 2012).  In Mahaffy, the Second Circuit held that 18 U.S.C. § 981(a)(2)(B), and thus a net-proceeds calculation of the forfeiture amount, applied to the defendants' conspiracy to commit securities fraud because "[t]rading . . . securities, as a general matter, is not unlawful.  Rather, any illegality occurred when the defendants bought and sold securities as part of a scheme involving illegal bribery and

frontrunning." Id. at 138; see U.S. v. Contorinis, 692 F.3d 136, 145 n.3 (2d Cir. 2012) ("We

agree with [Mahaffy] . . . that § 981(a)(2)(B) supplies the definition of 'proceeds' in cases in

involving fraud in the purchase or sale of securities and incorporate by reference the rationale

contained therein.") (citations omitted).  As a result, the Mahaffy Court held that "the proper

measure of forfeiture for each [defendant] is his net, not gross, gain . . . under § 981(a)(2)(B)."

Mahaffy, 693 F.3d at 138.  Mr. Romano and Mr. Kearney argue that their conspiracy to commit

fraud is similar to what occurred in Mahaffy: while they may have sold coins in an illegal way,

coins themselves are a lawful good.[2]

### 3. The Government's Argument That The Court Should Order Gross-Proceeds Forfeiture Under 18 U.S.C. § 981(a)(2)(A)

The government, by contrast, argues for the application of 18 U.S.C. § 981(a)(2)(A);

under this approach, the property subject to forfeiture in this case will "not [be] limited to the net

gain or profit realized from the offense."  Docket No. 355.  In other words, if 18 U.S.C. §

981(a)(2)(A) applies, the Court could order forfeiture of the gross proceeds taken in by the three

---

[2] We do note that the government also briefly argues that 18 U.S.C. § 981(a)(2)(A)'s mandate of gross-proceeds forfeiture applies because Mr. Romano and Mr. Kearney's acts constitute "unlawful activities" under that statute.  Docket No. 355.  In effect, the government argues that mail and wire fraud constitute "specified unlawful activities" under 18 U.S.C. §§ 1956(c) and 1961(1), and that "specified unlawful activities" are the same thing as "unlawful activities" qualifying under the statute.  Id.  In In re 650 Fifth Ave. & Related Properties, 777 F. Supp. 2d 529, 551 (S.D.N.Y. 2011), the Southern District of New York rejected that argument in part because that statutory construction would render other statutory phrases in 18 U.S.C. § 981(a)(2)(A), such as "health care fraud schemes," "superfluous."  See also U.S. v. Kalish, Case No. 06-CR-656, 2009 WL 130215, at *7 (S.D.N.Y. Jan. 13, 2009) (holding that if Congress wanted "specified unlawful activities" to meet the definition of "unlawful activities" for the purposes of 18 U.S.C. § 981(a)(2)(A), Congress would have put that precise term in the statute); cf. U.S. v. All Funds on Deposit in United Bank of Switzerland, 188 F. Supp. 2d 407 (S.D.N.Y. 2002) (holding that gross proceeds calculation applied because currency transfers were "specified unlawful activities" and therefore "unlawful activities" under 18 U.S. § 981(a)(2)(A)).  We agree with the conclusion of In re 650 Fifth Ave. & Related Properties, 777 F. Supp. 2d at 551, and find that 18 U.S.C. § 981(a)(2)(A) should not be read to render the phrase "telemarketing schemes" superfluous.

companies under the auspices of which Mr. Romano and Mr. Kearney committed mail or wire fraud.  Id.  This would result in a larger judgment for the government than would a net-proceeds calculation.  The government claims that trial evidence proves that the scheme to defraud, and the mail and wire fraud and money laundering conspiracies, lasted from August 2000 until November 24, 2008, and that bank records show that the three companies' gross proceeds during this period totaled $32,220,617.  Id.

The government highlights that 18 U.S.C. § 981(a)(2)(A) expressly applies to cases involving "telemarketing . . . schemes."  Docket No. 355.  The government emphasizes that Mr. Romano and Mr. Kearney's convictions for conspiracy to commit mail or wire fraud were premised on Mr. Romano and Mr. Kearney's telemarketing scheme to defraud coin purchasers.  See Docket No. 168.  As a result, the government reasons that 18 U.S.C. § 981(a)(2)(A)'s definition of "proceeds" governs here.  Docket No. 355.

### 4. Section 981(a)(2)(A) of Title 18 of the United States Code Provides For Gross-Proceeds Forfeiture In This Case

#### a. Mr. Romano And Mr. Kearney Were Convicted Of A Telemarketing Scheme

The view that Mr. Romano and Mr. Kearney's conviction was for a telemarketing scheme such that forfeiture of gross proceeds is required, and not net proceeds, better reflects the law and facts.  This conclusion arises from the clear record that Mr. Romano and Mr. Kearney's convictions were founded on a determination by a jury that they engaged in a telemarketing scheme.  The indictment stated that "[a]s part of the scheme to defraud, the defendants either personally telephoned potential customers or instructed employees under their supervision to telephone potential customers and offered coins for sale during sales pitches."  Docket No. 168 ¶ 12.  At trial, no fewer than eight witnesses testified that the three companies were telemarketing

19

businesses.[3]  Before the jury began deliberations, District Judge Bianco instructed the jurors and

gave a complete recitation of the indictment, which included the following description of the

alleged crime:  "As part of the scheme to defraud, the defendants either personally telephoned

potential customers or instructed employees under their supervision to telephone potential

customers and offered coins for sale during sales pitches."  Docket No. 291, Court Exh. F, p. 43.

"The defendants and those acting at their direction falsely informed the customers that the

[coins] being offered for sale were [a particular rating], when actually the condition of the [coins]

was of lesser quality."  Id.  On the basis of the aforementioned indictment, trial evidence and jury

instructions, the jury found Mr. Romano and Mr. Kearney guilty of conspiracy to commit mail

and wire fraud.   Docket No. 291.

It is notable that in United States v. Romano, 859 F. Supp. 2d 445, 451 (E.D.N.Y. 2012),

District Judge Joseph F. Bianco, who presided over the trial, denied Mr. Romano and Mr.

Kearney's motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal

Procedure, stating that "[t]he evidence at trial showed that defendants conspired to devise and

implement a scheme."  District Judge Bianco stressed that the trial evidence supporting

Defendants' convictions included witness testimony from several former customers and

---

[3] See, e.g., Tr. 471:23 (testimony of Wall Street Rare Coins secretary Krystal Schmidt that Wall Street Rare Coins was in the business of telemarketing coins); Tr. 716:6 (testimony of Postal Inspector Louis LaFleur that Northeast Gold and Silver "was a telemarketing operation"); Tr. 819:20, 820:2-8 (testimony of Police Officer Adam M. Quinones that Atlantic Coin Galleries was a "telemarketing operation," which he surmised because there were multiple phones present in a room to the rear of the storefront where people were sitting at the desks making calls); Tr. 841:6 (testimony of Wall Street Rare Coins employee Patrick Coleman stating that he was not shown any coin inventory before he began his job of telemarketing coins); Tr. 1099:22 (testimony of Atlantic Coin Galleries employee Daren Mutone stating that he began working for Atlantic Coin Galleries after answering an advertisement for telemarketers); Tr. 1690:21-1691:25 (testimony of co-Defendant Jarrett Stretch about what the telemarketing floor was like); Tr. 2244:11-2247:3 (testimony of Mr. Romano and Mr. Kearney's employee Robert Lepolszki describing his experience telemarketing coins for them); Tr. 2429:11 (testimony of Wall Street Rare Coins employee John McNerney about his telemarketing work for that company).

employees of Defendants' companies.  Id. District Judge Bianco did not expressly use the phrase "telemarketing scheme," but the customer and employee testimony to which he referred in his ruling was replete with information that the fraud committed was a telemarketing scheme throughout the years of the three companies' existence.  See, e.g., Section II.b.

