UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- x
UNITED STATES OF AMERICA,         :
        :
-against-           :
        :    **REPORT AND RECOMMENDATION**
MICHAEL ROMANO and WILLIAM    :
KEARNEY,           :    09-CR-168 (SJ) (VMS)
        :
        Defendants.    :
        :
------------------------------------------------------- x

**Scanlon, Vera M., United States Magistrate Judge:**

## I. Introduction

Defendants Michael Romano and William Kearney are convicted of conspiracy to commit mail or wire fraud in violation of 18 U.S.C. § 1349, and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h), 1956(a)(1)(A)(i), 1957(d)(1). Docket Nos. 168, 295. The Government now seeks, pursuant to the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. §§ 3663A, 3664, and in conjunction with Mr. Romano and Mr. Kearney's upcoming sentencing before District Judge Sterling Johnson, Jr., a restitution order in the amount of $9,332,667.10 for which Mr. Romano and Mr. Kearney would be jointly and severally liable. Docket Nos. 351, 367, 377. Mr. Romano and Mr. Kearney counter that the Court should not order restitution because "the determination of an appropriate restitution amount in this case is impracticable," citing 18 U.S.C. § 3663A(c)(3)(A) and 18 U.S.C. § 3663A(c)(3)(B) in support of their position. Docket No. 379.

District Judge Johnson referred the Government's restitution motion to the undersigned for a Report and Recommendation.[1] Docket Entry 1/23/2013. "The Court may refer any issue

---

[1] At the same time, District Judge Johnson referred Defendants' motion to recuse AUSA Gatz

arising in connection with a proposed order of restitution to a magistrate judge . . . for proposed findings of fact and recommendations as to disposition, subject to a de novo determination by the court." 18 U.S.C. § 3664(b)(6). The undersigned submits this Report and Recommendation to the District Judge pursuant to his referral of the restitution motion under 18 U.S.C. § 3664(b)(6). The undersigned respectfully recommends that the District Judge **grant** the Government's motion for a restitution order in the amount of $9,332,667.10 against these two Defendants jointly and severally. The reasons for the undersigned's recommendation are explained below.

In the next section of this Report and Recommendation, I offer a factual summary relevant to the instant motion. See Section II. In the subsequent sections of this Report and Recommendation, see Section III, I discuss federal restitution statutes, the Government's restitution motion made thereunder, Defendants' opposition, and my recommendations to the District Judge as to findings of law and fact. The final section briefly summarizes all Orders the undersigned respectfully recommends that the District Judge make regarding restitution in this case. See Section IV. What follows is a table of contents for the Report and Recommendation.

### Table Of Contents

I.   Introduction.................................................................................................................1
II.  Factual Background .....................................................................................................5
    a.  Synopsis Of The Case And What Happened At Trial...........................................5
    b.  The Government's Restitution Motion And Defendants' Opposition ................6
    c.  Trial And Hearing Witnesses Relevant To The Restitution Motion ...................7
        i.   Mr. Anthony Swiatek ...................................................................................7
        ii.  Agent William Hessle...................................................................................8
        iii. Dr. Mark Glickman......................................................................................9
        iv.  Mr. David Ganz ............................................................................................9

and the Government's forfeiture motion to the undersigned. Docket Entry 1/23/2013. Familiarity with those other motions and the corresponding reports and recommendations is assumed. Docket Nos. 360, 373.

d.   Factual Summary Relevant To The Restitution Motion ................................... 10

i.    Coin Grading Generally................................................................ 10

ii.   Coin Valuation Generally ............................................................. 11

iii.  The Government Identified 1,450 Of Defendants' Victims, And 220 Victims Submitted Loss Affidavits Seeking Restitution............................................ 12

iv.   Excerpts From Testimony And Statements Of The 220 Victims Seeking Restitution.................................................................................. 13

1.   Financial Distress Caused By Defendants' Scheme ........................... 14

2.   Harassment Employed In Effectuating Defendants' Coin Fraud Scheme ................ 17

v.    The Government Selected Nine Victims Of The 220 Victims Seeking Restitution To Serve As A Study Sample ...................................................... 20

vi.   Professional Grading Service NGC Assigned A Grade For Each One Of The Nine Selected Victims' 1,800 Coins ..................................................... 21

vii.  Coin Expert Anthony Swiatek Compiled Values For Each One Of The Nine Selected Victims' 1,800 Coins Using Various Data Points, Including (1) Defendants' Asserted Value For The Coins At Sale, (2) Actual Value For The Coins At Sale Had Defendants' Asserted Grade Been Correct, And (3) Actual Value For The Coins Using NGC Grade As Of October 2010 ................................... 21

viii. Coin Expert Anthony Swiatek Testified At Trial That His Examination Of The Nine Selected Victims' Coin Grades And Values Revealed That Defendants Represented Coin Grades And Values That Were Higher Than The Coins Merited... 23

ix.   Coin Expert Anthony Swiatek Updated The Nine Selected Victims' Coin Values in November 2012 In Anticipation Of The Government's Restitution Motion, And The Government Concluded That The Nine Selected Victims' Coins On Average Reflected A 21% Value-To-Price Ratio ............................................... 24

x.    The Government Applied The Nine Selected Victims' Average 21% Value-To-Price Ratio To The 220 Victims Who Filed Loss Affidavits Pursuant To A Modified Categorical Calculation And Seeks A Restitution Order In The Amount Of $9,332,667.10 On That Basis ....................................................... 24

xi.   Statistics Expert Dr. Mark Glickman Testified That He Cannot Say With Certainty Whether The Nine Selected Victims Sampled Were Representative Of The 211 Other Victims Without Knowing How The Nine Victims' Coin Portfolios Compare To The 211 Victims' Coin Portfolios ............................................ 27

xii.  Coin Expert David Ganz Testified ............................................... 31

III.   Legal Analysis ..............................................................................33

a.   Summary Of The Government's Restitution Motion, Defendants' Opposition And This Court's Recommendations .......................................................... 33

b.   Overview Of Relevant Restitution Law ........................................... 34

c.   Defendants' Arguments That Exceptions Apply In This Case Such That The Court May Not Order Mandatory Restitution In The Full Amount Of Victims' Losses ................... 38

i.    The Number of Identifiable Victims Is Not So Large As To Make Restitution Impracticable ................................................................................................. 38

ii.   The Need To Provide Restitution To Defendants' Victims Outweighs Any Burden On the Sentencing Process Arising From The Determination Of Complex Issues Of Fact Related To The Cause Or Amount Of The Victims' Losses .......................... 40

1.   The Government Had Shown By A Preponderance Of The Evidence That Its Method Of Collecting Victim Loss Affidavits Was Proper ..................................................... 42

2.   Swiatek Trial Evidence Is Admissible At Restitution Proceedings For The Fact And Extent Of Overvaluation ...................................................................................... 45

a. Mr. Swiatek Retains Coin Expert Status; His Testimony Is Admissible; And The Swiatek Valuation Chart Is Admissible In These Restitution Proceedings .......... 46

i.    District Judge Bianco's Ruling That Mr. Swiatek Is A Qualified Coin Valuation Expert Is The Law Of The Case At Restitution ............................ 48

1.   Defendants Argue No Intervening Change In Controlling Law ................... 51

2.   Defendants Present No New Evidence ......................................................... 51

3.   Defendants Show No Clear Error Or Manifest Injustice .............................. 56

ii.   District Judge Bianco's Rulings That Mr. Swiatek's Testimony And The Swiatek Valuation Chart Are Admissible Are The Law Of The Case ........... 56

b. The Swiatek Valuation Chart May Be Considered For The Purposes Of Determining The Extent To Which Defendants Overvalued Coins ...................... 57

c. Conclusion ...................................................................................................... 58

3.   The Government Has Shown By A Preponderance Of The Evidence That A 21% Value-To-Price Ratio Derived From A Nine-Victim Sample Is A Fair Multiplier With Which To Reasonably Approximate Restitution For All 220 Victims According To A Modified Categorical Calculation ................................................... 59

4.   The Government's Development Of Different Restitution-Calculation Formulae For Differently Situated Categories Of The 220 Victims Is Fair Because It Avoids Defendants' Payment Of Restitution On Amounts Already Recouped By Victims Via The Sale Of Their Coins To Third Parties ........................................................ 66

5.   The 21% Value-To-Price Ratio Modified Categorical Calculation Of Restitution For The 220 Victims Is Not Particularly Complex To Execute And, In Any Event, The Complexity Does Not Outweigh The Strong Need For Restitution For Victims In This Case ....................................................................................................... 68

a. There Is Little Residual Complexity Or Sentencing Delay In This Case Going Forward ........................................................................................................... 68

b. There Is A Strong Need For Restitution For Victims ............................................. 69

c. The Need For Restitution Far Outweighs Any Purported Complexity Or Delay In This Case Going Forward ................................................................................... 71

IV.   Conclusion ................................................................................................................71

V.   Objections ................................................................................................................72

## II.    Factual Background

### a.    Synopsis Of The Case And What Happened At Trial

Mr. Romano owned three rare coin companies known as Wall Street Rare Coins, Atlantic Coin Galleries and Northeast Gold and Silver, Inc. ("the three companies"), and Mr. Kearney worked at the three companies as a salesperson and manager.  Docket No. 168.  Over the course of the three companies' operations, $32,220,617 in gross proceeds passed through their operating accounts.  June 2 Tr. 2518-2519, 2521-2522 (Hessle).[2]  On June 13, 2011, after a one-month trial, Mr. Romano and Mr. Kearney were each convicted of conspiracy to commit mail or wire fraud in violation of 18 U.S.C. §§ 1341, 1343, 1349, and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h), 1956(a)(1)(A)(i), 1957(b), 1957(d)(1).  Docket No. 295.  At trial, the Government proved, inter alia, that Mr. Romano and Mr. Kearney played roles in devising and executing a telemarketing scheme whereby they and their employees called prospective purchasers and induced them to buy coins by representing that the coins were of a certain quality (which they were not),[3] and that the three companies would aid any purchaser in

---

[2] All trial and restitution hearing transcript citations will be formatted throughout this Report and Recommendation as follows:  "[date] Tr. [page]:[line] ([name of witness])."

[3] Robert Lepolski, who worked for Defendants, testified at trial that he was instructed to tell customers that the coins for sale were graded in adherence with "the strictest of [American Numismatic Association] grading standards," May 31 Tr. 2218:19-22 (Lepolski), but that Mr. Romano in fact graded the coins himself according to the price that Mr. Romano wished to receive.  Mr. Lepolski testified that Mr. Romano would ask Mr. Lepolski to look up two or three grades and prices for a coin from a book, that Mr. Romano would record "the high end" of the grades and values that Mr. Lepolski gave, "and that's how [Mr. Romano] would come up with the prices for the grading."  June 1 Tr. 2287:5-11, 2292:1-3 (Lepolski).  Mr. Lepolski further testified that in the event that a customer requested further information about the accuracy of a coin's grade, "we were told to state that we had nine in-house graders and they carefully, you know, look over the coins and one final grader gives a final decision."  May 31 Tr. 2219:2-6 (Lepolski).  Mr. Lepolski testified that he was not aware that any such graders actually existed.  May 31 Tr. 2219:10 (Lepolski).  In addition, Daren Mutone, who also worked for Defendants, testified that he was witness to Mr. Romano's consultations with Mr. Lepolski: "I would see Ron on the phone giving different prices over the telephone [for the same coin at different grades]. . .

reselling the coins at a profit (which they did not).  Id.; Docket No. 168 (second superceding indictment).  The Government also proved that Mr. Romano and Mr. Kearney laundered the fraud proceeds through at least seventy-four money transfers of $10,000 or more from the three companies' operating accounts to their own personal control.  Docket Nos. 362-1, 362-2.

### b.  The Government's Restitution Motion And Defendants' Opposition

The Government moves for an order directing Defendants to pay 220 identified victims of their coin fraud scheme a total of $9,332,667.10 in restitution.  Docket No. 377.  The motion is the culmination of the Government's long investigation into and prosecution of Defendants' crimes whereby the Government traced bank records to identify 1,450 of Defendants' victims; reached out to those 1,450 victims to alert them that Defendants were being prosecuted for wire and mail fraud relating to their coin sales via telemarketing; invited victims to submit loss affidavits for the purposes of restitution; collected 220 victims' loss affidavits; coordinated with nine of the 220 victims to submit the 1,800 coins they had purchased from Defendants to a professional coin grading service for grades for the purposes of a study of an average percentage of loss for all 220 victims; hired a coin expert to assign values to the 1,800 coins; compiled a chart comparing Defendants' representations about the 1,800 coins' grades and values with the coins' actual grades and values; calculated an average percentage of loss for the nine victims' 1,800 coins based on the comparative study; applied the average percentage of loss to all 220 victims who submitted loss affidavits to identify the victims' total losses according to various formulae tailored to whether a victim had sold none, some or all of his/her coins since the fraud;

---

. Mike was thinking how much he would sell the coins for."  May 19 Tr. 1158:13-24 (Mutone). Mr. Mutone believed that there was something wrong with the grading because "[t]here would be complaints from the customers, complaining about the grades," and because "[t]here was a joke around the office, the way Mike [Romano] graded, that he was not grading [the coins] properly."  May 19 Tr. 1148:16-24 (Mutone).

and requested that the Court grant restitution for those 220 victims in accordance with the resulting calculations.

Defendants' objections to the Government's approach to restitution include a challenge to the Government coin expert's valuation study which revealed that, on average, Defendants' victims received coins worth 21 cents for every dollar paid to Defendants (hereinafter the "21% value-to-price ratio"), and the Government's application of that 21% value-to-price ratio in distinct loss-calculation formulas for each of Defendants' identified 220 victims. Id. Defendants argue that coin grading and valuation are such subjective exercises that there could never be a fair value-to-price ratio from which to fashion a fair restitution order for any victim. Docket No. 379. Defendants also argue, by presenting a statistics expert's testimony, that the Government calculated the 21% value-to-price ratio using a non-representative sample of victims such that that particular value-to-price ratio should not be the basis for a restitution order for victims beyond the limited number of victims upon whose losses the estimate was specifically made. Id. The undersigned will develop the Parties' arguments further in the legal analysis section of this Report and Recommendation, see supra, Section III.

### c.  Trial And Hearing Witnesses Relevant To The Restitution Motion

The Parties urge the Court to consider four witnesses' testimony in its review of the instant restitution motion, in addition to cumulative trial testimony. Docket Nos. 377, 379. Anthony Swiatek testified at Defendants' May 2011 trial, and the three other witnesses—Agent William Hessle, Dr. Mark Glickman and David Ganz—testified at the June 26, 2013 and June 27, 2013 restitution hearing.

### i.  Mr. Anthony Swiatek

District Judge Bianco, who oversaw the 2011 criminal trial, certified Government witness

Mr. Swiatek as a coin valuation expert for trial, and Mr. Swiatek testified before the jury on May 26, 2011 and May 31, 2011.  May 26 Tr. 2015:25-May 31 Tr. 2163:1 (Swiatek).  Mr. Swiatek is a professional numismatist, which is a person who studies, researches and buys coins.  May 26 Tr. 2016:18-22 (Swiatek).  Mr. Swiatek has been a personal student of coins since 1952 and began his professional involvement in the coin industry in 1971. May 26 Tr. 2017:8-22 (Swiatek).  Mr. Swiatek has written books on the coin industry and has given seminars on coin-related topics.  May 26 Tr. 2016:21-22 (Swiatek).  He is a member of the Professional Numismatist Guild and the American Numismatic Association, and for that latter organization, he has served at various times as a member of the board, vice president and president.  May 26 Tr. 2019:4-17 (Swiatek).  Mr. Swiatek has also worked as a grader for his own personal coin deals, as well as for various professional grading organizations such as the Numismatic Guaranty Corporation ("NGC") and the Professional Coin Grading Service ("PCGS").  May 26 Tr. 2019:20-23 (Swiatek).  In these capacities, Mr. Swiatek has graded and valued over one million coins.  May 26 Tr. 2020:1 (Swiatek).

### ii.  Agent William Hessle

Agent Hessle testified as a fact witness for the Government at the June 26, 2013 restitution hearing. June 26 Tr. 9:3-138:23 (Hessle).  Agent Hessle has been contracted by the Justice Department as an investigator for approximately four years.  June 26 Tr. 9:18 (Hessle).  Previously, Agent Hessle worked as an inspector for the United States Postal Service for almost 25 years.  June 26 Tr. 9:21-22 (Hessle).  For eight of those 25 years, Agent Hessle's primary work was conducting fraud investigations; from 2007 through 2009, Agent Hessle investigated Defendants' coin fraud.  June 26 Tr. 11:15-19 (Hessle).