### b. The Plain Language Of 18 U.S.C. § 981(a)(2)(A) Shows That Any Forfeiture Order Premised On the Telemarketing Fraud Scheme Convictions Should Be Calculated From Gross Proceeds

The plain language of 18 U.S.C. § 981(a)(2)(A) shows that "telemarketing and health care schemes" were specifically singled out by Congress for gross-proceeds forfeiture treatment. 18 U.S.C. § 981(a)(2)(A).  In In re 650 Fifth Ave. & Related Properties, 777 F. Supp. 2d 529, 551-52 (S.D.N.Y. 2011), the Southern District of New York held that it was necessary to interpret the statute thus in order to avoid rendering the phrase "health care fraud schemes" in 18 U.S.C. § 981(a)(2)(A) superfluous.  This Court finds the same to be true for the phrase "telemarketing . . . schemes" that Congress placed alongside the phrase "health care fraud schemes" in the gross-proceeds statute.

### c. Legislative History Shows That 18 U.S.C. § 981(a)(2)(A) Requires Gross-Proceeds Forfeiture For Telemarketing Fraud Scheme Convictions

The legislative history of civil and criminal federal forfeiture statutes supports this reading of the text.  Congress added "telemarketing and health care fraud schemes" as offenses requiring gross-proceeds forfeiture to 18 U.S.C. § 981(a) in the "Civil Asset Forfeiture Reform Act of 2000," PL 106-185, 2000 H.R. 1658.  With that amendment, Congress brought the civil forfeiture statute into line with the criminal forfeiture statute which had itself been amended just two years earlier by the "Telemarketing Fraud Prevention Act of 1998," PL 105-184, 1998 H.R. 1847, to also provide for recovery constituting the gross proceeds that the defendant obtained

directly or indirectly as a result of the offense.

Some anecdotal legislative history reveals Congress's purpose in adding the telemarketing scheme/gross proceeds language to 18 U.S.C. § 981(a)(2)(A). For example, when weighing whether to pass 18 U.S.C. § 981(a)(2)(A), Congress heard testimony about the role of forfeiture law in recovering property lost "in a telemarketing scam and return[ing] it to the elderly victims," Civil Asset Forfeiture Reform Act: Hearing Before the Committee on the Judiciary, House of Representatives, 105th Cong. 61 (1997) (Statement of Stefan D. Cassella, Assistant Chief, Justice Department Criminal Division's Asset Forfeiture and Money Laundering Section). Then-U.S. Deputy Attorney General Eric H. Holder, Jr., urged Congress to expand forfeiture law so that it could be a more meaningful remedy for telemarking victims. See Federal Asset Forfeiture: Hearing before the Committee on the Judiciary, United States Senate, 106th Cong. 16 (1999) (Statement of Eric H. Holder, Jr., then-United States Justice Department Deputy Attorney General).

On the occasion of the passage of the modern language in 18 U.S.C. § 981(a)(2)(A) by the United States Congress, United States Senator Patrick Leahy (D-VT) read the following into the Congressional Record:

> [The new law] brings clarity and fairness to the confused body of case law concerning the definition of criminal proceeds. Specifically, in cases involving lawful goods or services that are sold or provided in an illegal manner, the term 'proceeds' is defined to mean the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services. An exception is made for caseus involving certain health care fraud schemes, since it would make no sense to allow those who provide unnecessary services to deduct the cost of those unnecessary services.

146 Cong. Rec. S. 1753, *1761 (2000). Senator Leahy did not make a similar specific pronouncement highlighting telemarketing schemes, but as telemarketing schemes were included

alongside health-care fraud schemes to a special family of crimes requiring gross-proceeds forfeiture, Senator Leahy's emphasis on denying overhead deductions for certain categories appears to apply with equal force against telemarketers. There is no evident reason why a defendant should receive credit for the costs of operating a telemarketing scheme, the purpose of which was to induce unwary buyers to make unnecessary purchases.

Further support for the Court's opinion that 18 U.S.C. § 981(a)(2)(A) requires gross-proceeds forfeiture calculation here comes from the fact that Congress also amended criminal forfeiture law 18 U.S.C. § 982(a)(8) just two years before it amended civil forfeiture law 18 U.S.C.§ 981(a)(2)(A); the revised 18 U.S.C. § 982(a)(8) requires gross-proceeds forfeiture in the event of telemarketing offenses:

> [t]he court, in sentencing a defendant convicted of an offense under section . . . 1341 [the mail fraud statute, or] 1343 [the wire fraud statute] . . . , or of a conspiracy to commit such an offense, if the offense involves telemarketing (as that term is defined in section 2325), shall order that the defendant forfeit to the United States any real or personal property . . . constituting, derived from, or traceable to the gross proceeds that the defendant obtained directly or indirectly as a result of the offense.

18 U.S.C. § 982(a)(8).[4] Title 18 of the United States Code, Section 2325, in turn, defines "telemarketing" as a "plan, program, promotion, or campaign that is conducted to induce . . . purchases of goods or services . . . ." 18 U.S.C. § 2325(1)(A).

Mr. Romano and Mr. Kearney's actions in the instant case—conspiring to commit mail

---

[4] The traditional difference between civil and criminal forfeiture is that civil forfeiture is an <u>in rem</u> action, while criminal forfeiture is an <u>in personam</u> action. <u>See</u> <u>U.S. v. Bajakajian</u>, 524 U.S. 321, 331 n.6 (1998). In addition, criminal forfeiture proceedings require as a predicate that the subject defendant be convicted of a crime beyond a reasonable doubt, <u>U.S. v. Sabhnani</u>, 566 F. Supp. 2d 148, 150 (E.D.N.Y. 2008), which civil forfeiture proceedings do not, <u>U.S. v. U.S. Currency in the Amount of $228,536</u>, 895 F.2d 908, 916 (2d Cir. 1990). Here, in the context of Defendants' wire and mail fraud conspiracy convictions, the government seek civil forfeiture. <u>Docket No. 355</u>.

or wire fraud by either personally telephoning, or causing third persons to telephone, individuals including elderly persons to induce their purchase of coins through a fraudulent representation that the coins were of a particular quality (which they were not) and that the three companies would aid the purchaser in reselling the coins at a profit (which they did not)—meets the 18 U.S.C. § 2325(1)(A)—and by extension, 18 U.S.C. § 982(a)(8)—telemarketing-scheme definition.  Given Congress's use of the same language in 18 U.S.C. § 981(a)(2)(A) as in 18 U.S.C. § 982(a)(8), it would appear that civil forfeiture provision is meant to capture the same conduct as in 18 U.S.C. § 982(a)(8).

Courts have similarly borrowed definitions for civil-forfeiture terms from criminal-forfeiture statutes in the past, and vice versa.  See U.S. v. Contents of Smith Barney Citigroup Account No. 34-19, 482 Fed. Appx. 134, 137 n.2 (6th Cir. 2012) ("The civil-forfeiture statute, 18 U.S.C. § 983, does not provide a definition of 'bona fide purchaser for value,' so courts have borrowed the definition from the [criminal-forfeiture law the] Continuing Criminal Enterprise Act, 21 U.S.C. § 853(n)(6)(B)."); U.S. v. Herder, 594 F.3d 352, 364 (4th Cir. 2010) ("We have never adequately articulated the proper standard for the requisite nexus between property and crime under [criminal forfeiture statute] § 853. We now expressly adopt the 'substantial connection' standard from case law interpreting nearly identical civil forfeiture language in 21 U.S.C. § 881.").   The Court therefore finds that Mr. Romano and Mr. Kearney's actions in the instant case meet the definition of a qualifying telemarketing scheme for the purposes of 18 U.S.C. § 981(a)(2)(A).  Because their conviction falls under 18 U.S.C. § 981(a)(2)(A), Mr. Romano and Mr. Kearney should forfeit the gross proceeds of their scheme.