### iii.  Dr. Mark Glickman

Dr. Glickman testified as a statistics expert for Defendants at the June 26, 2013 restitution hearing.  June 26 Tr. 139:1-218:16 (Glickman).  Dr. Glickman received a bachelor's degree in statistics at Princeton University; a master's degree and Ph.D in statistics from Harvard University; and a post-doctoral degree in statistics and medicine at Harvard Medical School. June 26 Tr. 140:8-10 (Glickman).  Dr. Glickman is a research professor of health policy and management at the Boston University School of Public Health.  June 26 Tr. 139:18-20 (Glickman).  He also works as a senior statistician at the Center for Health Quality Outcomes and Economics Research, which has been named a United States Veterans Administration Center of Excellence.  June 26 Tr. 139:20-22 (Glickman).  He also serves as a visiting professor in the Harvard University Statistics Department.  June 26 Tr. 140:2-3 (Glickman).  Dr. Glickman, who organized projects analyzing and designing survey data, has received awards and grants for his work as a statistician.  June 26 Tr. 140:11-143:12 (Glickman).

### iv.  Mr. David Ganz

Mr. Ganz testified as a coin expert for Defendants at the June 27, 2013 restitution hearing.  June 27 Tr. 3:19-71:11 (Ganz).  Mr. Ganz is an attorney, and he has been and is involved in coin collecting, buying and selling coins for himself and for clients.  June 27 Tr. 4:15-17, 5:3-17 (Ganz).  Mr. Ganz has been a board member and president of the American Numismatic Society, June 27 Tr. 4:19-24 (Ganz), as well as a member of other numismatic organizations, June 27 Tr. 5:18-24 (Ganz).  He published articles, treatises and books on subjects relating to coins, June 27 Tr. 6:3-15 (Ganz), and worked pro bono with the Government on various coin-related projects, including the regulation of coin telemarketing operations, June 27 Tr. 9:8-18 (Ganz).  Over the course of Mr. Ganz's career, he bought or sold between 1,000 and

10,000 coins, all of which he valued himself using certain industry publications known as
Greysheets or Bluesheets.  June 27 Tr. 8:9-23 (Ganz).

### d.  Factual Summary Relevant To The Restitution Motion

#### i.  Coin Grading Generally

In the American coin collection industry, PCGS and NGC are the leading professional
coin grading services.  June 26 Tr. 15:9 (Hessle).  In grading a coin, PCGS and NGC describe a
particular coin's quality by giving it a grade from zero to 70 on what is known as the Sheldon
Scale, with 70 being the highest-quality grade.  June 26 Tr. 13:15-14:8, 13:23 (Hessle).  Coins
that have never been used in commerce are called uncirculated and can be in mint state ("MS");
for that reason, they usually receive a grade at the higher end of the Sheldon Scale, i.e., 60-MS to
70-MS.  June 26 Tr. 14:7-11 (Hessle).  A professional coin grading service frequently employs a
practice called "slabbing," whereby the graded coin is encapsulated so that its condition at the
moment of grading is preserved.  June 26 Tr. 14:19-23 (Hessle).

Coin graders typically consider four factors in grading a coin, which are: (1) strike (the
quality of the mold that the mint used to strike the coin, i.e., was the mold in good or bad
condition such that the coin produced has or lacks any flaws in its form); (2) luster (the visual
appearance of light bouncing off the coin, e.g., whether the coin is tarnished); (3) the existence
and location of contact marks (dings or scratches on the surface of a coin); and (4) eye appeal.
June 27 Tr. 11:23-13:24 (Ganz).  In order to mitigate the influence of graders' subjective
preferences in coin grading, professional grading services such as PCGS and NGC usually have
two or three graders work on any single coin.  June 27 Tr. 18:9-22 (Ganz).  If all three graders
give the coin the same grade, the coin will go to a finalizer who will finalize the grade according
to whether he or she believes the consensus is correct.  June 27 Tr. 18:17-20 (Ganz).  If the three

graders give the coin different grades, the finalizer reviews the disparate grades then assigns a final grade according to his or her own judgment.  June 27 Tr. 18:9-22 (Ganz).  One reputable professional grading service may grade a coin differently from another grading service.  June 27 Tr. 17:10-14, 17:20-23 (Ganz).

### ii.  Coin Valuation Generally

It is a regular practice for those in the coin collecting industry to consult the publications Greysheets and Bluesheets for the purposes of determining coin prices for graded coins. Although both Greysheets and Bluesheets are described as publications meant for use by coin wholesalers, May 26 Tr. 2045:25-2046:4, 2047:21-23, 2048:6-7 (Swiatek); May 31 Tr. 2085:7-10, 2085:11-14 (Swiatek); Gov't Exh. 113 (example of Greysheets admitted in evidence), it is accepted practice, at coin shows and elsewhere, for coin retailers to use Greysheets and Bluesheets to quote retail prices for collectors and investors, May 26 Tr. 2048:16-23, 2049:11-13 (Swiatek); May 31 Tr. 2145:17-19 (Swiatek).

Greysheets is most often used to determine the price of an encapsulated coin of a particular type and grade if the buyer of the coin first has the opportunity to look at the coin ("sight-seen").  June 26 Tr. 20:1-3 (Hessle); Gov't Exh. 113 (example of Greysheets admitted in evidence).  By contrast, Bluesheets lists the standard industry price for an encapsulated coin according to its type and grade if the coin buyer purchases the subject coin without an opportunity to examine the coin first ("sight unseen").  June 26 Tr. 18:1 (Hessle); Gov't Exh. 114 (example of Bluesheet admitted in evidence).

Greysheets and Bluesheets are formatted in a similar way, which is that each offers two prices—a bid and an ask price—for any given coin based on its type and year of origin.  The bid value signifies what a buyer will typically bid as a price to buy, and the ask value signifies what

a seller will typically ask as a sale price.  May 26 Tr. 2049:17-22 (Swiatek); May 31 Tr. 2086:4-9 (Swiatek).  The bid price is always lower than the ask price, and so read together, a coin's bid and ask prices create a price range between them, and buyers and sellers frequently negotiate a mutually acceptable price for a coin sale within this range.

### iii.  The Government Identified 1,450 Of Defendants' Victims, And 220 Victims Submitted Loss Affidavits Seeking Restitution

Agent Hessle testified at the June 26, 2013 restitution hearing about the process the Government undertook to identify victims of Defendants' coin fraud scheme. The testimony of some scheme victims was used at trial.  The data collected from the victims is relevant for restitution as well.

In preparing its case, the Government faced significant challenges in identifying specific victims because Defendants' employees had, at Defendants' direction, cut off the tops of the subject companies' paper invoices.  This resulted in a separation of purchaser information from purchase information.  June 26 Tr. 23:18-22, 26:18-20 (Hessle).[4]  Agent Hessle eventually was able to identify potential victims of the coin fraud scheme by examining bank records and canceled checks showing payment to Defendants for coins, and tracing the bank data back to Defendants' customers.  June 26 Tr. 27:1-15 (Hessle).  Agent Hessle's investigation revealed that during the relevant period, there were 1,450 victims of Defendants' coin fraud scheme.  June

---

[4] Agent Hessle's testimony in this respect is corroborated by other trial testimony.  For example, on May 12, 2011, Michelle Stumpf, a former employee of Atlantic Coin Galleries, testified at trial that Michael Romano and William Kearney directed the staff to rip off the tops of invoices and shred them.  May 12 Tr. 405:8-406:4 (Stumpf).  On May 17, 2011, Patrick Coleman, a former employee of Wall Street Rare Coins, testified at trial that William Kearney had directed him to destroy invoices by cutting off the tops, and he had complied.  May 17 Tr. 880:6-20 (Coleman).  On May 19, 2011, Daren Mutone, a former employee of Atlantic Coin Galleries, testified at trial that William Kearney came around the office with a large garbage bag to collect documents to throw away, and that the employees were tasked with cutting off the tops of invoices to get rid of customer information relating to Atlantic Coin Galleries.  May 19 Tr. 1174:16-22 (Mutone).

26 Tr. 23:18-22, 26:18-20 (Hessle).

The Government contacted the 1,450 identified victims; informed them of the charges filed against Defendants; and told the victims that if they had been actual victims of the coin fraud scheme, they could submit a loss affidavit and potentially get restitution at the close of the case. MRWH-1 (copy of notification letter mailed to victims). This outreach was complicated by the fact that Defendants' fraud scheme targeted elderly persons, one consequence of which was that many victims were either deceased or physically and/or mentally unable to respond by the time the Government reached out to them. June 26 Tr. 27:18-29:16 (Hessle).[5] At times, when a victim was infirm or deceased, someone connected to the victim answered in his/her stead as a personal or estate representative. In the end, 220 victims submitted sworn victim loss affidavits to the Government and became part of the pool of individuals seeking restitution. Gov't Exh. 4 (a binder containing copies of the 220 victim loss affidavits).

### iv. Excerpts From Testimony And Statements Of The 220 Victims Seeking Restitution

The testimony and statements of the 220 victims who submitted loss affidavits for restitution is too voluminous to include in this Report and Recommendation, but what follows is a sampling of the victims' experiences in doing business with Defendants' fraudulent coin operations.

---

[5] Agent Hessle's testimony in this respect is corroborated by trial testimony. On May 17, 2011, Patrick Coleman, Defendants' former employee, testified at trial that he sat across from Mr. Kearney on the sales floor, and that Mr. Kearney's avowed sales tactics were to "crush weak people" and to "confuse the shit" out of "older people." May 17 Tr. 864:24-865:6 (Coleman). On May 19, 2011, Daren Mutone, a former employee of Atlantic Coin Galleries, testified at trial that the Atlantic Coin Galleries salespeople would make fun of the victims because they were old and easier to convince. May 19 Tr. 1159:23-1160:13 (Mutone). Mr. Mutone testified that the elderly were "easier to push around," and that Mr. Romano and Mr. Kearney would hear the jokes and push the sales staff to sell even more coins to a victim who showed susceptibility to pressure and manipulation. May 19 Tr. 1160:12-13 (Mutone).

## 1. Financial Distress Caused By Defendants' Scheme

Mrs. Sharon Oldham testified at trial.  She had been a stay-at-home mother for twelve years when her husband passed away, leaving her on a fixed income—a yearly payment from the sale of his share in a business.  May 19 Tr. 1312:17-1317:15 (Oldham).  Mrs. Oldham began receiving calls from a man calling himself Mike Scott[6] at Atlantic Coin Galleries, later employed at Northeast Gold and Silver, who wished to sell her coins.  Mrs. Oldham would have "lengthy discussions over the phone concerning my financial situation [and] the assets my husband left . . . ."  May 19 Tr. 1214:16-20 (Oldham).  Mr. Scott called Mrs. Oldham "sometimes 10 or 12 times a day," and, despite the fact that she was low on cash while waiting for the next annual payment from her husband's business, Mr. Scott "encouraged [Mrs. Oldham] to sell something else, to get cash from wherever I could, from my credit card.  And even possibly to tap my children's educational accounts."  May 19 Tr. 1317:7-9, 1317:19-23 (Oldham).  Mrs. Oldham told Mr. Scott that she did not want to buy any more coins, but Mr. Scott responded that "he found [a coin] specifically for [Mrs. Oldham].  He even implied sometimes that his supervisors or his bosses might not like it if [Mrs. Oldham] didn't purchase [the coin] since [Mr. Scott] had already spent money on it."  May 19 Tr. 1318:22-25 (Oldham).  When Mrs. Oldham still hesitated, Mr. Scott offered her his employee discount.  May 19 Tr. 1319:17-19 (Oldham).

Mrs. Oldham told Mr. Scott that she was buying coins to help pay for her childrens' college, and Mr. Scott told Mrs. Oldham that when that time came, he would help her locate coin graders or even help her locate individuals willing to purchase some of her coins.  May 19 Tr. 1325:13-14 (Oldham).  When Mrs. Oldham's son was about to go to college, she asked Mr. Scott for the promised help.  May 19 Tr. 1326:2-8 (Oldham).  Mr. Scott "was evasive . . . 'Let me get

---

[6] On May 10, 2011, Michelle Stumpf testified at trial that the Defendants and their salespeople used false names when interacting with customers.  May 10 Tr. 342:8-343:20 (Stumpf).

back to you on that. I will get you some names.' Which he never did." May 19 Tr. 1926:10-14 (Oldham). The Government estimates that Mrs. Oldham lost $112,180.00 in Defendants' coin fraud scheme. Gov't 2.

Frank Donald Miser, Jr., also testified at trial. He is a bird farmer in Riverside, California, and he bought coins from Atlantic Coin Galleries and Northeast Gold and Silver. May 17 Tr. 944:21-945:7 (Miser). Representatives from Atlantic and Northeast "called [him] all the time," May 17 Tr. 945:25 (Miser), stated that they had rare coins of high grade with potential to appreciate in value, and Mr. Miser "relied upon everything the gentleman said. [H]e believed their word. They are only as good as their word." May 17 Tr. 948:2-20 (Miser). Mr. Miser "never took any of [the coins he purchased from Atlantic and Northeast] out of the boxes of the shipping crates they came in . . . . Because it was basically for investment." May 17 Tr. 950:13-25 (Miser). Mr. Miser said that he bought many of his coins from someone who identified himself as "Alan," and Alan at some point "quit" Atlantic and moved to Northeast because, according to Alan, "[the people at Atlantic] were not treating him fair because they would not give him time off to stay home . . . with his new daughter." May 17 Tr. 955:18-956:15 (Miser). The Government estimates that Mr. Miser lost approximately $158,138.00 in Defendants' coin fraud scheme. Gov't Exh. 2.

Other victims incurred significant financial losses as a result of Defendants' coin fraud scheme. For example, Mr. Douglas Fairbrother purchased approximately $15,000 worth of coins from Defendants upon their assurances that some coins would appreciate in value. Gov't Exh. 3 at MR-00636. Mr. Fairbrother is a double-leg amputee as a result of war wounds; he had hoped that the promised appreciation in the coins' value would allow him to finance a new wheelchair ramp in his home. Id. Mr. Fairbrother still does "not have enough 'appreciated value' to do so"

as a result of Defendants' "over-pricing and/or overgrading" of coins.  Id.

Mr. Paul Farr and Mrs. Roberta Farr, husband and wife, spent $112,405.00 on coins.  Id. at MR-0638.  The Farrs live on a fixed income—Social Security—because the money they gave to Defendants was their life savings.  Id.  They "paid for top grade MS65+, and received 'raw grade' coins."  Id.  The Farrs' affidavit concludes that they have suffered "grave hardship . . . We need help."  Id.

Lois DeNeales, recently deceased, was in her 90's when she purchased coins from Defendants totaling over $312,000, opening eight different credit cards under pressure from Defendants to effect the purchases.  Id. at MR-00586.  Ms. DeNeales almost lost her home of forty-five years as a result, and her estate later found that the coins were worth 10% of the purchase price.  Id. at MR-00586.

Mrs. Joan Harmon and her husband "lost everything" when they paid Defendants $470,495 for coins.  Id. at MR-00781.  "Because of [Northeast Gold and Silver] we got deep into credit card debt and had to sell our house. My son says we got very little out of the house to subsidize our assisted living costs and will run out of money within 2-3 years."  Id.

Merrill Jerome Edwards, 73-years old, purchased $52,035 in coins from Defendants that he was able to sell for a mere $12,388 after first seeking bids from four different coin companies.  Id. at MR-00629.  Mr. Edwards has "had to continue working" as a result of Defendants' fraud, which deprived him of "most of [his] life savings."  Id.

Mr. Eino Ritola bought coins from Defendants for $7,200; he later found that they were overvalued by $5,200.  Id. at MR-01148.  Mr. Ritola suffered depression as a result, as the coins were meant to help him in his retirement.  Id.

Ms. Gladys Seamons spent $44,5210 on coins from Defendants, and she lost her savings

16

and home in the process.  Id. at MR-01178.  She is now living on a "very limited income with

many physical, mental and emotional" effects from a stroke.  Id.  Since losing her home, she is

"reduced to living in [a] one bedroom apartment."  Id.; see also id. at MR-00061 (Victim Robert

Alton stated that he "lost over $70,000 . . . I received a return of about 15% for the money to

purchase coins. I had to get a second mortgage of $50,000 for my house."); id. at MR-00225

(Victim William Bunch revealed that he "purchased . . . in excess of $64,000 for which I hold

receipts.  Extreme emotion and financial hardship which resulted in my filing for bankruptcy.");

id. at MR-00281-00282 (Victim Candice Cope averred that she "purchased . . . $75,560. . . . I am

in the process of packing up and getting ready to sell my home.  I can no longer afford to own

my own home.  Because of these men, I was forced to get a mortgage on my home to repay all

my credit cards used to pay for the coins which I hoped to use as my retirement. . . . I am only

able to buy food once in every [sic] 6 weeks.  When what I have is gone I will be forced to go to

the food pantry or go to my church for help.").

## 2.  Harassment Employed In Effectuating Defendants' Coin Fraud Scheme

Donna Lutz, who testified at trial, was 71-years old; she had retired after working as a

budget analyst for twenty-seven years for the United States Navy.  May 16 Tr. 653:13-654:1,

684:21 (Lutz).  In February 2005, Ms. Lutz began receiving phone calls from Atlantic Coin

Galleries, and later, from Northeast Gold and Silver.  May 16 Tr. 654:12-655:4 (Lutz).  Ms. Lutz

relied upon representations that the quality, grade, age and mints of various coins meant they

would increase in value in the future, and Ms. Lutz began to buy coins.  May 16 Tr. 654:24

(Lutz).  At some point, Defendants phoned Ms. Lutz once a week, then the calls were spaced by

days; the sales pitch focused on encouraging Ms. Lutz to buy a complete set of particular coins.