### 5. This Court Recommends That The District Judge Enter A Forfeiture Order Calculated From The Gross Proceeds Obtained Directly Or Indirectly As A Result Of The Mail And Wire Fraud

In light of the foregoing, this Court respectfully recommends that the District Judge **find** that it has been proved by a preponderance of the evidence that Mr. Romano and Mr. Kearney's convictions for mail and wire fraud are founded on a telemarketing scheme, and accordingly **grant** the government's motion for a forfeiture order calculated on the basis of the three companies' gross proceeds as 18 U.S.C. § 981(a)(2)(A) requires when a telemarketing scheme is at issue.

### ii. Whether Forfeiture Order Must Be Limited To Property Obtained From The Nine Specific Fradulent Transactions Discussed At Trial Or Whether It May Include Property Obtained From The Broader Telemarketing Scheme

### 1. Mr. Romano and Mr. Kearney's Argument That The Forfeiture Order Must Be Limited To Gross Proceeds Obtained From The Nine Victims Who Testified At Trial

Mr. Romano and Mr. Kearney emphasize that at trial the government only put on specific evidence as to Mr. Romano and Mr. Kearney defrauding nine customers from August 2000 through November 24, 2008. <u>Docket No. 356</u>. According to Mr. Romano and Mr. Kearney, this means that the government proved nothing with respect to Mr. Romano and Mr. Kearney's other 1,391 known customers such that the Court should therefore only order forfeiture of proceeds relating to those nine customers. <u>Id.</u> They reason that even if gross proceeds were to be forfeited, it can only be the gross proceeds as to the nine customers' transactions. Mr. Romano and Mr. Kearney further argue that as trial evidence showed that grading coins is an imperfect art, there is no way to extrapolate from the nine customers' experiences discussed at trial that Mr. Romano and Mr. Kearney's 1,391 other customers were also defrauded. <u>Id.</u>

2. **The Government's Argument That The Forfeiture Order Must Include Property Obtained From The Broader Telemarketing Scheme Proven By A Preponderance Of The Evidence**

In response the government argues, "[t]he jury rejected the testimony of Defendants' experts with regard to the legitimacy of the business . . . ." Docket No. 358. The government points to the testimony of Mr. Mutone and Mr. Stretch, two telemarketers working for Mr. Romano and Mr. Kearney, to show that evidence was adduced at trial to show that the fraudulent telemarketing scheme infected the whole business, not just the transactions relating to the nine particular victims' transactions. Docket No. 355 (citing to Tr. 1152-59, 1212, 1615-1619, 1640-1643).

3. **A Forfeiture Order Including Proceeds Obtained From The Full Telemarketing Scheme Is Proper**

a. **Mr. Romano And Mr. Kearney Stand Convicted Of A Scheme**

Mr. Romano and Mr. Kearney stand convicted of conspiracy to commit mail or wire fraud, which as a matter of law means that they stand convicted of a scheme. See U.S. v. Capoccia, 503 F.3d 103, 112 (2d Cir. 2007) (examining the language of 18 U.S.C. §§ 1341 and 1343). Conspiracy to commit mail or wire fraud criminalizes schemes. See 18 U.S.C. § 1341 ("Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses . . . ."); 18 U.S.C. § 1343 ("Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses . . . ."); Capoccia, 503 F.3d at 112 (examining the language of 18 U.S.C. §§ 1341 and 1343); U.S. v. Schwartz, 924 F.2d 410, 420 (2d Cir. 1991) ("An essential element of the crimes of mail and wire fraud is a scheme."); U.S. v. Ashley, 905 F. Supp. 1146, 1156 (E.D.N.Y. 1995) (detailing the scheme

26

alleged by an indictment's wire fraud charges).

The record also shows that the jury rendered a verdict against Mr. Romano and Mr. Kearney based on evidence that their conspiracy to commit mail or wire fraud was a scheme. First, the actual charging portion of Count One of the indictment alleged that Mr. Romano and Mr. Kearney devised a scheme to defraud the three companies' customers. See Docket No. 168 ¶ 18; Capoccia, 503 F.3d at 111-12 (noting that the charging portion of the indictment in that case did not charge a scheme: "Nothing in [the indictment's] language . . . suggests that [specific] payments are illustrative of a scheme or that the list is otherwise non-exhaustive.").  The indictment did not posit that Mr. Romano and Mr. Kearney's scheme was composed of nine discrete violations and nothing more; in fact, the trial evidence showed that the nine violations were meant to be illustrative, not exhaustive, of the three companies' general modus operandi. Docket No. 168.  Second, the jury instructions explained to the jurors that they "need not find . . . every precise detail of the scheme or the means by which its object or purpose was to be accomplished."  Docket No. 291 (containing the jury instructions at Court Trial Exh. F).  Third, the jury found that the government proved Mr. Romano and Mr. Kearney guilty on Count One's allegations that they conspired to commit mail or wire fraud beyond a reasonable doubt. Docket No. 295.  Fourth, District Judge Bianco, in denying Mr. Romano and Mr. Kearney's motions for judgment of acquittal, held that "[t]he evidence at trial showed that defendants conspired to devise and implement a scheme to defraud coin purchasers of money and property by the sale of coins at highly inflated prices by means of false and fraudulent representation." U.S. v. Romano, 859 F. Supp. 2d 445, 451 (E.D.N.Y. 2012).  No more is needed to determine that a scheme took place.

**b. The Fact That Mr. Romano And Mr. Kearney Stand Convicted Of A Scheme Means That Forfeiture Under 18 U.S.C. § 981(a)(1)(C) Need Not Be Limited To Property Constituting Proceeds Of Individual Transactions Proven At Trial, But May Include Property Constituting Scheme Proceeds**

Mr. Romano and Mr. Kearney's conviction for executing a fraudulent scheme is relevant in light of the Second Circuit in <u>Capoccia</u> stating that the government under such circumstances is entitled under 18 U.S.C. § 981(a)(1)(C) to the proceeds of unproven substantive acts relating to an enterprise when the "conviction itself is for executing a scheme, conspiracy, or conducting a racketeering enterprise . . . ." <u>U.S. v. Capoccia</u>, 503 F.3d 103, 117-18 (2d Cir. 2007). In order to obtain such a forfeiture order, <u>Capoccia</u> instructed, the government need only establish by a preponderance of the evidence that the forfeited assets have the "requisite nexus," Fed. R. Crim. P. 32.2(b)(1), to that scheme, conspiracy or enterprise. <u>Id.</u>

There is further precedent for such an approach to forfeiture when dealing with a mail or wire fraud scheme such as this one. In <u>United States v. Fruchter</u>, 411 F.3d 377, 379-80 (2d Cir. 2005), the Second Circuit rejected the proposition that in a RICO case the government could obtain forfeiture of property "only by reference to conduct that had been proved to the jury beyond a reasonable doubt." In <u>Fruchter</u>, the district court had ordered forfeiture for conduct for which the defendant had actually been acquitted. The Second Circuit held that "it seems plain" that proceeds from the activities of which a defendant has been acquitted can still be forfeited as proceeds of racketeering activity. <u>See id.</u> at 384; <u>see also</u> <u>U.S. v. Genova</u>, 333 F.3d 750, 762 (7th Cir. 2003) ("The fact that [the defendant] was acquitted of counts charging that he devoted the City's resources to his home-improvement projects does not eliminate all possibility of a

28

forfeiture based on these activities." ).[5]  Such a defendant "is not being punished for committing the substantive acts found to be 'not proven.' He is being punished for conducting the affairs of an enterprise through a pattern of racketeering activity."  Fruchter, 411 F.3d at 384 (citing U.S. v. Edwards, 303 F.3d 606, 643 (5th Cir. 2002)).

Yet another example of this doctrine at work appears in United States v. Kahale, Case No. 09-CR-159, 2010 WL 3851987, at *31 (E.D.N.Y. Sept. 27, 2010), in which the district court stated that all funds shown at trial to have been obtained by a defendant relating to a scheme to defraud have the requisite nexus to the scheme to justify a forfeiture order, even when the related conduct was not catalogued in the indictment.  "A common-sense reading of the plain language of the Indictment, the applicable rules, and relevant case law . . . demonstrate that the properly forfeitable property in this case . . . should encompass all funds obtained as part of the overall scheme to defraud, of which all defendants were convicted."  Id.