May 16 Tr. 664:14, 668:11-15 (Lutz).  Ms. Lutz trusted "Steve" in all of his representations to

her, and she bought coins in reliance upon those representations because she "had no reason not to trust him.  I mean, you know it's a company that is selling coins.  And he was—you know, it was nice to talk to him . . . I didn't know the coin business.  So I figured, why would I not trust him?"  May 16 Tr. 670:20-24 (Lutz).

At some point, Ms. Lutz had no more money to buy coins and told Steve as much.  May 16 677:22-23 (Lutz).  Steve "kept talking, trying to get me to buy additional coins.  And I finally could not buy any more . . . and hung up the phone. . . . He called back.  He called back.  I kept telling him the same thing . . . and just to stop talking. And this went back and forth three or four times. . . . And he would not give up.  And when I'd . . . hang up the phone, he called right back, telling me I was rude for hanging up."  May 16 Tr. 678:4-11 (Lutz).  Steve called Ms. Lutz again, stating "'I want you to talk to my boss.'  And to be honest, I didn't really listen to whatever he had to say, because I was upset at this time.  And so I just hung up on him.  But again the phone rang, and it was Steve, telling me how rude I was for hanging up on his boss. You know, what can I do?"  May 16 Tr. 678:16-22 (Lutz).  The Government estimates that Ms. Lutz lost approximately $11,238.00 as a result of Defendants' coin fraud scheme.  Gov't Exh. 2.

Other victims recalled the harassment Defendants employed in selling coins.  Barbara Bailey Hull, the executor for the estate of victim Richard Aaron Bailey, wrote in a letter supplementing the estate's loss affidavit, that her father suffered from Alzheimer's Disease. Gov't Exh. 3 at MR-00146-00147.  Ms. Hull moved into her father's home and "witnessed my father receiving a high volume of telephone solicitations from coin dealers . . . . [I] would then explain to any coin dealer who called that my father was ill with dementia and unable to enter into any transactions . . . . While the majority of vendors honored the 'do-not-call' request, . . . Atlantic Coin Galleries . . . ignored our request over and over again.  If we got to the phone

before Dad, they would hang up on us.  But if Dad got there first, he as often as not would go ahead and buy the coins, or explain he couldn't understand the conversation and hang up."  Id. The Government estimates that Mr. Bailey lost approximately $5,569.00 to Defendants' coin fraud scheme.  Gov't Exh. 2.

Nora A. Beall wrote in her loss affidavit that she "will never forget the endless sales calls day and night.  I will never forget the way a sale was accomplished.  I will never forget the Federal Express driver knocking on my door soon after [Defendants' phone call] with a prepaid envelope for my check.  I will never forget not feeling safe and/or smart enough to figure out a way to stop the unwanted sales."  Id. at MR-00167.  Ms. Beall submitted handwritten notes that she had made contemporaneously with Defendants' sales calls as a supplement to her loss affidavit, which includes the following entries:  (1) "'what other assets do you have?'"; (2) "did I call on my 401K[,] did I get the forms[,] did I fill out the forms"; (3) "how long do you think it will take to sell your car"; (4) "after [some problem] on checks he asked me to get to the bank by cab and get a cashier's check . . ."; (5) "when I told Fed Express I changed my mind and cancelled [and would not send Defendants the check that they had sent Federal Express to pick up] I would get a call a little later asking why I didn't have the check ready and was told Fed Ex would be back in 1 hour and I better have the check"; (6) "'you are not being a very good girl'". Id. at MR-00168-00169.  The Government estimates that Ms. Beall lost approximately $28,128.00 to Defendants' coin fraud scheme.  Gov't Exh. 2.

Cindy Salemi, who the Government estimates lost $4,377.00 as a result of Defendants' coin fraud scheme, Gov't Exh. 2, wrote in a supplemental letter to her loss affidavit that "[o]ne of the sale tactics that was used [to] lure me into making another purchase was that I was told a salesman was so upset by me not buying anything from him on this one particular day, he went

up to the roof with his beloved dog and proceeding [sic] to jump off of said building." Id. at MR-01166.

### v. The Government Selected Nine Victims Of The 220 Victims Seeking Restitution To Serve As A Study Sample

Agent Hessle reviewed the 220 victim loss affidavits in order to identify which victims were the most appropriate candidates for closer study. Agent Hessle selected for closer study those victims who (1) still had all coins purchased from Defendants in their possession, and (2) still had invoices issued by Defendants for those coins. June 26 Tr. 27:1-15 (Hessle). This victim subset was critical to the prosecution strategy, including its study for restitution purposes, because Agent Hessle intended to send out the victims' coins to NGC for grading and to Mr. Swiatek for valuation. Prepared with the data collected from NGC and Mr. Swiatek, the Government planned to conduct a comparative analysis of, inter alia, the professional assignment of grades and expert calculation of values against Defendants' asserted grades and values which were printed on the invoices sent to the victims with their coins at the time of purchase. After several months of reviewing the 220 affidavits, nine victims emerged as reliable subjects for the restitution study because they were still in possession of all of the coins as well as their invoices.[7]   June 26 Tr. 27:1-15 (Hessle). In all, these nine victims had purchased approximately 1,800 coins from Defendants. June 26 Tr. 30:3-5 (Hessle).

---

[7] Agent Hessle excluded some victims who retained all of their coins and invoices from the sample because they had been the target of multiple coin fraud schemes. June 26 Tr. 29:8-16 (Hessle). Under such circumstances, if a victim had, for example, purchased one Benjamin Franklin half dollar of a particular type and year from Defendants, and purchased the same coin from another dealer, Agent Hessle could not be certain which coin came from which vendor, injecting uncertainty into the grade and value comparisons with Defendants' representations. June 26 Tr. 29:8-16 (Hessle).

### vi. Professional Grading Service NGC Assigned A Grade For Each One Of The Nine Selected Victims' 1,800 Coins

In 2010, Agent Hessle sent the nine selected victims' 1,800 coins—the entire collection of these nine victims' purchases from Defendants—to professional coin grading service NGC to receive grades in accordance with industry standards. June 26 Tr. 29:20-30:12 (Hessle).  In assigning a grade to each of the coins, NGC used the methodology described supra, Section II.d.i.  Once Agent Hessle received the NGC grades for the 1,800 coins, he created a spreadsheet that listed each one of the 1,800 coins.  Gov't Exh. 1.  Each row on the spreadsheet corresponded to one of the 1,800 coins, with fields reflecting, inter alia, the coin's type and year of origin, Defendants' asserted grade, the date Defendants sold the coin to the corresponding victim, Defendants' asserted value (the sale price) of the coin and NGC's grade.  Id.

### vii. Coin Expert Anthony Swiatek Compiled Values For Each One Of The Nine Selected Victims' 1,800 Coins Using Various Data Points, Including (1) Defendants' Asserted Value For The Coins At Sale, (2) Actual Value For The Coins At Sale Had Defendants' Asserted Grade Been Correct, And (3) Actual Value For The Coins Using NGC Grade As Of October 2010

Government coin expert Mr. Swiatek used Agent Hessle's spreadsheet to determine three values for each one of the 1,800 coins in anticipation of trial.  First, Mr. Swiatek listed values for all the coins using Defendants' representation of the coin's grade to the victim and Defendants' represented value for the coin at the moment of sale.  May 26 Tr. 2025:16-18, 2041:2-10 (Swiatek).  Next, Mr. Swiatek valued all coins using Defendants' representation of the coin's grade to reach the actual value for the coin at the moment of sale.  Id.  Finally, Mr. Swiatek valued all coins using NGC's grade as of October 2010.  May 26 Tr. 2025:16-18, 2041:2-10 (Swiatek).

Mr. Swiatek did not personally examine the coins to grade them; instead, he relied on

Defendants' grades, NGC's grades and industry valuation data to assign values to the coins. May 26 Tr. 2025:16-18, 2026:2-20; May 31 Tr. 2068:9-13, 2070:7-11 (Swiatek). Mr. Swiatek conceded that if he were buying a coin for himself, he would examine it personally first, May 31 Tr. 2069:23-2070:3 (Swiatek), but he testified that he did not directly examine the 1,800 coins here because as a general practice, NGC's grades are so accepted in the coin industry there was no reason to do so,[8] May 26 Tr. 2043:4-8 (Swiatek); May 31 Tr. 2069:10-12 (Swiatek).

Mr. Swiatek testified that he principally used Greysheets in valuing the 1,800 coins, but that he also consulted Bluesheets.[9] May 26 2050:1-14 (Swiatek). Mr. Swiatek never simply used the bid or ask price in Greysheets or Bluesheets to set a value for a victim's coin. May 26 Tr. 2050:1-14 (Swiatek). Instead, Mr. Swiatek looked at the Greysheets or Bluesheets bid-ask price as of the coin's sale date to a victim as a starting point; thought about the coin in terms of his own personal knowledge about prices at the time; researched historical auction prices; then assigned a value for a particular coin within the Greysheets or Bluesheets range using all of these factors as a guide.[10] May 26 Tr. 2050:1-14 (Swiatek).

---

[8] Mr. Swiatek testified that at times a coin collector may seek "cross grading" for a coin after obtaining an NGC grade, which means submitting it to another professional grading service such as PCGS in an effort to get a higher grade. This does not indicate a lack of industry faith in NGC; instead, Mr. Swiatek testified that it has been his experience that people seeking a cross grade frequently overlook some flaw in their coins that is the basis for the disappointing grade and that cross grading only yields a different grade "on a small number of pieces." May 31 Tr. 2073:21-2074:23, 2075:1-10 (Swiatek).

[9] Mr. Swiatek testified that there are instances in his practice when he does not use Greysheets or Bluesheets at all, but that this is only in the case of very rare coins. May 31 Tr. 2090:12-17 (Swiatek). To help price a very rare coin, Mr. Swiatek researches auction prices. Id.

[10] Mr. Swiatek acknowledged that a collectible coin could have been in better condition at the moment of its sale than in 2010 when NGC graded it due to mishandling by its owner (Defendants sold most of the 1,800 coins from 2005 to 2008). May 31 Tr. 2100:2-7 (Swiatek). However, Mr. Swiatek made clear that there is usually no meaningful degradation of a coin's quality absent abuse. May 31 Tr. 2100:9-2105:2 (Swiatek). There is no evidence in the record

Mr. Swiatek testified that he applied a consistent methodology in making his valuation of the 1,800 coins, and that he performed a quality-control review to check his valuations.  In reviewing his work, Mr. Swiatek found that he had valued similar coins on the chart inconsistently only 45 out of 1,800 instances.  May 31 Tr. 2123:17, 2146:24 (Swiatek).   Thus, 97.5% of Mr. Swiatek's valuations were consistent with those of similar coins among the 1,800 coins.

Mr. Swiatek testified that he stood by his valuation of the coins regardless of whether they were part of a set of coins.  May 31 Tr. 2132:6-11, 2137:19 (Swiatek).  Mr. Swiatek testified that he did not adhere to the viewpoint that building sets of coins increased the individual coins' value, and that the vast majority of coin collectors did not assign special value to sets.  May 31 Tr. 2132:6-11, 2137:19 (Swiatek).  Swiatek said that only about 10% of the coin collecting industry feels that set building increases coins' value, May 31 Tr. 2137:24-2138:4 (Swiatek), and that it is common practice for dealers to simply break down sets and price coins separately, May 31 Tr. 2133:1-3 (Swiatek).

### viii.  Coin Expert Anthony Swiatek Testified At Trial That His Examination Of The Nine Selected Victims' Coin Grades And Values Revealed That Defendants Represented Coin Grades And Values That Were Higher Than The Coins Merited

Mr. Swiatek's three different valuations for each coin were incorporated into the spreadsheet (hereinafter "the Swiatek valuation chart").  Gov't Exh. 1.  At trial, Mr. Swiatek, using the comparative data in the Swiatek valuation chart, testified that Defendants systematically gave coins higher grades than the NGC did, May 31 Tr. 2087:9-11, and that Defendants sold the coins at prices that far exceeded their actual worth, Gov't Exh. 1.  At times,

_____

that the nine victims mishandled or abused their collectible coins.  In fact, Frank Miser, one of the nine selected victims, had never taken his coins out of the boxes.  June 26 Tr. 99:10-17 (Hessle).

the grade at which Defendants sold a coin was three grades off from the grade that NGC

assigned which, according to Mr. Swiatek, had "enormous financial consequences" for the coin's

value.  May 26 Tr. 2041:21-2042:7 (Swiatek).

> **ix.  Coin Expert Anthony Swiatek Updated The Nine Selected Victims' Coin Values in November 2012 In Anticipation Of The Government's Restitution Motion, And The Government Concluded That The Nine Selected Victims' Coins On Average Reflected A 21% Value-To-Price Ratio**

On the basis of Mr. Swiatek's October 2010 valuations, the nine victims' coins roughly

showed a 15% value-to-price ratio.  June 26 Tr. 64:3 (Hessle); Gov't Exh. 6.  Thus, as of

October 2010, the coins the nine victims purchased from Defendants were worth on average, 15

cents for each dollar that a victim had paid.  June 26 Tr. 62:10-12 (Hessle).

Agent Hessle asked Mr. Swiatek to update the coin valuations in November 2012 in order

to reflect the increase of gold and silver values that had occurred in the marketplace since

October 2010.  June 26 Tr. 64:9-11 (Hessle).  On the basis of Mr. Swiatek's update, Agent

Hessle calculated that on average in November 2012, the nine victims' coins reflected a 21%

value-to-price ratio, i.e., the victims' coins were worth 21 cents for every dollar the victims had

paid to buy them from Defendants.  June 26 Tr. 64:18-21 (Hessle); Gov't Exh. 6.

> **x.  The Government Applied The Nine Selected Victims' Average 21% Value-To-Price Ratio To The 220 Victims Who Filed Loss Affidavits Pursuant To A Modified Categorical Calculation And Seeks A Restitution Order In The Amount Of $9,332,667.10 On That Basis**

Agent Hessle believed that the nine victims' average value-to-price ratio was

representative of the loss amount suffered by the 220 victims of Defendants' coin fraud scheme

because the nine victims' coin portfolios included coins, such as Benjamin Franklin half dollars,

that were well represented in the coin portfolios of all victims.  June 26 Tr. 44:17-21 (Hessle).

Agent Hessle explained that a study of the three companies' wholesaler records showed that the

three companies bought vast quantities of similar coins for its coin fraud scheme.[11]  June 26 Tr. 43:25-44:15 (Hessle).  As just one example, Defendants purchased some 7,106 rolls of brilliant uncirculated ("BU") Benjamin Franklin half dollars during the period 2000 to 2008.  June 26 Tr. 51:18-22 (Hessle).  Nearly 1,400 of the 1,800 coins (approximately 78%) on the Swiatek valuation chart were Benjamin Franklin half dollars.  June 27 Tr. 53:3-5 (Ganz).

Agent Hessle next set about calculating a proposed restitution amount for each of the 220 victims who submitted claims.  Agent Hessle's first step in this project was to separate victims into different categories according to whether they had sold some, none or all of their coins.  June 26 Tr. 56:8-10 (Hessle).  Agent Hessle believed that victims' loss amounts should be calculated differently according to whether they had sold none of their coins (because the victims' losses would have to be estimated), as opposed to some or all of their coins (because some or all of the victims' losses did not have to be estimated due to existing facts regarding the prices at which the victims sold their coins); he therefore devised a distinct restitution formula for each one of these categories.   For three of the four categories where victims still had or likely had some of their coins in their possession, Agent Hessle used the 21% value-to-price ratio as a multiplier to calculate restitution estimates, while for the fourth category, Agent Hessle diverged from the 21% value-to-price ratio and used actual data to calculate restitution (hereinafter referred to as "the 21% value-to-price ratio modified categorical calculation").

---

[11] Gov't Exh. 120 is a table showing the value of coins the three companies purchased from ten different wholesalers from December 2000 through November 2008.  Gov't Exh. 120.  The wholesaler chart reveals that the three companies bought $13,368,194.73 worth of coins from the ten wholesalers during that period.  Id.  The Government also again introduced at the restitution hearing what had been introduced at trial as Gov't Exh. 120B, which is a pie chart showing the percentage of business the three companies did with each wholesaler with respect to their total wholesaler business.  Gov't Exh. 120B.  On May 21, 2011, Val J. Webb, Andrew M. Seminerio and Michael Palmadessa, all wholesalers who sold coin inventory to Defendants, testified at Defendants' trial.  May 21 Tr. 1427:1-1510:14 (Webb, Seminerio, Palmadessa).

The first category was made up of the 133 victims who still had all of their coins; this category included 60% of the total 220 victims. June 26 Tr. 77:1-79:25 (Hessle). Agent Hessle used the 21% value-to-price ratio to recommend that to make them whole these victims receive 79 cents in restitution for every dollar spent. Gov't Exh. 2. That is, because the victims had overpaid for the coins by an average 79% (using 2012 prices), the restitution amounts should close the financial gap between the value they received in coins and what they actually paid.[12] Therefore, Agent Hessle calculated restitution for these victims by multiplying the price they paid for coins by 79%. June 26 Tr. 77:1-79:25 (Hessle).