The Kahale Court reached that conclusion on the basis of Capoccia, 503 F.3d at 110, citing it for the Second Circuit's language that "[w]here the conviction itself is for executing a scheme, engaging in a conspiracy, or conducting a racketeering enterprise, the government need only establish that the forfeited assets have the 'requisite nexus,' Fed. R. Crim. P. 32.2(b)(1), to that scheme, conspiracy, or enterprise."  Kahale, 2010 WL 3851987, at *30. "Thus, although defendants generally cannot be ordered to forfeit funds which are proceeds of uncharged or acquitted conduct, where an indictment charges a conspiracy or scheme to defraud, the proceeds

---

[5] "The government enjoys a number of advantages in civil asset forfeiture that make it more attractive to prosecutors than its rarely used criminal counterpart. Of utmost significance is the fact that, unlike criminal forfeiture, civil forfeiture does not require a criminal conviction. Civil forfeiture does not even require that criminal charges be brought at all. Indeed, the alleged offender may even be acquitted on the same criminal charges on which a successful civil forfeiture action may be premised."  Jimmy Gurulé, Sandra Guerra Thompson, & Michael O'Hear, The Law of Asset Forfeiture § 1-5 (2d ed. 2004).

of uncharged or acquitted conduct may become forfeitable because the government may be able to prove that money 'involved in the uncharged or acquitted [conduct] nevertheless constituted the proceeds of, or was traceable to, or was involved in, the [conspiracy or scheme to defraud] crime of conviction." Id. at *30 (discussing Capoccia, 503 F.3d at 117).

> **c.  The Court Finds By A Preponderance Of The Evidence That Mr. Romano And Mr. Kearney Knew That The Three Companies' Operations Were A Corrupt Fraudulent Scheme Beyond The Nine Specific Victims Who Testified At Trial**

The Court may order property forfeited beyond the nine examined transactions "so long as the sentencing court finds by a preponderance of the evidence that the criminal conduct through which the proceeds were made was foreseeable to the defendant." Fruchter, 411 F.3d at 384; see U.S. v. Gotti, 459 F.3d 296, 347 (2d Cir. 2006) (holding that although the defendant was not charged or convicted of a particular offense, he could have foreseen that the racketeering enterprise would commit that offense and that that foreseeability justified a court order directing forfeiture of related proceeds).

The Second Circuit has approved a broad-based forfeiture order of the kind contemplated here on similar facts.  In U.S. v. Kalish, 626 F.3d 165, 168 (2d Cir. 2010), the jury found the defendant guilty of wire and mail fraud due to fraudulent statements made to induce customers' patronage, and the district court ordered the forfeiture of fees paid by all customers.  The defendant protested that "only a few customers testified that false promises had been made to them" such that forfeiture corresponding to any transaction other than one of the transactions shown at trial was improper.  Id. The Second Circuit, with substantial reliance on Fruchter, upheld the district court's forfeiture order, stating that "[i]n view of the abundant evidence that false promises were routinely made to [the defendant's] customers to induce them to pay [the

fees], the District Court's decision to base the forfeiture amount" on a swath of customers regardless of whether there was particularized proof that they had suffered fraud "will not be disturbed." Id.; see U.S. v. Nicolo, 597 F. Supp. 2d 342, 347 (W.D.N.Y. 2009) ("[I]t is irrelevant, for forfeiture purposes, whether a defendant convicted of fraud in connection with a kickback scheme actually performed any of the services that he contracted to perform as a result of the scheme. Again, monies paid to a defendant as a result of the scheme are 'proceeds' subject to forfeiture, without regard to whether the victim received anything in return.").

Here, the trial record similarly shows by a preponderance of the evidence, through the testimony of the three companies' employees, that the scheme to defraud was systemic and that the scope of the scheme was known to Mr. Romano and Mr. Kearney.[6] The trial record also shows by a preponderance of the evidence that a nexus exists between the three companies' corrupted operations and $32,220,617 in gross proceeds from the period relevant to the offense. Tr. 2518-2519, 2521-2522. Because as a scheme the three companies had no legitimate ends, the Court finds by a preponderance of the evidence that the $32,220,617 in gross proceeds of the three companies were obtained directly or indirectly as a result of the commission of the fraudulent telemarketing scheme and should be forfeited.

---

[6] See Tr. 846:22, 855:14; Tr. 851:9-14; Tr. 876:10-15 (Patrick Coleman's testimony that he made approximately 25,000 telemarketing calls over the course of three years; that it was a running joke in the office that the coins were overgraded; and that Mr. Romano specifically instructed him to misrepresent a coin grade); Tr. Tr.1099:17-20; Tr. 1128:5-1131:5; Tr. 1157:12-21, 1159:18-24, 1160:8-13 (Daren Mutone's testimony that he worked under Mr. Romano and Mr. Kearney for three years; that Mr. Romano and Mr. Kearney would sing a song ridiculing their fraud victims; and that Mr. Kearney opined that the companies' victims, by virtue of their age, were "gullible" and "easier to push around"); Tr. 1615:13, 1618:2-3, 1618:5, 1619:6, 1633:12-13; Tr. 1632:18-21; Tr. 1640:21-1641:10; Tr. 1669:6, 1670:7-9; 1673 (Jarret Stretch's testimony that he worked for the defendants for roughly three years; that Mr. Romano and Mr. Kearney wrote the sales pitches and listened in on some percentage of the hundreds of telemarketing calls made daily; and that Mr. Romano and Mr. Kearney called customers "stupid," "morons," and "retards"). See Section II.b., supra.

31

4. **This Court Recommends That The District Judge Enter A Forfeiture Order In The Amount Of $32,220,617, Which Represents Property Obtained From The Defendants' Entire Telemarketing Scheme**

In light of the foregoing, the Court respectfully recommends that the District Judge **find** that Mr. Romano and Mr. Kearney stand convicted of a telemarketing fraud scheme; that the District Judge **find** that the forfeiture calculation not be limited to the nine testifying victims' transactions; that the District Judge **find** that Mr. Romano and Mr. Kearney knew that the telemarketing scheme permeated the three companies' operations; that the District Judge **find** that the gross proceeds of the three companies' transactions over the course of the telemarketing scheme were $32,220,617, <u>see</u> Tr. 2518-2519, 2521-2522; and that the District Judge **grant** the government's motion for a forfeiture order in the amount of $32,220,617 as the amount of property obtained directly or indirectly as a result of Mr. Romano and Mr. Kearney's mail and wire fraud conspiracy.

c. **The Government's Motion For A Forfeiture Order Under 18 U.S.C. § 982(a)(2) Arising From Defendants' Money Laundering Convictions**

i. **Criminal Forfeiture Law Generally Applicable To Money Laundering**

The government seeks forfeiture based on Mr. Romano and Mr. Kearney's conspiracy to commit money laundering convictions under 18 U.S.C. §§ 1956(h), 1956(a)(1)(A), 1957(b), and 1957(d)(1).  <u>Docket No. 355</u>.  Title 18, United States Code, Section 982(a)(1) provides that district courts, "in imposing sentence on a person convicted of section 1956 . . . of this title, shall order that the Person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1). As Mr. Romano and Mr. Kearney have been convicted of conspiracy to commit money laundering under 18 U.S.C. § 1956(h), <u>Docket Nos. 168, 195</u>, 18 U.S.C.§ 982(a)(1) governs the government's forfeiture

motion as to Mr. Romano and Mr. Kearney's conspiracy to commit money laundering offense.