The second category was made up of nineteen victims who had kept some coins but sold others, and this category represented 9% of the total 220 victims. June 26 Tr. 71:18-19; 78:1-2 (Hessle). Agent Hessle calculated restitution for these victims by subtracting the amount for which a victim sold his or her coins to a third party from the total money the victim paid Defendants for coins, and then multiplying the difference by 79% so as to make the victim whole.[13] June 26 Tr. 72:5-8 (Hessle).

The third category was made up of sixty victims who had sold all of their coins to third parties, and this category represented 27% of the total 220 victims. June 26 Tr. 74:21-75:4 (Hessle). Agent Hessle determined that the victims who sold all of their coins received on

---

[12] I note that none of the restitution calculations includes what standard interest rate the victims could have earned had they left the money in a savings or similar safe investment account.

[13] There was some discussion at the restitution hearing as to why this process was fair. If a victim paid ten dollars for a coin but could sell it for only one dollar, then shouldn't the proven 10% value-to-price ratio apply rather than the applied average 21% value-to-price ratio? Or, in the alternative, if a victim paid ten dollars for a coin but could sell it for four dollars, then shouldn't the proven 40% value-to-price ratio apply rather than the estimated value-to-price ratio? The Government responded that while the above hypotheticals work in theory, in practice victims sold some of their coins without keeping accurate records of which coin sold for what price such that the calculation was not possible. June 26 Tr. 74:1-8 (AUSA Gatz).

average an 18.59% value-to-price ratio for their coins.  June 26 Tr. 75:7-11, 75:21-22 (Hessle). Agent Hessle calculated restitution amounts for this category of victims by assigning to them 81.41% of the money they had spent on coins so as to calculate an amount that would make them whole.  Agent Hessle did not employ the 21% value-to-loss ratio for these sixty victims because the data particular to their circumstance indicated that a 79% credit of their purchase price would not fully compensate these victims for their loss.

The fourth category was made up of seven victims for whom Agent Hessle had no data regarding whether they had sold none, some or all of their coins; this category represented 3% of the total 220 victims.  June 26 Tr. 79:15 (Hessle).  Agent Hessle assigned the seven victims in this category 79% of their total purchase price as restitution in order to make them whole.  June 26 Tr. 79:20.

Once Agent Hessle had assigned each individual victim to one of the four victim categories, and calculated restitution for that individual victim according to the methodology Agent Hessle had devised for that particular tranche of persons, he created a chart reflecting his findings (hereinafter "the Hessle victim loss summary chart").  Gov't Exh. 2.  The Hessle victim loss summary chart itemized each individual victim's proposed entitlement to restitution based on his or her particular circumstance.  He concluded that the 220 victims were entitled to $9,332,667.10 in restitution in total.  Id.

> ### xi.  Statistics Expert Dr. Mark Glickman Testified That He Cannot Say With Certainty Whether The Nine Selected Victims Sampled Were Representative Of The 211 Other Victims Without Knowing How The Nine Victims' Coin Portfolios Compare To The 211 Victims' Coin Portfolios

At the June 26, 2013 restitution hearing, Defendants' statistics expert Dr. Glickman testified about his analysis of the Swiatek valuation chart to determine whether one could

consider the nine-victim survey sample a statistically sound basis from which to extrapolate conclusions about the overall population of 220 victims who provided loss affidavits.  June 26 Tr. 142:15-143:12 (Glickman); Gov't Exh. 1.  Ultimately, Dr. Glickman testified that while he could not be certain whether the nine-victim survey was a statistically sound sample, he would feel more comfortable if the sample size were larger.

Dr. Glickman testified that, as Agent Hessle acknowledged that he chose the nine victims for his study sample for particular reasons, the nine victims were not chosen at random.  A random sample would have required a blind selection of nine victims out of the 220 victims seeking restitution.  June 26 Tr. 145:17-25 (Glickman).  Dr. Glickman testified that a non-random sample did not necessarily mean the sample is not a representative one.  One can only determine whether a sample is representative when one studies some information about the larger group.  June 26 Tr. 216:5-6 (Glickman).

Dr. Glickman testified that he needed more data before he could say that the nine victims' coins were not representative of the remaining 211 victims' coins, although he testified that it was possible that they were not representative.  June 26 Tr. 146:7-10 (Glickman).  In rendering his opinion that there was a possibility that the nine victims' coins were not representative of the remaining 211 victims' coins, Dr. Glickman explained that he never studied the remaining 211 victims' coins, or even a subset of the 211 victims' coins.  June 26 Tr. 147:13.  However, Dr. Glickman did study the Swiatek valuation chart in six different areas, which I now outline.   June 26 Tr. 147:10.

First, Dr. Glickman testified that the 1,800 coins appearing on the Swiatek valuation chart were itemized in 206 invoices.  June 26 Tr. 151:19-24 (Glickman).  Dr. Glickman calculated the average value-to-price ratio for each one of those invoices and testified that the results showed

that there was statistically significant variance between the average value-to-price ratio for each invoice as compared against the others.  June 26 Tr. 160:1-6 (Glickman); MRMG-1 (chart showing value-to-price ratio variance with respect to the 206 invoices on which the 1,800 coins appeared).  More specifically, Dr. Glickman showed that while 178 of the 206 invoices (86% of the invoices) clustered around the 21% average value-to-price ratio in the 0% to 40% range, the remaining 28 invoices exhibited value-to-price ratios greater than 40%.  MRMG-1.

Second, Dr. Glickman testified that he sorted the 206 invoices according to which of the nine victims they belonged, then calculated an average value-to-price ratio for each one of the nine victims appearing on the Swiatek valuation chart.  June 26 Tr. 160:1-6 (Glickman).  Dr. Glickman showed that each individual victim among the nine victims had a median value-to-price ratio that did not land precisely at 21%.  June 26 Tr. 172:1-8 (Glickman); MRMG-2 (chart showing value-to-price ratio variance with respect to the nine victims studied).  In other words, five of the nine victims had median value-to-price ratios above 21%, and four of them had value-to-price ratios lower than 21%.  MRMG-2.  Dr. Glickman said that this finding "doesn't address the issue about whether [the nine-victim sample is] representative or not," but it did suggest that "if you picked nine different victims, the [21%] value-to-price ratio could have been different."  June 26 Tr. 171:11-15 (Glickman).

Third, Dr. Glickman testified that he studied 105 coin entries from the 1,800 coins on the Swiatek valuation chart, and that he selected these 105 coins because they fell into one of six commonly represented coin types on the Swiatek valuation chart—$1 gold, $5 gold, $10 gold, $20 gold, Benjamin Franklin Half Dollar, and Walking Liberty Half Dollar.  June 26 Tr. 172:15-23,174:17-23, 174:25-175:15 (Glickman); MRMG-3 (chart showing value-to-price ratio variance with respect to commonly represented coin types in the universe of 1,800 coins).  Dr. Glickman

29

found, for instance, that the median value-to-price ratio was around 10% for $1 gold coins, 23% for $10 gold coins, 34% for $20 gold coins, 21% for $5 gold coins, 14% for Benjamin Franklin half dollars, and 8% for Walking Liberty Half Dollars.  MRMG-3.  According to Dr. Glickman, this established a statistically significant variance between the coin types in terms of value-to-price ratio, meaning that the individual coin types did not uniformly exhibit a median value-to-price ratio mirroring the 21% value-to-price ratio reflected on the Swiatek valuation chart.  June 26 Tr. 174:25-175:15 (Glickman).  Dr. Glickman testified that this meant that he would want to know what coin types the other 211 victims in order for him to say whether the nine victims' loss was representative of the other 211 victims' loss.  June 26 Tr. 175:9-15, 177:24-178:4 (Glickman).

Fourth, Dr. Glickman studied how a value-to-price ratio for a given coin varied depending on the coin's mint year; fifth, he studied actual value as of November 2012 (using the NGC grade); and sixth, he studied the number of coins bundled on the same invoice in which the coin was itemized.  June 26 Tr. 174:25-175:15, 179:4-7, 181:4-9, 183:1-2, 184:14-16 (Glickman); MRMG-4 (chart showing value-to-price ratio variance with respect to the mint years of 121 of the 1,800 coins), MRMG-5 (chart showing value-to-price ratio variance with respect to the November 2012 coin values of 121 of the 1,800 coins), MRMG-6 (chart showing value-to-price ratio variance with respect to the number of coins sold in a single purchase in a sample of 180 of the 206 invoices).  Dr. Glickman testified that when each of these measures—mint year, November 2012 value and number of coins bundled on an invoice—changed, he saw statistically significant variance from a 21% value-to-price ratio.  Dr. Glickman explained that he therefore could not say whether the nine victims' coins were or were not representative of the other 211 victims' coins without knowing whether "the distribution of coin types, mint year, bundlings of

coins or the values of the coins" for the 211 victims are "different in any substantive way from the nine customers that we analyzed."  June 26 Tr. 185:18-186:1 (Glickman).

Dr. Glickman "never concluded that [the nine victims were] a good sample or a bad sample." June 26 Tr. 197:3-6 (Glickman).  Dr. Glickman never said that the Swiatek valuation chart's analysis of nine victims was not representative of the other 211 victims.  "It could be a good sample but it just happens that the value-to-price ratio varies by customer."  June 26 Tr. 197:8-9 (Glickman).  However, Dr. Glickman testified that if he were crafting a true representative sample for the 220-victim group, he believed "you probably would want a larger number maybe close to 30 to 40 maybe . . . ."  June 26 Tr. 186:17-22 (Glickman).

### xii.    Coin Expert David Ganz Testified

At the June 27, 2013 restitution hearing, Defendants' coin expert David Ganz testified about coin value volatility, noting that NGC's Web site acknowledged in a "Frequently Asked Questions" section that coin prices may vary depending on which professional grading service grades a particular coin.  June 27 Tr. 20:13-14, 20:20-22 (Ganz); MRDG-4 (a printout of the NGC Web site's FAQ page).  In addition, the NGC Website has a coin grading guarantee in which the grading service has a disclaimer stating that "due to the volatile nature of the coin market and internet auctions/sales," the price estimates published by NGC "do not necessarily represent the current fair market value of any particular coin."  June 27 Tr. 23:6-10, 23:25-24:1 (Ganz).

Mr. Ganz testified that coin price volatility is attributable to the fact that the coin market is "not like the stock market where every purchase and every sale is recorded in some central source and then distilled down to a single price . . . . So the editor [of a coin valuation publication] will rely on reported sales by large dealers . . . but [the dealers' sales reporting]

never covers the entire market and hence it becomes the editor's opinion . . . ." June 27 Tr. 26:8-15 (Ganz). Mr. Ganz stated that although coin price publications like Greysheets or Bluesheets cannot "track[] every dealer to dealer sale," June 27 Tr. 29:13-19 (Ganz), the editors of Greysheets or Bluesheets seek data on large volumes of coin sales: "In other words, the fact that I might sell an 1881-S dollar at a particular price is not going to be of interest or concern to the Greysheet. But if dealer X were to buy 1,000 1881-S dollar [coins] at a particular price, that's more interesting [to the Greysheet/Bluesheet editors]." June 27 Tr. 50:13-20 (Ganz) (acknowledging the importance of investigating high volume sales to coin valuation accuracy).

Mr. Ganz next discussed a study that he conducted on 400 of the 1,800 coins appearing on the Swiatek valuation chart to see if his valuation of these coins corroborated Mr. Swiatek's valuation of the coins. Mr. Ganz chose these 400 coins arbitrarily (with the exception of one which he chose out of a personal familiarity with the coin type) and priced them using Greysheets' November 2012 monthly supplement. June 27 Tr. 31:3-33:19; 34:13-24; 35:1-3 (Ganz). Mr. Ganz testified that twelve of the 400 coins he chose out of the 1,800 coins were valued higher on the Greysheet November 2012 monthly supplement than they were valued on the Swiatek valuation chart.[14] Id. Thus, Mr. Ganz only valued 3% of the 400 coins he studied at

---

[14] Mr. Ganz's testimony included his observation that he found it difficult to replicate Mr. Swiatek's valuation process. June 27 Tr. 28:16-19 (Ganz). Mr. Swiatek's valuation process did not employ Greysheets or Bluesheets exclusively. Instead, it began with Greysheets or Bluesheets values and then adjusted according to auction data or Mr. Swiatek's personal knowledge relating to coins. This Court therefore understands Mr. Ganz's testimony that Mr. Swiatek undervalued twelve coins out of 400 coins to mean that Mr. Ganz did not take into account Mr. Swiatek's analyses beyond Greysheets or Bluesheets. As to Mr. Ganz's own views on valuation methodology, Mr. Ganz testified that Greysheets and Bluesheets are "used widely to get a general impression of what the price [of a coin] is at any given point in time," June 27 Tr. 49:22-50:5 (Ganz), but he believed that Greysheets and Bluesheets consultation was a jumping off point and that investigation of what real prices are, for instance, by examining various auction house records as Mr. Swiatek also did, is a necessary followup, June 27 Tr. 25:18-24, 28:4-15 (Ganz).

a higher amount than appeared on the Swiatek valuation chart.  Mr. Ganz memorialized his findings regarding those twelve coins out of 400 in a chart.  MRDG-3.

Mr. Ganz conducted another study in which he compared those same 400 coins' valuations on the Swiatek valuation chart against auction prices.  June 27 Tr. 35:14-42:14 (Ganz).  Mr. Ganz found seven instances in which a coin valuation on the Swiatek valuation chart was lower than the price assigned to the identically described coin at one or more auction houses.  June 27 Tr. 36:18-41:13 (Ganz).  Thus, Mr. Ganz only valued 1.75% of the 400 coins he studied at a higher amount than appeared on the Swiatek valuation chart.  Ganz memorialized his findings regarding those seven coins out of 400 in a chart.  MRDG-1, MRDG-2.

### III.    Legal Analysis

#### a.    Summary Of The Government's Restitution Motion, Defendants' Opposition And This Court's Recommendations

The Government moves this Court for a restitution order against Mr. Romano and Mr. Kearney in the amount of $9,332,667.10 jointly and severally as co-conspirators.  Docket No. 377.  In support of its motion, the Government cites the Swiatek valuation chart and the Hessle victim loss summary.  Id.; Gov't Exh. 1; Gov't Exh. 2.  In sum, the Government argues that the these two exhibits and all the testimonial and documentary evidence summarized in these chart exhibits, requires the Court to fashion a restitution order which, roughly stated, grants to victims restitution calculated as 79% of the total purchase price they paid Defendants for coins (depending on which of the four victim-category formulae is applicable to a victim).  Docket No. 377; Gov't Exh. 1; Gov't Exh. 2.

The Government argues for 79% as the basis for the restitution calculations based on the above-described analysis that it conducted of nine victims' experiences as a result of Defendants' fraud.  The nine victims the Government selected as their restitution study sample received only

21-cents worth of coin value for every dollar they spent purchasing 1,800 coins from Defendants' fraud scheme.  Docket No. 377.  The Government urges the Court to apply that same 21% value-to-price ratio to craft a restitution order for each of the remaining 211 victims (with adjustments made in the calculation for victims who have already sold some or all of their coins).  Id.

Defendants oppose the restitution motion, stating that two exceptions to mandatory restitution apply.  Docket No. 279.  One of these exceptions, 18 U.S.C. § 3663A(c)(3)(A), applies when "the number of identifiable victims is so large as to make restitution impracticable."  18 U.S.C. § 3663A(c)(3)(A).  The other exception, 18 U.S.C. § 3663A(c)(3)(B), applies when "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  18 U.S.C. § 3663A(c)(3)(B).

This Court recommends that the District Judge **find** that the 18 U.S.C. § 3663A(c)(3)(A) exception does not apply because a preponderance of the evidence shows that calculating restitution for the 220 victims in this case is not impracticable.  See infra, Section III.c.i.  The Court also recommends that the District Judge **find** that the 18 U.S.C. § 3663A(c)(3)(B) exception does not apply because a preponderance of the evidence shows that the Government's proposed approach to calculating restitution is not only fair, but is straightforward to execute, such that the strong need to provide restitution to the victims favors the entry of a restitution order.  See infra, Section III.c.ii.

### b.  Overview Of Relevant Restitution Law

"The purpose of restitution is to compensate victims for their losses."  U.S. v. Gonzalez,

647 F.3d 41, 65 (2d Cir. 2011). The MVRA "provides for mandatory restitution in all sentencing proceedings for convictions of any offense that is, inter alia, an offense against property under Title 18 in which an identifiable victim or victims has suffered a pecuniary loss." U.S. v. Skowron, 839 F. Supp. 2d 740, 743 (S.D.N.Y. 2012) (citing U.S. v. Bengis, 631 F.3d 33, 38-39 (2d Cir. 2011), and 18 U.S.C. §§ 3663A(c)(1)(A)(ii)-(c)(1)(B)).

The Court "shall order the probation officer to obtain and include in its presentence report . . . information sufficient for the court to exercise its discretion in fashioning a restitution order." 18 U.S.C. § 3664(a).