The term "involved in" has consistently been interpreted broadly by courts "to include any property involved in, used to commit, or used to facilitate the money laundering offense." Nicolo, 597 F. Supp. 2d at 347-48 (quoting U.S. v. Schlesinger, 396 F. Supp. 2d 267, 271 (E.D.N.Y. 2005)); see U.S. v. Huber, 404 F.3d 1047, 1056 (8th Cir. 2005); U.S. v. Puche, 350 F.3d 1137 (11th Cir. 2003); U.S. v. McGauley, 279 F.3d 62, 76 n.14 (1st Cir. 2002). "[T]he term 'traceable to' means exactly what it says . . . that the property has some nexus to the property 'involved in' the money laundering offense." U.S. v. Voigt, 89 F.3d 1050, 1087 (3d Cir. 1996). "[A] defendant [must] forfeit a very specific amount—the proceeds of his criminal activity . . . even in cases of insolvent defendants." U.S. v. Casey, 444 F.3d 1071, 1076 (9th Cir. 2006).

> ### ii. The $32,220,617 That Cycled Through The Three Companies' Bank Accounts Was "Involved In" The Money Laundering Offense Because Its Presence In the Bank Accounts Where the Money Laundering Took Place Facilitated The Crime

> > #### 1. Mr. Romano And Mr. Kearney's Argument That Only Property Actually Laundered Was "Involved In" The Money Laundering Conspiracy Is Forfeitable

Mr. Romano and Mr. Kearney argue that the jury made no particularized findings as to how much fraudulently obtained money Mr. Romano and Mr. Kearney laundered such that the Court cannot know what amounts in Mr. Romano and Mr. Kearney's bank accounts were used for such purpose (and therefore may be forfeitable), and which amounts were not. Docket No. 357.

> > #### 2. The Government's Argument That All $32,220,617 Present In The Three Companies' Bank Accounts Is Forfeitable As "Involved In" The Money Laundering Conspiracy That Took Place In Those Accounts Because It Facilitated The Money Laundering Conspiracy By Obscuring The Laundering

The government relies on a theory of "facilitation" to support its request for $32,220,617

in forfeited property stemming from the money laundering conspiracy convictions. The government states that as the "only source of income for the three companies was through the fraudulent sale of coins to customers," "the gross proceeds generated by the three companies represent the proceeds of the mail fraud, wire fraud and money laundering conspiracies." Docket No. 355. The record shows that the three companies had $32,220,617 in their operating accounts during the relevant period. Id. The government points out that the Hessle money laundering chart for Mr. Romano, and the Hessle money laundering chart for Mr. Kearney show that from 2001 to 2008 at least $3,558,458.73 was laundered in the same accounts. Docket Nos. 362-1, 362-2. In effect, then, the government's argument is that the three companies' gross proceeds were "involved in" the conspiracy to commit money laundering by virtue of co-mingling with the laundered funds. Docket No. 355.

### 3. The Court's Analysis Of Facilitation Theory

#### a. Facilitation Theory Permits Unlaundered Money To Be Forfeited As "Involved In" Money Laundering If Its Commingling With Laundered Funds Facilitated The Offense

In United States v. Nicolo, 597 F. Supp. 2d 342, 348-51 (W.D.N.Y. 2009), the Western District of New York elaborated upon and endorsed a theory of "facilitation" in the context of forfeiture. The court stated that "[f]acilitation occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance." Id. at 348 (quoting U.S. v. Wyly, 193 F.3d 289, 302 (5th Cir. 1999)). Nicolo held that "it is not necessary for the government to prove that the funds that are being proposed for forfeiture could not possibly have come from any source other than [the defendant's] unlawful [laundering] activity." Id. at 354-55 (citations & quotations omitted). "The fact that [the defendant's] bank accounts may have contained some untainted funds cannot in itself defeat the government's forfeiture claim; were it

34

otherwise, it would be all too easy to avoid the reach of the forfeiture statutes." Id.

The Eastern District of New York also had occasion to apply the forfeiture facilitation theory to a money laundering offense in United States v. Certain Funds on Deposit in Account No. 01-0-71417, 769 F. Supp. 80, 84 (E.D.N.Y. 1991) (hereinafter "Certain Funds"), where the government sought the forfeiture of various bank accounts containing a mix of legitimately obtained and illegitimately obtained funds. In granting the government's request for an order directing the forfeiture of the accounts' full amounts, this Court stated that:

> [L]imiting the forfeiture of funds under these circumstances to the proceeds of the initial fraudulent activity would effectively undermine the purpose of the forfeiture statute. Criminal activity such as money laundering largely depends upon the use of legitimate monies to advance or facilitate the scheme. It is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue.

Id. at 84-85 (citing U.S. v. Tencer, 107 F.3d 1120, 1135 (5th Cir. 2007));[7] U.S. v. Puche, 350 F.3d 1137, 1153-54 (11th Cir. 2003) (affirming district court's forfeiture order that included $1,606,318.60 in legitimate funds that shared bank accounts with narcotics proceeds because "both legitimate and illegitimate [money was] rapidly moved into bank accounts in order to conceal the nature and source of the narcotics proceeds [such that] the jury could have inferred that the legitimate proceeds facilitated the illegal proceeds by acting as a 'cover' and hence reduced suspicion of the latter's source"); U.S. v. Hasson, 333 F.3d 1264, 1279 (11th Cir. 2003) ("Property is 'involved in' a money laundering transaction if the transaction involves the proceeds of mail or wire fraud and the transaction had the purpose of concealing the proceeds or

---

[7] Cf. Marine Midland Bank v. U.S., 1993 WL 158542, at *7 (S.D.N.Y. May 11, 1993), adhered to on reconsideration, 1993 WL 248796 (June 28, 1993), aff'd in part, remanded in part, 11 F.3d 1119 (2d Cir. 1993) (refusing to authorize the forfeiture of the entire contents of an interbank account whose contents included proceeds of drug sales, but where the court distinguished Certain Funds because it dealt with bank accounts "controlled by the perpetrators of an alleged fraud and allegedly used by them to launder the proceeds of such fraud").

promoting the mail or wire fraud . . .").

This Court agrees with logic of <u>Nicolo</u> and similar cases. Unlaundered money may be forfeited as a matter of law if its commingling with laundered funds facilitated the laundering crime.

> **b. The Court Finds By A Preponderance Of The Evidence That $32,220,617 In The Three Companies' Operating Accounts Facilitated The Laundering Of $3,558,458.73 Occurring In Those Three Accounts**

As discussed in <u>Nicolo</u>, the facilitation doctrine is to be applied broadly. "The only issue before the Court at this juncture [is] whether the government has sufficiently established the requisite nexus between the [bank accounts] and [the defendant's] violation to justify forfeiture [of the bank accounts]." <u>Nicolo</u>, 597 F. Supp. 2d at 353. A court must be satisfied by a preponderance of the evidence that the proposed forfeiture amount was either "involved in" the conspiracy to commit money laundering, or "traceable to" property involved in the conspiracy to commit money laundering. <u>U.S. v. Schlesinger</u>, 396 F. Supp. 2d 267, 279 (E.D.N.Y. 2005).

There is a preponderance of the evidence that there was $32,220,617 in the three companies' operating accounts, Tr. 2518-2519, 2521-2522; that Mr. Romano and Mr. Kearney had control of these same accounts, <u>Docket Nos. 362-1, 362-2</u>; and that Mr. Romano and Mr. Kearney's transfer of $3,558,458.73 from these same accounts was money laundering, <u>id.</u> <u>See</u> Section II.c., <u>supra</u>. The Court accordingly finds that the $32,220,617 should be forfeited as "involved in" Defendants' money laundering conspiracy offense under facilitation theory. <u>Docket No. 362-1, 362-2</u>.

### 4. This Court Recommends That the District Judge Enter A Forfeiture Order In The Amount Of $32,220,617, Which Represents Property "Involved In" The Defendants' Money Laundering Conspiracy Under A Facilitation Theory

In light of the foregoing, the Court respectfully recommends that the District Judge **find** that the forfeiture calculation relating to the money laundering conspiracy convictions not be limited to money actually laundered as a matter of law; that the District Judge **find** that money in the accounts where laundering took place can be forfeited as a matter of law under facilitation theory; that the District Judge **find** by a preponderance of the evidence that the three companies' operating accounts contained a total of $32,220,617 in earnings for the period in question; that the District Judge **find** by a preponderance of the evidence that Mr. Romano and Mr. Kearney laundered money in all three companies' operating accounts, thereby facilitating the money laundering conspiracy by the presence of the $32,220,617 in the same accounts; and that the District Judge **grant** the government's motion for a forfeiture order in the amount of $32,220,617 as having been "involved in" Mr. Romano and Mr. Kearney's money laundering conspiracy pursuant to 18 U.S.C. § 982(a)(1).