The sentencing court has broad discretion in determining the procedure to be used to resolve disputes regarding restitution so long as the defendant has an adequate opportunity to present his position. See U.S. v. Sabhnani, 599 F.3d 215, 257-58 (2d Cir. 2010). The Court is not required to rely exclusively upon the presentence report. See U.S. v. Miller, 116 F.3d 641, 685 (2d Cir. 1997) ("[T]he sentencing judge is not bound by the recommendations of the PSR."). "After reviewing the report of the probation officer, the court may require additional documentation or hear testimony . . . ." 18 U.S.C. § 3664(d)(4).

Here, the Probation Department published separate presentence reports for Mr. Romano and Mr. Kearney, which the Court has read. This Court also received additional documentation. On June 26, 2013 and June 27, 2013, this Court held a restitution hearing during which it took witness testimony and, after the hearing, the Parties made written submissions regarding their positions and gave the Court a binder containing all exhibits used by their witnesses during examination.[15]  June 26 Tr. 5:10-13.

---

[15] The Court will refer to those exhibits throughout this Report and Recommendation as they were referred to by the Parties during the restitution hearings. The Parties sometimes referred to exhibits as they were marked at trial, and other times the Parties marked them anew at the

As this is a case involving the victims' loss of money to Defendants as a result of the coin fraud scheme, 18 U.S.C. § 3663A(b)(1)(A) requires that the order of restitution direct Defendants to return the lost money "to the owner of the property or someone designated by the owner."[16]  18 U.S.C. § 3663A(b)(1)(A).

Any disputes between the Parties as to the amount or fact of restitution must be resolved "by the preponderance of the evidence."  18 U.S.C. § 3664(e).  "The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government."  Id.

The loss for the purpose of restitution may be reasonably estimated.  See U.S. v. Cheng, 96 F.3d 654, 657-58 (2d Cir. 1996) (holding that the district court drew a permissible inference to determine actual loss from the defendant's unlawful use of food stamps, i.e., that the third-party vendors receiving the food stamps cashed them in, causing Government loss).  However, "a court must base its restitution award on more than mere speculation about a victim's actual losses."  U.S. v. Donaghy, 570 F. Supp. 2d 411, 423 (E.D.N.Y. 2008).  "So long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not

_____

restitution hearing.  Those exhibits are: Government Exhs. 1, 2, 5, 6, 113, 114, 120, 120B, 122; Exhs. K-2, K-3, K-4, K-5; Exhs. MR-DG-1, MR-DG-2, MR-DG-2, MR-DG-3, MR-DG-4, MR-DG-5; Exhs. MR-MG-1, MR-MG-2, MR-MG-3, MR-MG-4, MR-MG-5, MR-MG-6; and Exhs. MR-WH-1, MR-WH-2, MR-WH-3, MR-WH-4, MR-WH-5.  At this writing, the undersigned has a binder in chambers with copies of all of these exhibits, but the Parties were advised at the restitution hearing, and are here advised again, that they are responsible for maintaining custody of all original exhibits in the event of further proceedings in this case.

[16] Defendants also mention 18 U.S.C. § 3663A(b)(1)(B) as a potential grounds for the restitution order, but that statute regards how a court must calculate restitution in the event that a victim's loss involves real property that "is impossible, impracticable, or inadequate" to give back.  See, e.g, U.S. v. Robes, 698 F.3d 937, 948 (7th Cir. 2012) (discussing the calculation of a money value for real property in the context of 18 U.S.C. § 3663A(b)(1)(B)); U.S. v. Yeung, 672 F.3d 594, 601 (9th Cir. 2012) (same).  This statute does not apply here because none of the victims lost real property via the scheme.

preclude a trial court from ordering restitution."  U.S. v. Savoie, 985 F.2d 612, 617 (1st Cir. 1993).

In fashioning a reasonable estimate of restitution for victims, a court must keep sight of the fact that the MVRA does not just make some restitution mandatory, the MVRA makes restitution mandatory in the full amount of each victims' losses as determined by the court and without consideration of the economic circumstances of the defendants.  18 U.S.C. § 3664(f)(1)(A) (emphasis added).  In United States v. Catoggio, 326 F.3d 323, 329 (2d Cir. 2003), the Second Circuit vacated a district court's restitution order that undervalued the victims' losses. The Catoggio Court said that ordering partial restitution is inconsistent with the MVRA's requirement that restitution be ordered on the full amount of victims' loss, and it remanded for further proceedings.  Id.  "Uncertainties with respect to the amount in question should be resolved in favor of the victim in accord with the statutory focus on making the victim whole." Id.; see U.S. v. Schwamborn, 467 Fed. Appx. 35, 38 (2d Cir. 2012) (vacating restitution order and remanding case after finding that the Government's decision to abandon its original request for $1,278,350.11 and to request only $413,450.08 suggested that this latter amount did not represent the full amount of victim loss, as required by the MVRA).

A sentencing court has discretion to "make each defendant liable for payment of the full amount of restitution or . . . apportion liability among the defendants to reflect the level of contribution to the victim's loss."  18 U.S.C.§ 3664(h).  Here, the Government seeks a restitution order holding Defendants jointly and severally liable, and does not ask for apportionment. Docket No. 377.  "[W]here, as here, [Defendants] are convicted of participating in a scheme, conspiracy, or pattern of criminal activity, each may be held liable, jointly and severally, for the full amount of losses causes by the scheme."  U.S. v. Nucci, 364 F.3d 419, 423-24 (2d Cir. 2004)

(affirming the district court's restitution order directing joint and several liability and not apportionment); see In re Newsday Litig., Case No. 08-MC-096, 2008 WL 2884784, at *3 (E.D.N.Y. July 23, 2008) ("Co-conspirators may be held jointly and severally liable for restitution owed to the victims of the conspiracy.").

### c. Defendants' Arguments That Exceptions Apply In This Case Such That The Court May Not Order Mandatory Restitution In The Full Amount Of Victims' Losses

The MVRA's plain and broad mandate that restitution is required in the full amount of victims' loss bends in two circumstances.  Although the Parties here agree that Defendants' offenses are ones to which the MVRA applies, Defendants argue that statutory exceptions are relevant.  Docket No. 379.  Restitution is not required in cases where (A) "the number of identifiable victims is so large as to make restitution impracticable," and (B) "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  18 U.S.C. § 3663A(c)(3)(A), (B).

Defendants claim that both of the MVRA exceptions apply in this case such that no restitution order can issue to compensate their victims.  Docket No. 379.  This Court reviews Defendants' arguments regarding the exceptions in turn.

### i. The Number of Identifiable Victims Is Not So Large As To Make Restitution Impracticable

"Under the MVRA, victims of any offense against property under Title 18, including any offense committed by fraud or deceit, are not entitled to mandatory restitution if the district court determines that 'the number of identifiable victims is so large as to make restitution impracticable.'"  In re W.R. Huff Asset Mgmt. Co., LLC, 409 F.3d 555, 563 (2d Cir. 2005) (citing 18 U.S.C. § 3663A(c)(3)).  This Court does not find that the 220 identified victims in this

case are so numerous as to render restitution impracticable, and therefore rejects Defendants' argument that 18 U.S.C. § 3663A(c)(3)(A) forecloses restitution in this case.

First, the Government identified 220 victims through these victims' submission of loss affidavits, briefed and argued restitution for all 220 victims, and developed a coherent record for all 220 victims.  See, e.g., Docket No. 377; Gov't Exh. 3.  The results of the Government's efforts are evidence that restitution for 220 victims is not impracticable.  See Deming v. U.S., Case No. 01-CV-7450, 2002 WL 1467740, at *2 (E.D.N.Y. May 1, 2002) ("As the Government has already identified every victim of the conspiracy by name and the specific amount lost to each, the payment of restitution as funds become available is not impracticable."); see also Hsu v. United States, Case No. 07-CR-1066, 2013 WL 3771714, at *6 (S.D.N.Y. July 16, 2013) (holding that the MVRA exception applied in part because the Government itself asserted that "identifying [the defendant's] victims" would delay and burden the sentencing process).

In Catoggio, 326 F.3d at 328, the Second Circuit rejected the idea that 18 U.S.C. § 3663A(c)(3)(A) foreclosed restitution where "the record indicates that the district court, although aware of the difficulties involved in ordering restitution . . . did not consider the process too burdensome."  Here, as in Catoggio, I do not find that the restitution process is unduly burdensome.  I acknowledge, as is obvious, that consideration of the restitution motion requires thought and time; in other words, it is to some extent a burden. The question, however, is whether that burden is undue.  Review of the loss affidavits shows that Defendants' victims suffered and continue to suffer extreme financial hardship as a result of the coin fraud. See supra, Section II.d.iv. (summarizing various victims' experiences).  This Court therefore believes that fashioning a restitution order for these 220 victims is important, feasible and deserving of the Court's attention.  The acute financial burden Defendants inflicted upon so many victims for

39

whom a restitution order would alleviate some suffering as the law requires is a practical project for this Court, as this Report and Recommendation makes clear.  In fact, many courts have found restitution practical even where greater amounts of money and numbers of victims were involved.  See, e.g., Catoggio, 326 F.3d at 328 (affirming district court's rejection of defendant's argument that the number of victims was too large and the issues too complex in a case involving $193 million and 10,000 victims); U.S. v. Brennan, 526 F. Supp. 2d 378, 384 (E.D.N.Y. 2007) (holding that the number of identifiable victims was not so large as to make restitution impracticable in a case involving thousands of victims and over $100 million in losses); cf. In re W.R. Huff, 409 F.3d at 563 (holding that district court did not abuse its discretion in allowing a settlement agreement establishing a victims' fund in lieu of restitution where there were "potentially tens of thousands of victims of the [defendants'] crimes" and "a multitude of factual and causal issues [that] would extend the sentencing process").

For the foregoing reasons, this Court respectfully recommends that the District Judge **find** that 18 U.S.C. § 3663A(c)(3)(A) does not exempt this case from the MVRA's mandatory restitution requirement.

> **ii.  The Need To Provide Restitution To Defendants' Victims Outweighs Any Burden On the Sentencing Process Arising From The Determination Of Complex Issues Of Fact Related To The Cause Or Amount Of The Victims' Losses**

Defendants next argue that the MVRA does not apply to require restitution in this case because "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process" (hereinafter "the factual-complexity exception").  Docket No. 379; 18 U.S.C. § 3663A(c)(3)(B).  Defendants argue that this MVRA exception applies under a variety of theories.

Defendants complain about the streamlined process that the Government devised with which to calculate the basis for a restitution order in this case, the 21% value-to-price ratio modified categorical calculation. Docket No. 379. This modified categorical calculation obviates the need for a coin-by-coin loss calculation for all 220 victims by (1) taking the results of a study of 1,800 coins of nine select victims; (2) calculating a 21% average value-to-price ratio for the 1,800 coins; (3) sorting all 220 victims into one of four categories depending upon whether they have sold none, some or all of their coins to third parties since the fraud, or if that fact is unknown; and (4) applying the 21% average value-to-price ratio and/or an actual value-to-price ratio, to the 220 victims' purchase prices paid to Defendants for coins in order to fashion a global restitution order. See supra, Section II.d.x. (explaining the streamlined restitution calculation process in greater detail); Docket No. 379.

Broken down, Defendants' objection to the Government's 21% value-to-price ratio modified categorical calculation is fourfold. First, Defendants believe that the Government employed an unfair method in collecting the 220 loss affidavits that constitute some of the strongest evidence in support of the restitution motion. Second, Defendants argue that Mr. Swiatek cannot be considered a coin valuation expert such that the Government's restitution calculations may rely upon any Swiatek evidence. Third, Defendants claim that the nine-victim sample that the Government used to derive the 21% average value-to-price ratio is not representative of the loss of the larger 220-victim population. Finally, Defendants argue that the Government's separation of the 220 victims into four categories and the 21% value-to-price ratio modified categorical calculation is inconsistent and unfair.[17] Id. This Court will address each of

---

[17] Defendants also argue other grounds that purportedly show the unfairness of the Government's streamlined restitution calculation to which the Court has already responded in other parts of this Report and Recommendation. Docket No. 379. Defendants say (1) that NGC's coin grading

Defendants' arguments about the Government's approach then will review whether the 21% value-to-price ratio modified categorical calculation violates 18 U.S.C. § 3663A(c)(3)(B).

### 1. The Government Had Shown By A Preponderance Of The Evidence That Its Method Of Collecting Victim Loss Affidavits Was Proper

The Government's restitution motion seeks restitution for 220 victims who have filed loss affidavits, and the Government has submitted those affidavits to the Court for review. <u>Docket No. 377</u>; <u>Gov't Exh. 3</u> (a binder containing all 220 victim loss affidavits). Defendants claim that the victim loss affidavits were collected via an unfair method and urge the Court to find that the Government has not proven the identities of the victims by a preponderance of the evidence. <u>Docket No. 379</u>.

The Court notes at the outset that each one of the 220 victim-loss affidavits clearly identifies the name of the affiant-victim. <u>Gov't Exh. 3</u>. Defendants do not contest this fact, but instead complain that the notification letter prompting the filing of the affidavits improperly suggested to the recipients, many of whom are elderly, that they may have been the victims of a coin fraud scheme and would be entitled to restitution. <u>Docket No. 379</u>; <u>see</u> <u>MRWH-1</u> (example of the Government's letter to potential victims of the coin fraud scheme). It appears, then, that Defendants' argument is that the Government has not met its burden of proof with respect to the veracity of the affidavits' content because the affiants were subject to intense pressure by the Government to file something; because the affiants filed inaccurate affidavits because they are elderly and may, according to Defendants, have compromised mental faculties; or because the

---

process is subjective; (2) that coin pricing is by its nature subjective; and (3) that Mr. Swiatek's valuation methodology is unfair because he relied on NGC's grade and did not personally inspect the coins. This Court discusses and rejects Defendants' objections to the accepted coin-industry grading and valuation practices in the context of the Swiatek evidence challenge, <u>infra</u>, Section III.c.ii.2. <u>Docket No. 379</u>.

affiants filed fraudulent affidavits in an attempt to use this prosecution as a money-making venture. Docket No. 379.

As to the Defendants' suggestion that the Government's notification letter unduly pressured recipients to file loss affidavits, it has no merit. Defendants complain that the notification letter told victims that Defendants were being prosecuted and that in the event they were convicted, victims had the "right to full and timely restitution as provided in law." Docket No. 379. Defendants do not explain what is improper about the letter's language in this respect, and there is no reason the Government should not have provided notice to victims. Indeed, the Crime Victims' Rights Act ("CVRA") establishes that a crime victim has the right to be kept abreast of nearly all aspects of criminal proceedings in which they are implicated, as well as "[t]he right to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6).

The Court not only finds that the correspondence was sent in furtherance of the Government's statutory obligations, but that the notification letter was fairly and evenly worded. Defendants complain that the letter stated that the criminal complaint against Defendants alleged that as a result of the fraud, victims "purchased coins worth approximately 10%-20% of the purchase price." Docket No. 379; MRWH-1. This language is taken directly from the Second Superceding Indictment of Defendants, and its inclusion in the letter does not constitute untoward behavior given the notification letter's intended purpose of providing victims with notice of the prosecution. Docket No. 168.

Defendants' argument that perhaps senile or criminal-minded individuals submitted affidavits without having suffered loss is also rejected. Docket No. 379. In support of this theory, Defendants mention that some of the affiants did not handwrite on their submissions whether Wall Street, Atlantic or Northeast was the vendor of the coins. Docket No. 379-1 (a

chart detailing which of the 220 affiants failed to write the vendors' name in their statement). This argument fails. The affiants did not need to write out the connection with the three companies by hand because the affidavit form stated that the victim purchased "gold and/or silver coins from Wall Street Rare Coins, and/or Atlantic Coin Galleries and/or Northeast Gold & Silver." Kearney Exh. 2; Gov't Exh. 3.

Defendants point out that not all affiants submitted customer invoices with their affidavits in order to corroborate their claims. Docket No. 379-1 (a chart detailing which of the 220 affiants failed to include customer invoices with their statements). Defendants argue the Court should be suspicious about these affidavits. The victims did not have to submit invoices for their affidavits to be credible. See U.S. v. Depiazza, 172 F.3d 38, at *1 (2d Cir. 1999) (rejecting the defendant's argument that victim loss declarations were not sufficiently itemized to support a restitution order, stating that "[t]here is no requirement that [victims'] losses be evidenced by receipts"). While it is correct that an affiant's submission of a customer invoice would have produced more complete evidence, especially in light of Defendants' intentional spoliation of the three companies' invoices, the affidavits lacking invoices nevertheless have sufficient indicia of reliability. For example, the affidavits are corroborated by the fact that the Government pre-identified the affiants as Defendants' victims before they submitted their loss affidavits. As a result of Defendants' spoliation of evidence, Agent Hessle had to investigate the three companies' bank records, including canceled checks, to track down 1,450 victims with whom the companies' transacted business, and the 220 loss affidavits were filed by individuals from within that pool of 1,450 people.[18]

---

[18] The evidence that Defendants suggest should be available would have been available had Defendants not destroyed the companies' invoices, particularly the records of clients' names and addresses. Defendants cannot reasonably demand evidence that no longer exists because of their

Finally, and with respect to the suggestion that some affiants are attempting to defraud the Government and the Court so as to secure restitution to which they are not entitled, the Court observes that the affidavits state that the affiant-victim "swear[s] that the above information is true and correct." Id.  Many of these affidavits were not signed in front of a notary public, but it is a federal crime to lie in completing them:  Section 1001 of the United States Code, Section 18, states that "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation . . . shall be fined under this title, imprisoned not more than 5 years . . . ." 18 U.S.C. § 1001. Accordingly, the affidavits are reliable by virtue of the penalties that affiants face were they to make materially false statements on the affidavits.