### d. Mr. Romano And Mr. Kearney Need Not Have Had The $32,220,617 In Their Personal Possession For The Recommended Forfeiture Order To Enter

The Court notes that it is irrelevant whether Mr. Romano or Mr. Kearney individually had all $32,220,617 in their personal possession at any given time. "While property need not be personally or directly in the possession of [a] defendant, the property must have, at some point, been under the defendant's control or the control of his co-conspirators in order to be considered acquired by him." U.S. v. Contorinis, 692 F.3d 136, 147 (2d Cir. 2012); see U.S. v. Gonzalez, Case No. 06-CR-726; 2008 WL 3914877, at *8 (S.D.N.Y. 2008) (denying a defendant's motion to strike a forfeiture order on the grounds that the indictment did not alleged that the defendant

37

Case 2:09-cr-00168-SJVM-MS  Document 373  Filed 07/26/12  Page 38 of 49 PageID #: 2682

ever received the money, because "[a] defendant need not receive or possess proceeds of a crime

to be subject to forfeiture; to be held jointly and severally liable, the defendant need only

participate in a crime in which the existence of proceeds was foreseeable").  Here, as Mr.

Romano was the owner of the three companies that were the instruments of the mail or wire

fraud and of the accounts through which the proceeds passed, and as Mr. Kearney was the

manager of the three companies, Mr. Romano and Mr. Kearney both, as co-conspirators, had

control over the property that is the subject of the government's forfeiture motion.  They actually

knew of the funds' existence because they actually participated in the business and wrote checks

on the business accounts for years.  See Docket No. 362-1 (showing Mr. Romano's control of the

money because of the numerous checks cut to him, by him, from the three companies' operating

accounts); Docket No. 362-2 (showing Mr. Kearney's control of the money because of the

numerous checks cut to him, by him, from two of the three companies' operating accounts).  The

trial record shows by a preponderance of the evidence that Mr. Romano and Mr. Kearney knew

and had control over $32,220,617 of three companies' funds such that it is forfeitable.

> **e. Specific Assets Seized By The Government Are Forfeitable As "Traceable To" Property "Involved In" The Offenses Of Which Mr. Romano And Mr. Kearney Stand Convicted**

In the event that the District Judge adopts the undersigned's recommendations that Mr.

Romano and Mr. Kearney be ordered to forfeit $32,220,617 to the United States, see Sections

III.b.i.5., III.b.ii.4., III.c.ii.4., supra, the government next requests that the Court order the

forfeiture of specific property seized by the government.  The undersigned respectfully

recommends a finding, for the reasons explained below, that the seized property is "traceable to"

both the conspiracy to commit mail or wire fraud offense under 18 U.S.C. § 981(a)(2)(A), and

the conspiracy to commit money laundering under 18 U.S.C. § 982(a)(1).[8] <u>Docket No. 355</u>.

### i. Forfeitability Of Specific Assets Traceable To Property Obtained As A Result Of The Conspiracy To Commit Wire Or Mail Fraud

Title 18 of the United States Code, Section 981(a)(2)(A), the "telemarketing scheme" statute which the undersigned has recommended be applied to entitle the government to a forfeiture award of gross proceeds in the amount of $32,220,617 for the fraud conviction, provides that proceeds includes property "traceable" to "property . . . obtained . . . as a result of the commission of the offense giving rise to the forfeiture." <u>Id.</u> (citing 18 U.S.C. § 981(a)(2)(A)).  In addition, the government's concurrent entitlement to the same $32,220,617 under 18 U.S.C. § 982(a)(1) for the money laundering conspiracy deals with the forfeiture of specific assets.  If the District Judge rejects the undersigned's recommendations under both 18 U.S.C. § 981(a)(2)(A) and 18 U.S.C. § 982(a)(1), the undersigned requests that the District Judge return the case to the undersigned for analysis of particular net proceeds to be forfeited.

### ii. Forfeitability Of Specific Assets Traceable To Property Obtained As A Result Of The Conspiracy To Commit Money Laundering

Title 18 of the United States Code, Section 982(a)(1), the money laundering statute, provides that "the court, in imposing sentence on a person convicted of an offense in violation of section . . . 1957 . . . shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."

Accordingly, when dealing with specific property, the Court's analysis moves from the

---

[8] One might wonder why there even exists a mechanism through which to seek forfeiture of specific assets involved in, or traceable to, an offense, if the government can obtain a personal money judgment against a defendant.  One answer to this question is that criminal forfeiture "is not limited to property owned by the defendant; 'it reaches any property that is involved in the offense' whether the defendant has an interest in the property or not." Stefan Cassella, <u>Asset Forfeiture Law in the United States</u> § 15-3 at 483 (2007) (quoting <u>De Almeida v. U.S</u>, 459 F.3d 377, 381 (2d Cir. 2006).

fact that the \$32,220,617 was "involved in" the conspiracy to commit money laundering offense to whether the specific property sought by the government is "traceable to" the conspiracy to commit money laundering offense. The Third Circuit explained its view of the difference between "involved in" and "traceable to" in United States v. Voigt:

> [I]f the defendant receives \$500,000 cash in a money laundering transaction and hides the cash in his house, the government may seize that money as property "involved in" the money laundering offense. If the defendant purchased a \$250,000 item with that money the government may seek the remaining cash as "involved in" the offense, whereas the item purchased is subject to forfeiture as property "traceable to" property involved in the money laundering offense.

89 F.3d 1050, 1087 (3d Cir. 1996); U.S. v. Bornfield, 145 F.3d 1123, 1135 (10th Cir. 1998) ("[P]roperty 'traceable to' means property . . . the acquisition [of which] is attributable to the money laundering scheme rather than from money obtained from untainted sources.").

### iii. The Government Must Prove The Traceability Of A Specific Asset By A Preponderance Of The Evidence Under Both 18 U.S.C. § 981(a)(1) and 18 U.S.C. § 982(a)(2)(A)

Whether 18 U.S.C. § 981(a)(1) or 18 U.S.C. § 982(a)(2)(A) is applied, the "[d]istrict court must find by a preponderance of the evidence that the amount of money or property to be forfeited was derived from proceeds traceable to the fraud." Kalish, 626 F.3d at 167. The Second Circuit has held that evidence adduced at trial, as well as evidence presented specifically in the context of the forfeiture motion, is properly considered by a district court determining a forfeiture order. See Capoccia, 503 F.3d at 109.

### 1. Mr. Romano's Forfeitable Specific Property

In its motion for an order that specific property belonging to Mr. Romano be ordered forfeited, the government argues that the three companies paid Mr. Romano a salary of \$6,715,625 over the course of the 2000 to 2008 fraud scheme. Docket Nos. 355, 355-2, 355-3,

355-4, 355-6 355-7. As further proof that this salary was paid to Mr. Romano by the three companies, the government offered a chart entered in evidence at trial relating to various Defendants' salaries. Gov't Exh. 117.

The government also provided the Court with an April 17, 2013 sworn declaration from William Hessle, a United States Department of Justice investigator and a former Postal Inspector with the United States Postal Inspection Service to aid in the determination of whether specific assets, which the government asks the Court to order forfeited, are traceable to the proceeds of the mail or wire fraud ("the Hessle Declaration"). Docket No. 355-7. Mr. Hessle studied bank records and avers in his sworn declaration that "the majority of [Mr. Romano's] monies received from [the three companies] were deposited into his account at JP Morgan Chase, Account #3421140025" (hereinafter "the Romano JP Morgan Chase principal account"). Id. ¶ 5. Then, according to Mr. Hessle, Mr. Romano transferred monies from the Romano JP Morgan Chase principal account to twelve other accounts in which he had an ownership interest (hereinafter "the twelve Romano satellite accounts"). Id.[9] Mr. Hessle also states that Mr. Romano transferred $142,630 from the JP Morgan Chase principal account, and caused one of the three companies to transfer $2,000, to Villages of Windsor by Ansca for the purchase of the real property located at 8154 Via Bolzano, Lake Worth, Florida (hereinafter "8154 Via Bolzano"). Id. ¶ 6.