In light of the foregoing, this Court respectfully recommends that the District Judge **find** that the Government's method in collecting the victim loss affidavits was proper and, by extension, that the loss affidavits may be considered in these restitution proceedings as showing by a preponderance of the evidence the identities of the 220 victims seeking restitution as well as the money spent by each to purchase coins from Defendants.

### 2.  Swiatek Trial Evidence Is Admissible At Restitution Proceedings For The Fact And Extent Of Overvaluation

Defendants ask this Court to rule that Mr. Swiatek is not a coin expert and that as a result, Mr. Swiatek's trial testimony and the Swiatek valuation chart are inadmissible at restitution. Docket No. 379.  This is the third time that Defendants have raised this issue.  Id. (stating that they are excerpting previous filings in asking for this relief again).  As discussed below, Defendants twice raised this issue at the trial stage, and the Court denied both motions seeking

own conduct.

the exclusion of Mr. Swiatek's evidence.  Defendants ask in the alternative that this Court only consider Swiatek evidence for the purpose of determining the fact of Defendants' coin overvaluations, but not the extent to which Defendants overvalued coins.  Id.  This Court respectfully recommends that the District Judge **reject** Defendants' argument.

> ### a.  Mr. Swiatek Retains Coin Expert Status; His Testimony Is Admissible; And The Swiatek Valuation Chart Is Admissible In These Restitution Proceedings

Defendants argue that Mr. Swiatek is not and cannot be a qualified coin expert because coin grading and valuation are so subjective that he cannot provide reliable information for the Court's consideration.  Docket No. 379.  Defendants argued against the admissibility of Mr. Swiatek's testimony for the first time during the pretrial stage.  District Judge Bianco held a hearing pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), for the purpose of determining Mr. Swiatek's qualifications as an expert witness.  Docket Entry 4/11/2011.  On May 11, 2011, District Judge Bianco orally denied the motion.  Docket Entry 5/12/2011.  Mr. Swiatek later testified at trial on May 26, 2011 and May 31, 2011.  May 26 Tr. 2015:25-May 31 Tr. 2163:1 (Swiatek).  The jury therefore had heard Mr. Swiatek's testimony regarding the valuation of Defendants' coins when they convicted Defendants on June 13, 2011 of conspiracy to commit mail or wire fraud in violation of 18 U.S.C. §§ 1341, 1343, 1349, and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(h), 1956(a)(1)(A)(i), 1957(b), 1957(d)(1).  Docket No. 295.

The following month, on July 29, 2011, Defendants challenged the admissibility of Mr. Swiatek's testimony for the second time in their motion for a judgment of acquittal or, in the alternative, for a new trial.  Docket Nos. 297, 300.  On May 3, 2012, the Court denied Defendants' motions in a thirty-page Memorandum and Order devoted almost entirely to the

Swiatek challenge, and the Court affirmed Defendants' convictions.  See U.S. v. Romano, 859 F. Supp. 2d 445 (E.D.N.Y. 2012).  District Judge Bianco concluded that he had properly certified Mr. Swiatek as a certified expert on coin valuation and admitted Mr. Swiatek's testimony. District Judge Bianco ruled that Mr. Swiatek's testimony met all of the requirements of Daubert. Id. at 456.  Not only was Mr. Swiatek's testimony "relevant, [but] its highly probative value was not substantially outweighed by the danger of unfair prejudice or any of the other considerations of Rule 403."  Id.

District Judge Bianco discussed in detail Defendants' challenge that Mr. Swiatek's opinion was "not based upon a consistent and objective methodology."  Id.  District Judge Bianco stated that Defendants' attack on the subjectivity of the coin industry's grading and valuation practices ignored that "the system for coin grading and valuation rests on well-established industry standards, publications and market trends, which are sufficiently reliable to form the basis of expert testimony."  Id. at 458.  "Although it is uncontroverted that there is a subjective component to grading and valuation, that subjective component does not render the expert testimony as unreliable given the widely-accepted grading standards and valuation publications utilized in the industry to determine the current market value of coins."  Id.[19]

---

[19] See U.S. v. Numisgroup Int'l Corp., 368 F.3d 880 (2d Cir. 2004) (affirming district court's certification of Mr. Swiatek as a coin valuation expert); see also U.S. v. Kayne, 90 F.3d 7, 11 (1st Cir. 1996) (affirming district court's admission of eight coin dealers' testimony that the defendants sold coins "of substantially lower quality and value than represented in the accompanying documentation and holding that defendants' complaint that the experts' opinions "were subject to factors of taste and assessment of the market" was something that defendants had the opportunity to show the jury through "searching cross-examination"); U.S. v. Kail, 804 F.2d 441 (8th Cir. 1986) (finding that the district court did not err in admitting coin expert testimony because "the record in this case does not support [defendant's] assertion that rare coin dealers do not rely upon [Greysheets and industry grading standards] in reaching conclusions regarding the value of rare coins.  To the contrary, each expert stated that . . . grading standards enjoyed almost industry-wide acceptance, and that [Greysheets] is recognized as the chief guide to the current price of rare coins."); FTC v. Security Rare Coin & Bullion Corp., Case No. 3-86-

Defendants now ask this Court for the third time to rule that Mr. Swiatek is not a qualified expert witness and find his testimony inadmissible using argument excerpted from their previous, denied post-trial motion.  Docket No. 379 at 5.  Defendants say that their motion to exclude Swiatek trial evidence from these restitution proceedings requires de novo review because the case is now at the sentencing stage.  Id.  In addition, Defendants argue that Swiatek trial evidence deserves de novo review because District Judge Bianco deemed Swiatek trial evidence "relevant and probative on the limited issue of whether the defendants intentionally overvalued the coins," but not on the issue of the extent to which the coins of individual customers are overvalued.  Id.  The Court finds no merit in either of these distinctions.

> **i.  District Judge Bianco's Ruling That Mr. Swiatek Is A Qualified Coin Valuation Expert Is The Law Of The Case At Restitution**

Courts routinely consider trial evidence in restitution proceedings without engaging in de novo review of its admissibility.  See U.S. v. Hassebrock, 663 F.3d 906, 925 (7th Cir. 2011) ("In general, the [United States Probation Officer] calculates the amount of . . . loss using evidence admitted at trial and then recommends this amount for restitution in its presentence report ("PSR").  As we have stated, [a] district court may rely on the PSR in ruling . . . in the sentencing context as long as the PSR is based upon sufficiently reliable information." (citation omitted)); U.S. v. Ubak-Offiong, 364 Fed. Appx. 859, 865 (5th Cir. 2010) (holding that the district court did not abuse its discretion in requiring the health fraud defendant to pay restitution, which was calculated in the presentence report and based on evidence presented at trial); U.S. v. Filcheck, 165 Fed. Appx. 284, 288 (4th Cir. 2006) (holding that the district court did not abuse its

---

CR-1067, 1989 WL 134002, at *18 (D. Minn. Sept. 11, 1989) (finding that the Government had not met its burden of proof on a fraud charge, but stating that "[t]he Court, however, does not, based on this record, accept the view that grading is so inherently subjective that a pattern of overgrading may not be the basis of a deceptive practices claim, in a proper case").

discretion in calculating restitution, in prosecution for health care fraud where the restitution was based on injuries proven at trial); U.S. v. Cloud, 872 F.2d 846, 855 (9th Cir. 1989) ("It is clear from the record in this case that the district court considered the relevant factors as required by the VWPA . . . [T]he sentencing court indicated before ordering . . . restitution that it had considered the following materials: the presentence report prepared by the probation office, the evidence presented at trial, [etc.].").[20]

     This Court will discuss Defendants' request for de novo review and why it cannot succeed because of law-of-the-case doctrine.[21]  The law-of-the-case doctrine holds "that when a Court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." U.S. v. Ucio, 940 F.2d 753, 758 (2d Cir. 1991); Vitrano v. U.S., 06-CV-6518, 2009 WL 1011582, at *8-*9 (S.D.N.Y. Apr. 14, 2009) (stating that the government could no longer argue that Rule 41(g) movant had not presented sufficient evidence to create an issue of material fact when the government had lost its earlier summary judgment

---

[20] See also People v. Rosado, 859 N.Y.S.2d 897 (Table), 2008 WL 552849, at *4 (N.Y. Sup. 2008) ("Although none of these victims testified at the restitution hearing, the trial record, which was admitted in evidence by the People, shows that they all testified under oath [at trial] . . . and were extensively cross-examined . . . by defendant's trial counsel."); State v. Salazar, Case No. 4-CR-1999, WL 1908717, at *3 (Wash. App. Div. 1 2003) ("[T]he trial court may have examined other evidence that was admitted, acknowledged, proven at trial or at the time of sentencing to set the restitution order . . . . We remand this matter to allow the trial court to parse the evidence proved, admitted, or acknowledged at trial or sentencing, in addition to evidence admitted at the restitution hearing, to determine the amount of damages . . . .").

[21] As an aside, the Court notes that even if admitted trial evidence should be reviewed anew for admission at restitution, admissibility standards at restitution are more lax than those at trial. Any evidence that the court deems to have probative value may be received, regardless of whether it would have been admissible at trial.  See, e.g., U.S. v. Rutley, 482 Fed. Appx. 175, 179 (7th Cir. 2012) ("Loss and restitution amounts . . . are to be determined by the judge at sentencing based on a preponderance of the evidence, which can include reliable evidence not mentioned in the indictment nor even admissible at trial."); U.S. v. Acosta, 303 F.3d 78, 85 (1st Cir. 2002) (holding that the exclusionary rule does not bar the use of evidence seized in violation of a defendant's Fourth Amendment rights at sentencing).

motion on that point, concluding that "when a court decides upon a rule of law, that decision should generally continue to govern the same issues in subsequent stages in the same case" (quotations & citations omitted)).  Law-of-the-case doctrine "is implicated when a court reconsiders its own ruling on an issue in the absence of an intervening ruling on the issue by a higher court."  U.S. v. Quintieri, 306 F.3d 1217, 1225 (2d Cir. 2002) (stating that if on remand for resentencing a different loss amount is calculated, the district court may then recalculate restitution, and implying that if the loss amount is the same on remand, the restitution order remains the law of the case); see U.S. v. Carr, 557 F.3d 93, 102 (2d Cir. 2009); U.S. v. Dionisio, Case No. 04-CR-1068, 2010 WL 117862, at *3 (E.D.N.Y. Jan. 8, 2010).  Although the doctrine is discretionary, see U.S. v. Williams, 205 F.3d 23, 34 (2d Cir. 2000), courts generally invoke it to "refuse to reopen what has been decided," Devilla v. Schriver, 245 F.3d 192, 197 (2d Cir. 2001), unless "cogent" and "compelling" reasons militate otherwise, U.S. v. Tenzer, 213 F.3d 34, 39 (2d Cir. 2000).  "Cogent" and "compelling" reasons include "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  Tenzer, 213 F.3d at 39.  None of the Tenzer factors applies to permit the undersigned to recommend that the District Judge disturb District Judge Bianco's ruling regarding Mr. Swiatek's expert status.[22]

---

[22] It may be that Defendants would prefer that their argument be framed as a reconsideration motion, though they do not use that terminology.  Docket No. 379.  In light of the fact that "[n]either the Federal Rules of Criminal Procedure nor the Local Criminal Rules of the United States District Courts for the Southern and Eastern Districts of New York contemplate motions for reconsideration . . . courts in these districts have long applied Local Civil Rule 6.3 to reconsideration motions in criminal cases."  See U.S. v. Smith, Case No. 11-CR-724, 2012, at *3 (S.D.N.Y. May 15, 2012).  Local Civil Rule 6.3 sets forth the procedure by which to make a motion for reconsideration, requiring that the motion "be served within fourteen (14) days after the entry of the Court's determination of the original motion, or in the case of a court order resulting in judgment, within fourteen (14) days after the entry of the judgment."  Local Civ. Rule 6.3.  In addition, "[t]here shall be served with the notice of motion a memorandum setting

**1. Defendants Argue No Intervening Change In Controlling Law**

As to the first <u>Tenzer</u> factor, "an intervening change of controlling law," Defendants do not cite any cases or law. <u>Docket No. 379</u>. In fact, Defendants' written submission in support of their restitution objection cites only four cases throughout, none of which has any bearing on this question (three of which are cited for the most basic of restitution principles and not offered to make any tailored argument). <u>Id.</u> at 2, 14.

**2. Defendants Present No New Evidence**

Regarding <u>Tenzer</u>'s second factor, "the availability of new evidence," a movant "must demonstrate that the evidence [relied upon] was unavailable notwithstanding the exercise of due diligence to obtain it" when the Court made its prior decision. <u>U.S. v. Incorp. Vill. of Island Park</u>, 90-CV-992, 2008 WL 4790724, at *3 (E.D.N.Y. Nov. 3, 2008). Defendants fail to meet the new-evidence standard.

Defendants state that "while Mr. Swiatek may have been qualified as an expert . . . we submit that his testimony at trial" demonstrates that the Court should revisit Mr. Swiatek's expert status. <u>Docket No. 379</u>. Defendants then proceed to cite various passages from Mr. Swiatek's

---

forth concisely the matters or controlling decisions which counsel believes the Court has overlooked." <u>Id.</u> Here, Defendants would have missed the fourteen-day filing deadline for a reconsideration motion relating to District Judge Bianco's May 3, 2012 Memorandum and Order. In addition, Defendants do not provide this Court with any judicial decisions, controlling or otherwise, in support of a reconsideration motion as required by Local Civil Rule 6.3. Finally, setting aside these procedural points, this Court observes that reconsideration motions and law-of-the-case doctrine are not unrelated such that the central question would remain whether any of the <u>Tenzer</u> factors are met such that District Judge Bianco's decision should be disturbed. <u>See, e.g.</u>, <u>McCrary v. Lee</u>, Case No. 12-CV-2867, 2013 WL 5937420, at *2 (E.D.N.Y. Oct. 29, 2013) ("In determining a motion for reconsideration, the court should consider (1) whether there has been an intervening change of controlling law; (2) whether there is new evidence presented that was not previously available on the original motion; and (3) whether there is a need to correct a clear error or prevent manifest injustice." (citations & quotations omitted)); <u>U.S. v. Yakubova</u>, Case No. 00-CR-67, 2007 WL 1827429, at *2 (E.D.N.Y. June 25, 2007) (same).

trial testimony which they claim was internally inconsistent. Id. at 7-9. Obviously, District Judge Bianco, who presided over the trial, heard all of this evidence so it is not new nor was it unavailable for Defendants to argue at trial or with Defendants' post-trial motion. See Romano, 859 F. Supp. 2d at 457-60. Accordingly, as the trial testimony does not constitute new evidence, the undersigned will not recommend disturbing Mr. Swiatek's designation as an expert witness on that basis under the law-of-the-case doctrine. See Vitrano, 2009 WL 1011582, at *8-*9 (denying the government's summary judgment argument that it did not seize the defendant's watch during arrest because the court had earlier decided that there was a genuine issue of material fact as to that question, making that the law of the case, and "[t]he [g]overnment does not present any new evidence here to warrant revisiting that decision"); U.S. v. Perez, Case No. 96-CR167, 1998 WL 50213, at *6 (S.D.N.Y. Feb. 6, 1998) (denying the defendant's motion seeking withdrawal of plea based on improper venue when the court had already ruled that venue was proper on the same body of evidence).

Defendants also mention in their argument to decertify Mr. Swiatek as a coin expert that Coin World and other sources reveal variance within the coin industry in grading and assigning value to coins. Docket No. 379. Again, this is not new evidence. District Judge Bianco responded to such evidence by stating that "[a]lthough defendants have argued that certain publications have opined on the subjectivity and swings in coin grading, these articles do not establish that expert testimony in coin grading and valuation should be barred. Instead, given the sufficient reliability of the methodology, these articles go to the weight of the testimony in this area of expertise under the particular facts of each individual case, not the admissibility." Romano, 859 F. Supp. 2d at 459.

Next, Defendants claim that Agent Hessle's testimony at the restitution hearing revealed

potential infirmities with Mr. Swiatek's calculation of an average value-to-price ratio, i.e., whether any of the nine victims whose coins were the basis for the Swiatek calculation returned any of their coins for a refund; whether any of the nine victims were paying on an installment plan such that the loss calculation should not be premised on the full purchase price; or whether any of the nine victims received free coins such that this unaccounted-for value will prejudice Defendants. Docket No. 379. The Court rejects these hypothetical scenarios as failing to undermine Mr. Swiatek's calculations. The nine victims submitted loss affidavits in which they swore that they purchased coins for a stated amount. These victims would be committing perjury or making a false statement by claiming loss based on an unremitted full purchase price in a sworn affidavit. See, e.g., 18 U.S.C. § 1001. Furthermore, the majority of the nine victims that were the subject of Mr. Swiatek's study testified at trial and were subject to cross-examination by defense counsel. See, e.g., supra, Section II.d.iv (excerpting from some victim trial testimony). Therefore, defense counsel does not need to speculate whether such oversights existed in the Swiatek valuation chart calculations. Counsel had the opportunity to explore these alleged flaws at trial and did not.