If any specific assets should be forfeited, Mr. Romano does not oppose the government's argument that the Romano JP Morgan Chase principal account, the twelve Romano satellite accounts and 8154 Via Bolzano should be forfeited as specific assets traceable to the mail or

---

[9] These accounts are listed in Mr. Hessle's sworn declaration as: JP Morgan Chase, Account #s 2749486680, 820604259601, 8236053717-01, 100071218532, 100072225892, 5200156671, and 5000071473795; Fidelity Investments, Account # Z44-848794; Charles Schwab & Co., Inc., Account # 7587-1823; ING Direct, Account # 23293409; Capital One Bank, Account # 2286077009; and Smith Barney, Account # 42F-60573-16 (hereinafter collectively referred to as "the twelve satellite accounts").

wire fraud offense. <u>Docket Nos. 356, 358</u>. Mr. Romano's only objection to the forfeiture of these specific assets appears to be premised on Mr. Romano and Mr. Kearney's predicate argument that the government was not entitled to $32,220,617 in gross proceeds forfeiture in the first instance. <u>Docket No. 356</u>.

    Despite the fact that Mr. Romano does not contest the forfeitability of 8154 Via Bolzano in the event that this Court enters a forfeiture order in the amount of $32,220,617, the Court would like to address why 8154 Via Bolzano is forfeitable in its entirety when it has only been shown that $144,630 in traceable proceeds went towards its purchase.

    The issue has not yet been squarely addressed by the Second Circuit. However, in <u>United States v. Hawkey</u>, 148 F.3d 920, 928 (8th Cir. 1998), the Eighth Circuit reviewed a district court's order that a defendant must forfeit his motor home based on evidence that he paid for part of it using tainted funds. The <u>Hawkey</u> defendant argued that his motor home should not be seized for its full value because he could show that he added value to it using untainted funds. <u>Id.</u> The Eighth Circuit rejected the defendant's argument, ruling that "[i]rrespective of whether the increased value to the converted property is the result of wise investment, personal effort by [the defendant], or by adding [the defendant's] untainted personal funds, because [tainted] property is traceable to the unlawful monetary transaction, we conclude that the property is subject to forfeiture under the statute." <u>Id.</u>; <u>see</u> <u>U.S. v. Real Property Identified as: Parcel 03179-005R</u>, 287 F. Supp.2d 45, 60 (D.D.C. 2003) (holding that a defendant who used ill-gotten funds to make a down payment on real property had to forfeit the entire property irrespective of the fact that the property subsequently increased in value: "Any contrary result would reward [the defendant] for his illegal activities by permitting him to profit from the purchase of property that has substantially increased in value.").

42

At least one federal court has reached the opposite result.  In <u>United States v. Federal Security, Inc.</u>, Case No. 97-CR-516, 1998 WL 324842, at *1 (N.D. Ill. June 9, 1998), for example, the court stated that it "recognize[d] that the government has an interest in [real] properties to the extent that they have benefitted from tainted funds, but we fail to understand how legitimately acquired assets cease to be substitute assets by the use of one dollar of tainted funds."  <u>See</u> <u>U.S. v. Pergler</u>, Case No. 98-CR-469, 1998 WL 887113, at *4 (N.D. Ill. 1998) ("The government may seek to forfeit [the defendant's] house and three cars only to the extent to which [the defendant] used tainted funds to benefit those assets.").  <u>Federal Security, Inc.</u> appeared to draw a distinction, however, or at least to mention the appearance of a distinction, between properties that benefitted in larger or lesser measure from tainted funds, <u>i.e.</u>, where a down payment was made with tainted funds versus where an already owned property's real estate taxes were paid with tainted funds.  <u>See</u> <u>Federal Sec., Inc.</u>, 1998 WL 324842, at *1.

This Court finds that the Eighth Circuit has the better argument in <u>Hawkey</u>, and accordingly respectfully recommends the District Judge allow the full forfeiture of 8154 Via Bolzano.  <u>Federal Security, Inc.</u>'s observation about the role that tainted funds played in a defendant's acquisition of a real property is material to this conclusion.  If a defendant could not have otherwise bought a property in the absence of the tainted money, or if the purchase would have been substantially more difficult without the tainted money, then this Court believes that full forfeiture of the property is merited.  <u>See</u> <u>U.S. v. Real Property Identified as: Parcel 03179-005R</u>, 287 F. Supp.2d at 60.  To do otherwise would allow a defendant to use tainted funds to create an opportunity for new profit that would likely not otherwise exist or would be unavailable without some hardship in finding funds from a legitimate source.[10]

---

[10] Even if this Court were to recommend, or the District Judge rule, that 8154 Via Bolzano is not

In conclusion, the undersigned finds that the government, through its submission of trial testimony and exhibits and Mr. Hessle's sworn declaration, has shown by a preponderance of the evidence that the Romano JP Morgan Chase principal account; the twelve Romano satellite accounts; and 8154 Via Bolzano are specific assets traceable to the commission of the mail or wire fraud. Accordingly, in the event that the District Judge adopts the undersigned's recommendation that Mr. Romano and Mr. Kearney must forfeit $32,220,617 in gross proceeds, the undersigned also recommends that the District Judge **order** that $4,762,878.97 seized by the government from the Romano JP Morgan Chase principal account and the twelve Romano satellite accounts be forfeited to the United States, and that 8154 Via Bolzano also be forfeited to the United States.

## 2. Mr. Kearney's Forfeitable Specific Property

In its motion for an order that specific property belonging to Mr. Kearney be ordered forfeited, the government argues that the three companies paid Mr. Kearney a salary of $3,938,993 over the course of the August 25, 2000 to November 24, 2008 fraud scheme. Docket

---

a forfeitable specific asset under the above analysis, the government could still try to seize it from Mr. Romano another way. "The Second Circuit, like other circuit courts, has also held that [forfeiture law] permits imposition of a money judgment on a defendant who possesses no [traceable] assets at the time of sentencing." U.S. v. Awad, 598 F.3d 76, 78-79 (2d Cir. 2010); see U.S. v. Voight, 89 F.3d 1050, 1081 (3d Cir. 1996) (holding that while jewelry was not forfeitable as a traceable specific asset, the government's entitlement to a $1,600,000 criminal forfeiture order could be satisfied, at least in part, by amending the judgment of forfeiture to show that the jewelry was forfeitable as a substitute asset); U.S. v. Black, 526 F. Supp. 2d 870, 889-90 (N.D. Ill. 2007) (holding that the contents of defendant's accounts were not traceable to the offense such that things purchased therewith were forfeitable specific assets, and stating that as a result, "[a]t this stage, the government is entitled only to a money judgment"); but see U.S. v. Surgeant, Case No. 04-CR-364, 2009 WL 2525137, at *11 (E.D.N.Y. Aug. 17, 2009) (stating that courts allowing in personam money judgments despite the fact that forfeiture statutes do not authorize this "do not even attempt to explain how a statute can authorize personal money judgments when it does not, by its terms, authorize such judgments"). "[C]riminal forfeiture need not be traced to identifiable assets in a defendants's possession" in order to ensure that "there is a mechanism by which the government may disgorge [a defendant's] ill-gotten gains, even those already spent." Awad, 598 F.3d at 79.

44

Nos. 355, 355-2, 355-3, 355-4, 355-6, 355-7. As further proof that this salary was paid to Mr.

Kearney by the three companies, the government presents the Court with a chart entered in

evidence at trial relating to various Defendants' salaries. Gov't Exh. 117.