Defendants next argue that the undersigned is not bound by the law-of-the-case doctrine insofar as "evidence adduced at [the restitution] hearing regarding [Swiatek's] valuation chart . . . amply demonstrate[s] that his testimony was not the product of reliable principles and method; and that he failed to apply appropriate principles and methods reliably to the facts of the case." Docket No. 379. In this regard, Defendants argue that they paid 42.5 cents on the dollar[23] for the coins they sold to victims such that Mr. Swiatek's valuations reflecting a 15% value-to-price

---

[23] Defendants explain that they paid $13,621,296 for coin inventory during the same period in which they earned $32,220,617 in gross revenue. Gov't Exh. 4; Gov't Exh. 120; Docket No. 379. Defendants divide $13,621,296 by $32,220,617 to make the point that they paid 42.5 cents on the dollar for the coins that they then sold to victims. Id.

ratio in October 2010 or 21% value-to-price ratio in November 2012 must be incorrect and prove that Mr. Swiatek is a poor coin valuator and not a coin expert.  Id.

Defendants' 42.5-cent argument is, once again, not new evidence.  Agent Hessle testified about this fact at trial—when defense counsel asked Agent Hessle "[I]f looking at the cost of the coins against the gross revenues, Mr. Romano spent more than 30 percent on the purchase of those coins; am I correct?", Agent Hessle responded "If the math is correct, yes."  June 2 Tr. 2519:3-6 (Hessle).  Therefore, District Judge Bianco heard this evidence at trial and still affirmed Mr. Swiatek's coin expert status in the May 3, 2012 Memorandum and Order.  See Romano, 859 F. Supp. 2d at 457-60.  In order to succeed on the basis of Tenzer's new-evidence factor, Defendants "must demonstrate that the evidence was unavailable notwithstanding the exercise of due diligence to obtain it" at the moment of the district court's prior decision.  Incorp. Vill. of Island Park, 2008 WL 4790724, at *3.  Here, as Defendants could have make the 42.5-cent argument before District Judge Bianco on their motion for acquittal/new trial, and again, as District Judge Bianco, the presiding judge, was aware of this fact, this does not present a new fact to justify reconsidering District Judge Bianco's ruling.

Even if Defendants' 42.5-cent argument did not suffer from this obvious problem, this Court would still find the 42.5-cent argument unconvincing for two other reasons.  First, although it appears true that Defendants spent $13,621,296 on coin inventory and made $32,220,617 during the same period, it is unclear what amount of Defendants' coin inventory generated that $32,220,617.  In other words, the coin fraud scheme was not broken apart by the Government on the very day that Defendants sold the final coin out of the $13,621,296 worth of coin inventory.  This fact is relevant to whether Defendants' did in fact pay 42.5 cents on the dollar for the coins that they later sold to victims.

Second, assuming arguendo that Defendants did pay 42.5 cents on the dollar for the coins, this Court is still unconvinced that that undermines Mr. Swiatek's expert credentials. Defendants have been convicted of mail and wire fraud conspiracy through a coin fraud telemarketing scheme, which does not make them coin experts[24] or, for that matter, good businesspersons. Yet Defendants' argument remains that their own valuation of coins when buying inventory (and by extension the bad business decision it might theoretically support) proves that the valuations done by Mr. Swiatek—who has valued over one million coins during his forty-plus years of professional involvement in the coin industry, written books and given seminars on the subject, and served as president and board member of a national coin association—should not be considered expert opinion. This Court disagrees, particularly because Defendants produced their own coin expert Mr. Ganz at the restitution hearing who did not opine that Mr. Swiatek's valuations were incorrect as to more than 4.75% of the coins Mr. Ganz studied. See supra, Section II.c.iv. This Court therefore declines to reconsider Mr. Swiatek's expert status on the basis of this purportedly new, but decidedly preexisting, evidence.

---

[24] In fact, quite the contrary, as this Court finds that the Swiatek valuation chart shows that there was no rational relationship between Defendants' coin grades and the prices they charged for the coins. See Gov't Exh. 1 (comparing columns for "ACG/NEGS Grade," "ACG/NEGS Price" and "Value if on [ACG/NEGS] Grade"). On May 10, 2011 and May 11, 2011, Michelle Stumpf and Krystal Schmidt's trial testimony showed why Defendants' grades were not rooted in reality: Whenever a wholesaler coin shipment arrived to Defendants, Mr. Romano would split open coin cases with pliers and throw the packaging, which bore quality information, into the trash so that Mr. Romano could repackage them with his own grades. May 11, Tr. 347:18-348:2 (Stumpf); May 12 Tr. 488:8-11, 495:21-496:1-19 (Schmidt). On May 19, 2011, Daren Mutone, another one of Defendants' employees, testified that Mr. Romano's coin grades were unrelated to prices charged, prompting many customers to ask why they were being charged such low prices for such purportedly high-value coins. May 19 Tr. 1145:22-1146:25 (Mutone). Mr. Mutone would tell customers that the subject companies' "got very lucky to obtain [the coin] at a coin show," or some similar story to explain the arbitrary grade-price combinations. May 19 Tr. 1146:19-23 (Mutone).

### 3. Defendants Show No Clear Error Or Manifest Injustice

Finally, Defendants have alleged no clear error or manifest injustice present in District Judge Bianco's May 3, 2012 Memorandum and Order. Docket No. 379. Defendants simply request a third review of an already-decided legal question.

In summary and in light of the above analysis, the Court finds that District Judge Bianco's certification of Swiatek as an expert on coin valuation, and the admission of his testimony, is the law of the case. There is no change of controlling law, availability of new evidence, or need to correct a clear error or prevent manifest injustice that would allow District Judge Bianco's prior ruling to be disturbed for a de novo analysis. See Dionisio, 2010 WL 117862, at *3 ("Defendant has failed to cite any [of the necessary factors] which would cause the court to reconsider its ruling."). Moreover, District Judge Bianco's order is well-reasoned and persuasive on the merits.

### ii. District Judge Bianco's Rulings That Mr. Swiatek's Testimony And The Swiatek Valuation Chart Are Admissible Are The Law Of The Case

For all the same reasons, this Court rejects Defendants' argument that the Court should not admit Mr. Swiatek's testimony or the Swiatek valuation chart at restitution because it was created using faulty methodology. Docket No. 379. In District Judge Bianco's May 3, 2012 Memorandum and Order, he ruled that

> First, the [Swiatek valuation chart] was probative of the Government's theory of the case that the defendants did not actually grade the coins and that the defendants assigned arbitrary grades to the coins. The [Swiatek valuation chart] was used to show, among other things, that some of the defendants' prices for the coins had no correlation to the grades that were assigned by defendants to the coins, which would suggest that the grades given by defendants were arbitrarily assigned. Of course, by allowing the Government to demonstrate that the grading was arbitrary, the [Swiatek valuation chart] also provided evidence on the issue of whether the misrepresentations regarding grading and value were knowingly and

intentionally made.

<u>Romano</u>, 859 F. Supp. 2d at 461.  As District Judge Bianco admitted Mr. Swiatek's testimony and the Swiatek valuation chart at trial, this Court finds that that ruling, like the rulings relating to Mr. Swiatek's expert status, is the law of the case.

### b. The Swiatek Valuation Chart May Be Considered For The Purposes Of Determining The Extent To Which Defendants Overvalued Coins

Defendants argue that District Judge Bianco only granted Mr. Swiatek expert witness status for the purposes of demonstrating that Defendants intentionally overvalued the coins, but not for the purposes of showing the extent to which Defendants overvalued the coins of individual customers.  <u>Docket No. 379</u>.  Defendants argue that this Court must accordingly reevaluate Mr. Swiatek's expert qualifications for the latter question.  <u>Id.</u>  This Court disagrees.

The Swiatek evidence presented to the jury plainly showed the extent to which the Defendants overvalued individual coins.  <u>See</u> <u>Gov't Exh. 1</u>.  That was one of the main points of the chart.  The Swiatek valuation chart at trial had four columns containing comparative coin values which plainly demonstrated the extent to which Defendants overvalued coins for the jurors to consider—(1) a coin's value on the date of sale based on Defendants' grade; (2) a coin's value as represented by the price at which Defendants sold it to a victim; (3) a coin's value on the date of sale based on NGC's grade; and (4) a coin's value as of October 2010 based on NGC's grade.  <u>Id.</u>  It is true that the jury's task at trial was to question whether evidence showed beyond a reasonable doubt that Defendants intentionally overvalued coins, but the jurors necessarily decided that question by determining that Defendants had overvalued coins at least to some extent.

Once again, in these restitution proceedings, the Government asks the Court to consider

the same data that was admitted and considered by jurors at trial, only with coin values updated as of November 2012. Docket No. 377; Gov't Exh. 1. And, once again, Defendants claim that this proceeding requires a de novo admissibility analysis for the Swiatek evidence. Docket No. 379. This Court disagrees. District Judge Bianco already allowed the Swiatek valuation chart in evidence at trial, May 26 Tr. 2027:23-2028:8 (admitting the Swiatek valuation chart into evidence and allowed the Government to place it on the overhead to discuss the various grade and valuation columns with Mr. Swiatek before the jury), without any limiting jury instruction as to the evidence, June 8 Tr. 2924:19-3022:14 (reading the jury instructions and sending jury to deliberate). What is more, District Judge Bianco allowed the Government, while examining Mr. Swiatek, to show jurors through the Swiatek valuation chart the extent to which Defendants overvalued coins by studying specific examples of overvaluation. May 26 Tr. 2029:15-2041:10 (Mr. Swiatek discussing the extent to which Defendants overvalued specific coins). In other words, Defendants' contention that this would be a novel use of the Swiatek valuation chart at restitution is plainly incorrect.

Therefore, the Swiatek evidence is admitted for this Court's consideration as law of the case for all the reasons explained supra, Section III.c.ii.2.a. Defendants make no argument under the Tenzer factors as to why an exception to the law of the case may apply.

### c. Conclusion

In light of the foregoing, this Court respectfully recommends that the District Judge **find** Defendants' argument relating to Mr. Swiatek unavailing, and **find** Mr. Swiatek to be a coin expert; Mr. Swiatek's evidence and the Swiatek valuation chart admissible; and the Swiatek valuation chart to be valid evidence relating to the question of the extent to which Defendants overvalued the coins.

**3.    The Government Has Shown By A Preponderance Of The Evidence That A 21% Value-To-Price Ratio Derived From A Nine-Victim Sample Is A Fair Multiplier With Which To Reasonably Approximate Restitution For All 220 Victims According To A Modified Categorical Calculation**

The Government asks the Court to fashion a restitution order in this case using data it collected from a nine-victim study sample and applying it to facts relating to all 220 victims according to a modified categorical calculation.  Docket No. 377.  The Government refers the Court to the Swiatek valuation chart's analysis of 1,800 coins that nine victims purchased from Defendants.  Id.  The Swiatek valuation chart, which was updated in November 2012 to reflect market increases in the value of gold and silver, computed an average 21% value-to-price ratio for those 1,800 coins, meaning that for every dollar the nine victims spent buying the 1,800 coins, they received on average 21 cents in value.  Gov't Exh. 2.

The Government urges the Court to use this 21% value-to-price ratio as a multiplier in fashioning a restitution order for all 220 victims according to a modified categorical calculation. Docket No. 377.  Defendants object to this approach, claiming that the Government cannot show by a preponderance of the evidence that the 21% average value-to-profit ratio generated by the nine-victim study sample is based on a random sample or representative of the 220 victims' loss. Docket No. 379.  The Court disagrees with Defendants that the Government has this obligation.

The nine-victim sample selected by Agent Hessle is not a random sample.  As described above, Agent Hessle testified to the Court that he chose for closer study nine victims out of the 220 who submitted loss affidavits because those nine victims (1) still had all coins purchased from Defendants in their possession, and (2) still had invoices issued by Defendants for those coins.  June 26 Tr. 27:1-15 (Hessle).  These nine victims had purchased 1,800 coins from Defendants.  June 26 Tr. 30:3-5 (Hessle).  Defendants' expert Dr. Glickman testified that Agent

59

Hessle's selection of the nine victims on the basis of certain indicators meant that the nine-victims were not a random sample, as this would have required a blind selection of nine victims out of the 220 seeking restitution.  June 26 Tr. 145:17-25 (Glickman).  The Court finds that Dr. Glickman's testimony is credible and makes sense, and the Court agrees that the nine-victim sample was not random.

Dr. Glickman testified that just because the nine-victim sample was not random vis-à-vis the 220-victim pool does not necessarily mean that the nine-victim sample was not representative of the 220-victim pool in terms of loss suffered.  Dr. Glickman stated that because he found variance within the nine-victim sample regarding value-to-price ratio when he broke down the nine-victim sample data invoice by invoice, victim by victim, coin type by coin type, mint year by mint year, and value by value, he believed it was possible that the non-random nine-victim sample was not representative, but Dr. Glickman reserved on a decision on the question, stating that he needed more data before he could definitively reach that conclusion.  June 26 Tr. 146:7-10 (Glickman).

In sum, Dr. Glickman "never concluded that [the nine victims] were a good sample or a bad sample," June 26 Tr. 197:3-6 (Glickman), stating that "[i]t could be a good sample but it just happens that the value-to-price ratio varies by customer," June 26 Tr. 186:17-22 (Glickman).  The Court therefore does not find Dr. Glickman's testimony to be problematic vis-à-vis the 21% value-to-price ratio's use in the modified categorical calculation of restitution, especially in light of the fact that loss for the purpose of restitution may be reasonably estimated.  See Cheng, 96 F.3d at 657-58.

In addition, it is of great interest to the Court that Dr. Glickman testified that in his opinion, he believed that data from 30 to 40 victims could more safely be assumed to be a

representative sample of all 220 victims.  June 26 Tr. 186:17-2.  Although the Swiatek 21%

victim-to-price ratio derives from data relating to the nine-victim sample, the Court also has an

average value-to-price ratio for 60 additional victims.

Agent Hessle told the Court that he had data from 60 victims who had already sold the

coins they bought from Defendants to third parties, and that he had calculated an average value-

to-price ratio for these victims as well.  June 26 Tr. 74:21-75:4 (Hessle).  These sixty victims had

sold their coins such that there was an 18.59% value-to-price ratio for their coins on the

purchases from Defendants.  June 26 Tr. 75:7-11, 75:21-22 (Hessle).  This 18.59% average

value-to-price ratio for victims who sold their coins to third parties is compelling evidence that

there is a reasonable basis for the Government's proposed restitution calculations.  This 60-

victim sample is well in excess of what Defendants' statistics expert testified would satisfy him

in terms of a representative sample and corroborates, within 2 to 3 percentage points that favor

Defendants, the Government's proposed 21% average value-to-price ratio.  These 60 people

actually went out into the coin marketplace, sold their coins to third parties, and as a result, have

concrete figures upon which to estimate the value-to-price ratio of Defendant-sold coins.  This

convinces the Court that the Government's 21% average value-to-price ratio is a reasonable

approximation of the 220 victims' losses.[25]

For the stated reasons, this Court finds, contrary to Defendants' argument, that the

Government has shown by a preponderance of the evidence that the nine victims' 21% average

value-to-price ratio is a reasonably accurate multiplier with which to calculate a restitution order

---

[25] The Court anticipates that Defendants would respond to this observation by saying that the
sixty victims were likely foolhardy and sold their coins at dismal rates because they did not know
what they were doing.  But "[n]othing in the detailed provisions of [federal restitution law]
contemplates that a defendant guilty of criminal fraud can escape mandatory restitution by
requiring district courts to conduct mini-trials on the possible contributory negligence of the very
persons victimized by the defendant."  U.S. v. Zafar, 291 Fed. Appx. 425, 429 (2d Cir. 2008).

for all 220 victims according to a modified categorical calculation.  In fact, the Government's calculation awards to Defendants a higher credit for price than would the data derived from actual market transactions by victims.

Defendants argue that Mr. Ganz testified that he conducted a study of 400 of the 1,800 coins detailed in the Swiatek valuation chart, and that Mr. Ganz opined that he would have given 19 out of the 400 coins a higher value.  June 27 Tr. 31:3-33:19, 34:13-24, 35:1-3, 36:18-41:13 (Ganz); MRDG-1; MRDG-2.  The Court is appreciative of Mr. Ganz's testimony, which on the whole aided this Court in understanding the methodology of coin grading and valuation. However, Mr. Ganz's conclusion that Mr. Swiatek undervalued coins in his sample by varying degrees 4.8% of the time does not show a sufficiently significant problem in the Government's modified categorical calculation of restitution for 220 victims to counter the Government's evidence.  Indeed, Mr. Ganz's suggestion that there is a greater than 95% accuracy rate for Mr. Swiatek's calculations shows a sufficiently high degree of accuracy for the Court to find it a reliable basis upon which to recommend restitution.