 Mr. Hessle's Declaration avers that "the majority of [Mr. Kearney's] monies received

from [the three companies] were deposited into his account at Citibank, Account #66435322"

(hereinafter "the Kearney Citibank principal account"). Docket No. 355-7 ¶ 8. Then, according

to Mr. Hessle, Mr. Kearney transferred monies from the Kearney Citibank principal account to

ten other accounts in which he had an ownership interest (hereinafter "the ten Kearney satellite

accounts"). Id.[11] Mr. Hessle also states that Mr. Kearney caused monies to be transferred from

the three companies to Astoria Federal Savings Bank accounts held in the name of Mr.

Kearney's wife, Karen Kearney (hereinafter "the Mrs. Kearney accounts"). Id. ¶ 9. Finally, Mr.

Hessle states that Mr. Kearney paid approximately $99,109 from the Kearney Citibank principal

account and one of the ten Kearney satellite accounts to Citibank for a mortgage Mr. Kearney

owed on 8 Valerie Place, East Islip, New York (hereinafter "8 Valerie Place"), and that Mr.

Kearney paid approximately $147,375 from the same two accounts to the previous owner of 8

Valerie Place. Id. ¶ 10.

 Mr. Kearney mounts no opposition to the government's argument that the Kearney

Citibank principal account, the ten Kearney satellite accounts, the Mrs. Kearney accounts and 8

Valerie Place should be forfeited as specific assets traceable to the mail or wire fraud offense, if

any forfeiture is appropriate. Docket Nos. 356, 358. As with Mr. Romano, Mr. Kearney's only

---

[11] These Kearney accounts are listed in Mr. Hessle's sworn declaration as: Citibank, Account #
66435154; JP Morgan Chase, Accounts #s PXS-616192, 737707158; Fidelity Investments,
Account # X26361585; ING Direct, Account # 35543264; Smith Barney, Account # 42F-2702C-
12; Wachovia Securities, Account #s 6395-0113, 4671-2430, 4671-2458; and HSBC, Account #
976085471 (hereinafter collectively referred to as "the ten Kearney satellite accounts").

objection to the forfeiture of these specific assets appears to have been premised on Mr. Romano and Mr. Kearney's predicate argument that the government was not entitled to $32,220,617 in gross proceeds forfeiture in the first instance and that any forfeiture should be limited to nine victims. The undersigned has already rejected Mr. Kearney's net proceeds argument in Section III.b.5.

### 3. Mrs. Kearney, As A Third Party, May Object To The Forfeiture Of Her Account If She Thinks She Qualifies As An Innocent Owner

The Court sua sponte addresses whether Mrs. Kearney's accounts can be forfeitable to the United States given that Mrs. Kearney herself is not a defendant subject to sentencing. The Court views the forfeiture of Mrs. Kearney's accounts proper as it has found by a preponderance of the evidence that they represent Mr. Kearney's own ill-gotten gains. It is true that Mrs. Kearney, or any third party to a criminal forfeiture proceeding, may object to the forfeiture of property in which he or she purports to have an ownership interest. See De Almeida v. U.S., 459 F.3d 377, 381 (2d Cir. 2006) (explaining that an "ancillary proceeding is evidently the only avenue for a post-indictment third-party claim to forfeited property"). However, in the event that such an objection is successful, the government could seek to satisfy the forfeiture order under 21 U.S.C. § 853 with substitute assets if the conditions of that statute are met.

The undersigned finds that the government, through its resubmission of trial exhibits and Mr. Hessle's sworn declaration, has shown by a preponderance of the evidence that the Kearney Citibank principal account, the ten Citibank satellite accounts, the Mrs. Kearney accounts and 8 Valerie Place are specific assets traceable to the commission of the mail or wire fraud. Accordingly, in the event that the District Judge adopts the undersigned's recommendation that Mr. Romano and Mr. Kearney must forfeit $32,220,617 in gross proceeds, the undersigned also

recommends that the District Judge **order** that the $1,506,111.27 seized from the Kearney Citibank principal account; the ten Kearney satellite account; and the Mrs. Kearney accounts be forfeited to the United States, and that 8 Valerie Place also be forfeited to the United States.

### 4. This Court Recommends That The District Judge Order Atlantic And Northeast's Operating Accounts Forfeited

Mr. Hessle also states that the government seized what was left of two of the three companies' operating accounts, <u>Docket No. 355-7</u>. The government argues that these, too, should be seized as traceable to the convicted offense, <u>Docket No. 355</u>. Mr. Hessle informs the Court that Atlantic's operating accounts were at JP Morgan Chase, Account #s 8235012873 and 8235012873-66. <u>Docket No. 355-7</u>, ¶ 11. According to Mr. Hessle, Atlantic's operating accounts contained a total of approximately $21,309.74. <u>Id.</u> Mr. Hessle goes on to say that Northeast's operating account was located at JP Morgan Chase, Account #000757968672, and that it contained $129,000 at the time of seizure. <u>Id.</u> Because these funds were the operating funds of the schemes, they were by definition used to further the schemes for which Mr. Romano and Mr. Kearney stand convicted.

The undersigned finds that the government, via the Hessle Declaration, has shown by a preponderance of the evidence that the approximately $129,000 seized from the Atlantic and Northeast operating accounts are traceable to the offense committed. As a result, the undersigned respectfully recommends that the District Judge **order** the $129,000 seized from the Atlantic and Northeast operating accounts forfeited to the United States.

### IV. Conclusion

In light of the foregoing, the undersigned respectfully recommends that the District Judge **order** that Mr. Romano and Mr. Kearney must forfeit $32,220,617 in the gross proceeds that the three companies collected over the course of August 2000 through November 24, 2008, when

Mr. Romano and Mr. Kearney conspired to commit mail and wire fraud. During the same period, Mr. Romano and Mr. Kearney also conspired to commit money laundering. As explained, supra, Section III.b.i.5., III.b.ii.4., III.c.ii.4., the undersigned respectfully recommends that the District Judge find that Mr. Romano and Mr. Kearney must forfeit the $32,220,617 in gross proceeds as a result of Mr. Romano and Mr. Kearney's convictions both for conspiracy to commit mail and wire fraud and for money laundering.

In addition, the undersigned respectfully recommends that the District Judge **order** that Mr. Romano and Mr. Kearney forfeit the specific property seized by the government and described, supra, Section III.e.iii.4. The specific properties that the undersigned recommends should be ordered forfeited by Mr. Romano are: (1) the Romano JP Morgan Chase account; (2) the twelve Romano satellite accounts; (3) 8154 Via Bolzano, Lake Worth, Florida. The specific properties that the undersigned recommends should be ordered forfeited by Mr. Kearney are: (1) the Kearney principal Citibank account; (2) the ten Kearney satellite accounts; (3) the Mrs. Kearney accounts; and (4) 8 Valerie Place, East Islip, New York. The forfeiture of this specific property will serve as partial satisfaction of the $32,220,617 money judgment entered by the Court against Mr. Romano and Mr. Kearney in the government's favor as a result of the general forfeiture order.

Should the District Judge choose not to adopt the undersigned's recommendations that criminal forfeiture law requires a forfeiture order in the amount of $32,220,617, because: (1) the District Judge believes that net proceeds, and not gross proceeds, are the proper forfeiture calculation in this case; (2) the District Judge believes that forfeitable gross proceeds should be limited to the nine customers' transactions discussed at trial; and/or (3) the District Judge believes that facilitation doctrine does not justify the criminal forfeiture premised on the

48

conspiracy to commit money laundering, then the undersigned respectfully recommends that the District Judge **return** the case to the undersigned for an additional forfeiture hearing where the Parties can present particularized evidence to the undersigned for a second report and recommendation on a forfeiture calculation tailored to the District Judge's construction of criminal forfeiture law.

## V. Objections

Objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen days of service of this Report. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 1, 59(b). Failure to file objections within fourteen days will preclude further review of this report and recommendation either by the District Court or the Court of Appeals.

Dated:  Brooklyn, New York
        July 26, 2013

                                    /s/
                              VERA M. SCANLON
                          United States Magistrate Judge