All told, the Government's 21% value-to-price ratio is a reasonable estimate from which to calculate the victims' losses in this case.  In fact, the Second Circuit has routinely upheld district courts' restitution orders founded on reasonable estimates.  For example, in United States v. Gushlak, 728 F.3d 184, 203 (2d Cir. 2013), the Second Circuit reviewed and affirmed a district court's restitution order for the victims of securities fraud in the face of the defendant's argument that the Government's estimates lacked precision and were calculated from sources which the defendant alleged could be unreliable in some instances.  The Second Circuit rejected the defendant's argument and found that the district court had not abused its discretion in ordering restitution, saying that "[a]ny identified potential imprecisions in what is by its nature

62

an imprecise process would not render the restitution amount estimate unreasonable." Id.

Gushlak is just one instance where the Second Circuit upheld a district court's informed and reasonable estimate of a restitution amount. In U.S. v. Uddin, 551 F.3d 176, 180 (2d Cir. 2009), the Second Circuit held that a district court did not abuse its discretion in ordering restitution in a food stamp fraud case using data from the city at large as a starting point from which to extrapolate loss amounts caused by the defendants' offense. The Uddin Court acknowledged that "[a]lthough there will undoubtedly be situations in which a district court's estimate of loss amount falls outside the boundaries of reasonableness, we need not define precisely what those boundaries are. It is enough that the district court here did not exceed them." Id. at 181. Here, by contrast to the Uddin restitution order, the Government urges this Court to use a study of the 220 victims' fellow victims to fashion a restitution order, an even more reliable and case-specific basis for this Court's reasonable estimate.

Other examples in Second Circuit case law affirm the reasonable estimate of restitution orders, sometimes on novel facts. See U.S. v. Kerekes, 2013 WL 5382066, at *2 (2d Cir. Sept. 27, 2013) (holding that the district court's adoption of a "conservative estimate of the Government's losses using a 20% capital gains tax rate was within its discretion," and finding that even if the Second Circuit would reach a different restitution rate, this does not mean that the district court abused its discretion); U.S. v. Lundquist, 731 F.3d 124, 138 (2d Cir. 2013) (holding that "a reasonable estimate of [the child pornography victim's] loss is all that is necessary"); U.S. v. Perez, 523 Fed. Appx. 842, 844 (2d Cir. May 7, 2013) (stating that the district court did not abuse its discretion in crafting a restitution order for victims—undocumented immigrants who paid defendant for promised legal status that never came—by "extrapolat[ing] the average amount of loss from known data and apply[ing] that average to transactions where the exact

amount of loss is unknown" (citations & quotations omitted)); U.S. v. Hsu, 669 F.3d 112, 122 (2d Cir. 2012) ("We do not say that the method chosen by the district court was the only way to measure loss in a Ponzi scheme case . . . other methodologies might have been appropriate in this case, and might even be preferable in other cases depending on the particular facts of the case . . . . [T]he district court's calculation is . . . reasonable and appropriately measures the scope of the harm done to victims.  We therefore have no reason to disturb it."); U.S. v. Melhado, Flynn & Assocs., Inc., 455 Fed. Appx. 81, 84 (2d Cir. 2012) ("[T]he loss figure adopted by the district court is not, as [defendant] contends, 'intolerably ambiguous.'  [Restitution does] not require that losses be calculated with precision, and we find no error in the district court's reliance on the Government's expert analysis as a reasonable estimate of loss.").

This Court is guided by the same logic here.  The Court imagines that a study of every single coin sold to every single one of the 220 victims might reveal a somewhat different value-to-price ratio, but the Government's proposed approach respects judicial resources and victims' need for timely restitution, and it is a reasonable workaround to find a reasonable estimate of loss without a coin-by-coin study.

This Court is in a position to state that the Government's approach is reasonable, having reviewed 1,450 pages of victim loss affidavits and their addenda; approximately 3,000 pages of trial transcripts (pursuant to this restitution motion and an earlier forfeiture motion); approximately 300 pages of restitution hearing transcripts, in addition to presiding over the restitution hearing itself; the Parties' written submissions and exhibits; and the presentence reports.  In all, this Court has reviewed over 5,000 pages of material relating to the Government's restitution motion and Defendants' objections thereto, and is satisfied that a 21% value-to-price ratio modified categorical calculation reasonably approximates all 220 responding

victims' loss.  See U.S. v. Price, 357 Fed. Appx. 319, 324 (2d Cir. 2009) (holding that the district court, in determining actual victim loss, "considered over 600 pages of documents and the testimony of multiple witnesses in addition to several different calculation methodologies for computing loss.  Based on the information presented . . . we cannot say . . . any aspect of the loss calculation, was clearly erroneous.").

Finally, this Court observes that Defendants actually have very little grounds for complaint in terms of the 21% value-to-price ratio that the Government proposes that the Court use in fashioning the restitution order.  Not only did the Government use an understandable methodology in reaching the proposed value-to-price ratio, but an earlier version of the Swiatek valuation chart showed an average 15% value-to-price ratio for the 1,800 coins studied, Gov't Exh. 6, which the 18.59% value-to-price ratio experienced by the 60-victim pool who sold all of their coins would have also corroborated as a multiplier in fashioning a restitution order.  But the Government is not seeking a 15% value-to-price ratio for the 220 victims.  Instead, the Government updated the Swiatek valuation chart in November 2012 to reflect increases in the value of gold and silver, and Defendants could consider themselves fortunate that the market for gold and silver improved to the point where the Court is now working with a 21% value-to-price ratio, which leads to a lower total amount of recommended restitution.  Cf. U.S. v. Turk, 626 F.3d 743, 749 (2d Cir. 2010) (observing that "in a gentler universe, where the housing market had gone up instead of down," the defendant may have been entitled to a greater offset against the restitution order).

In light of the foregoing, this Court respectfully recommends that the District Judge **find** that the Government has shown by a preponderance of the evidence that a 21% value-to-price ratio derived from the nine-victim sample examined to prepare the Swiatek valuation chart is a

65

fair multiplier with which to reasonably approximate restitution for all 220 victims using a modified categorical calculation.

### 4. The Government's Development Of Different Restitution-Calculation Formulae For Differently Situated Categories Of The 220 Victims Is Fair Because It Avoids Defendants' Payment Of Restitution On Amounts Already Recouped By Victims Via The Sale Of Their Coins To Third Parties

Defendants take issue with the Government's "different methodology" in calculating the 220 victims' loss according to the 21% value-to-price ratio modified categorical calculation, stating there is "no basis" for such methodology. Docket No. 379. Defendants are referring to the fact that Agent Hessle divided the 220 victims into four categories, i.e., (1) those who still had all of their coins (for whom the government proposes calculating restitution by multiplying these victims' total purchase price for these coins by .79), (2) those who still had some of their coins but had sold other coins to third parties (for whom the government proposes calculating restitution for retained coins by multiplying these victims' purchase price by .79 and then adding the victims' proven losses for the coins they sold to third parties), (3) those who had sold all of their coins to third parties (for whom the government proposes calculating restitution on a case-by-case basis in the actual amount of the victims' proven losses), and (4) those for whom there is no information regarding coin retention (for whom the government proposes calculating restitution by multiplying these victims' total purchase price by .79). Id. Defendants argue that "there is certainly no basis for using a different [restitution-calculation] methodology depending on whether a customer sold none, all or some of his/her coins." Id. Defendants do not explain their complaint further.

The Government's different treatment of victims depending on whether they have sold none, some or all of their coins is meant, in part, to more accurately calculate victims' losses.

Applying the 21% value-to-price ratio to a victim who has sold some of his/her coins, for example, without adjustment for the money the victim has already received in the marketplace, would give the victim too much recovery.  For example, assume that a victim bought two identical coins for $100 apiece, retained one, and sold the second for $25.  This victim should not receive $158 in restitution ($200 multiplied by .79).  Instead, this victim should receive $154 in restitution ($100 multiplied by .79 for restitution on the coin she retained, plus the $75 proven loss on the sale of the second coin).  See, e.g., U.S. v. Coriaty, 300 F.3d 244, 253 (2d Cir. 2002) (finding that the district court correctly decided restitution because, inter alia, the defendant was responsible for the amount taken from victims less [the value that victims already had in their possession]).  Otherwise, Defendants would be overpaying restitution.

The Court suspects that Defendants are really complaining about the Government's modified categorical calculation insofar as it would mean that Defendants' restitution obligation could exceed 79% for victims who already sold their coins to third parties at dismal prices.  In other words, suppose a victim bought $100 worth of coins from Defendants and sold them for $15 in the marketplace.  Defendants would, under the Government's modified categorical calculation, have to pay this particular victim $85 in restitution according to an actual 15% value-to-price ratio, as opposed to $79 calculated from the average 21% value-to-price ratio gleaned from the nine-victim study.  If this hypothetical captures Defendants' objection to the Government's modified categorical calculation, then this Court rejects Defendants' objection. The MVRA requires that victims receive restitution for the full amount of their losses, and although the 21% value-to-price ratio is an effort to reasonably estimate restitution, this Court will use concrete data where available to fashion restitution reflecting the full amount of a victim's loss.

In light of the foregoing, this Court respectfully recommends that the District Judge **find** that the Government's 21% value-to-price ratio modified categorical calculation of restitution is not just fair, but such restitution is required by the MVRA.  See 18 U.S.C. § 3664(f)(1)(A) ("In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant").

> **5.  The 21% Value-To-Price Ratio Modified Categorical Calculation Of Restitution For The 220 Victims Is Not Particularly Complex To Execute And, In Any Event, The Complexity Does Not Outweigh The Strong Need For Restitution For Victims In This Case**

This Court now reaches Defendants' ultimate point, which is that no restitution order should issue in the instant case because the facts on the record show that "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  Docket No. 379; 18 U.S.C. § 3663A(c)(3)(B).  This Court finds Defendants' argument without merit.

> **a.  There Is Little Residual Complexity Or Sentencing Delay In This Case Going Forward**

As the Court has addressed all of Defendants' arguments regarding various perceived instances of unfairness in the Government's proposal of restitution in this case, and as discussed, found by a preponderance of the evidence in favor of the Government's proposed restitution calculation, the Court does not believe there will be any notable complexity or sentencing delay to plague restitution in this case going forward.  This Court approves of using the Hessle victim loss summary's calculation for the individual and global restitution amounts.  Gov't Exh. 2. This Court is satisfied that the Hessle victim loss summary is the product of a well-reasoned and

well-executed restitution calculation method for all the reasons discussed in this Report and Recommendation and more.  Using the Hessle victim loss summary, a restitution order can issue in relatively short order.

In light of the foregoing, this Court respectfully recommends that the District Judge **find** that there is no meaningful complexity and delay promised in the resolution of this restitution motion in its final stages.  See Catoggio, 326 F. 3d at 328 (holding that deference to the district court's decision that restitution was not too complex if "the record indicates that the district court, although aware of the difficulties involved in ordering restitution[,] . . . considered restitution an essential part of [the defendant's] sentence").

### b.  There Is A Strong Need For Restitution For Victims

The Second Circuit has stressed that district courts must balance the purported complexity of any restitution against the need for restitution for victims before allowing the 18 U.S.C. § 3663A(c)(3)(B) MVRA exception to apply.  See Gushlak, 728 F.3d at 192-93.  A restitution motion is not properly denied simply for being complex; 18 U.S.C. § 3663A(c)(3)(B) "plainly does not require the district court to surrender whenever one or more complex issues of causation or loss calculation appear.  To the contrary, the statute explicitly contemplates that the district court weigh against the burden of ordering restitution the victims' interests in receiving restitution."  Id.

This Court observes that "the need to provide restitution" is an extremely heavy counterweight in this case.  Id.; see U.S. v. Eisen, Case No. 90-CR-18, 1991 WL 180403, at *1 (E.D.N.Y. Sept. 3, 1991) ("In deciding whether restitution will unduly complicate and delay sentencing, the statute calls upon the courts to balance these factors against 'the need to provide restitution to any victims.'").   It was established by trial testimony that Defendants targeted the

69

elderly and vulnerable.  May 19 Tr. 1157:18-2, 1159:18-24, 1160:8-13 (Mutone); see generally Gov't Exh. 3 (revealing a disproportionate number of elderly individuals).  This Court is "mindful," as it must be, that "victim[s] without resources ha[ve] an interest in the case," and merit extra attention in the context of restitution issues, as opposed to a "well-represented corporation or some such entity as a bankruptcy estate."  Eisen, 1991 WL 180403, at *1; see U.S. v. Gushlak, Case No. 03-CR-833 (NGG), 2011 WL 3159170, at *8 (E.D.N.Y. July 26, 2011) (requesting that the government submit better calculations regarding security values for restitution because the need for restitution for victims was strong: "[the defendant] has admitted to stealing from a large number of people what likely amounted to a significant portion of their personal wealth").

Victims in this case have suffered grave financial losses relative to their net worth as a result of Defendants' crimes, and many have found themselves in dire need of restitution in order to recover from the snowballing ill effects of Defendants' crimes.  This is well documented by the loss affidavits that the victims and their representatives filed.  Gov't Exh. 3.  Earlier in this Report and Recommendation, this Court cited to a handful of victim statements showing attempts to deal with the financial havoc wreaked by Defendants' fraud: refinancing a home; declaring bankruptcy, selling a home and pursuing charity.  See supra, Section II.d.iv.1.  There are ample additional examples in the victim loss affidavits regarding the dire need for restitution in this case.  It is clear from the trial testimony of Mrs. Oldham, Mr. Miser and Ms. Lutz, and the loss affidavits for Ms. DeNeales, Mr. Edwards, Mr. Fairbrother, the Farrs, Mrs. Harmon, Mr. Ritola, Ms. Seamons, Mr. Hull, Ms. Beall and Ms. Salemi, who exemplify many other victims similarly situated, that the need for restitution for many victims is high.  This Court acknowledges that there may be some victims who will not suffer gravely without restitution, but

the Court's duty is not to focus on the best-situated victims.  See 18 U.S.C. § 3663A(c)(3)(B).

For the foregoing reasons, this Court respectfully recommends that the District Judge **find** the need for restitution for victims to be an extremely strong weight in the balancing of factors in the factual-complexity exception.

### c. The Need For Restitution Far Outweighs Any Purported Complexity Or Delay In This Case Going Forward

As this Court finds that there is significant need for restitution for the victims in this case, and negligible complexity and delay going forward, this Court finds that balancing favors restitution and 18 U.S.C. § 3663A(c)(3)(B) is inapplicable.  Therefore, this Court respectfully recommends that the District Judge **find** that 18 U.S.C. § 3663A(c)(3)(B) does not exempt this case from the MVRA's mandatory restitution requirement.  See Gushlak, 728 F.3d at 193 (affirming the district court's entry of a restitution order, stating that the district court was of the view "that the need to compensate victims outweighed challenges of measurement.").

## IV.    Conclusion

In light of the foregoing, the undersigned makes the following recommendations to the District Judge in this case.  The undersigned respectfully recommends that the District Judge:

(1) **find** 18 U.S.C. § 3663A(c)(3)(A) does not exempt this case from the MVRA's mandatory restitution requirement.

(2) **find** by a preponderance of the evidence that the Government's method in collecting the victim loss affidavits was proper.

(3) **reject** Defendants' request for de novo review of Mr. Swiatek's expert status, and **find** Mr. Swiatek's testimony admissible; the Swiatek valuation chart admissible; and the use of the Swiatek valuation chart to consider the extent to which Defendants overvalued the coins proper.

(4) **find** by a preponderance of the evidence that the 21% value-to-price ratio is a fair multiplier with which to reasonably approximate restitution for all 220 victims.

71

(5) **find** by a preponderance of the evidence that the Government's categorical approach to the application of the 21% value-to-price ratio is fair and the resulting award required by the MVRA.

(6) **find** by a preponderance of the evidence that there is negligible complexity and delay expected in the resolution of this restitution motion in its final stages.

(7) **find** by a preponderance of the evidence that the need for restitution for victims is extremely strong.

(8) **find** 18 U.S.C. § 3663A(c)(3)(B) does not exempt this case from the MVRA's mandatory restitution requirement.

(9) **grant** the Government's motion for restitution and **order** restitution for all 220 victims who filed loss affidavits in the amount of $9,332,667.10, with the Government distributing the money according to the Hessle victim loss summary, Gov't Exh. 2.[26]

## V.     Objections

Objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen days of service of this Report. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 1, 59(b)(2); see U.S. v. Hotte, Case No. 97-CR-669, 2007 WL 2891313, at *4 (E.D.N.Y. Sept. 28, 2007).  Failure to file objections within fourteen days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals.

Counsel are directed to be in contact with District Judge Johnson's chambers regarding a schedule for additional proceedings related to forfeiture, restitution and sentencing.

Dated:  Brooklyn, New York
        December 17, 2013

                                                  **/s/**
                                          VERA M. SCANLON
                                          United States Magistrate Judge

---

[26] Although the undersigned makes these recommendations for the District Judge for his consideration, any victim should be aware that even if these recommendations are adopted, there may be additional proceedings related to payment, collection and distribution of any restitution, particularly in light of the significant amounts of recommended restitution and forfeiture, see Docket No. 373, Defendants' seemingly limited assets, and potentially competing claims for those assets.