Jeanne Romano 12/19/2024

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X

UNITED STATES OF AMERICA,

       Plaintiff,

                                Docket No.
  - against -                09-CR-168

MICHAEL ROMANO and WILLIAM KEARNEY,

       Defendants.

---------------------------------------------------------X

                                December 19, 2024
                                10:40 a.m.

     DEPOSITION of JEANNE ROMANO, the witness herein, taken by attorney for the Defendants, pursuant to Federal Rules of Civil Procedure, and Order, held via web-conference, before Joanne Maggiore, a Stenotype Reporter and Notary Public within and for the State of New York.

Free State Reporting, Inc. 410-974-0947

Jeanne Romano 12/19/2024

A P P E A R A N C E S:


BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
          Attorneys for Plaintiff
          610 Federal Plaza, 5th Floor
          Central Islip, New York  11772

BY:   DIANE C. LEONARDO, AUSA


MATTHEW GILMARTIN
          Attorney for Claimant
          JEANNE ROMANO
          P.O. Box 38040
          Olmsted, Ohio  44138

BY:   MATTHEW GILMARTIN, ESQ.


ALSO PRESENT: Celia Wells

Jeanne Romano 12/19/2024

F E D E R A L   S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that the sealing, filing and certification of the within deposition be waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form, are reserved to the time of trial;

IT IS FURTHER STIPULATED AND AGREED that the transcript of this deposition may be signed before any Notary Public, with the same force and effect as if signed before a clerk or Judge of the Court;

IT IS FURTHER STIPULATED AND AGREED that all rights provided to all parties by the F.R.C.P. cannot be deemed waived, and the appropriate sections of the F.R.C.P. shall be controlling with respect thereto.

oo0oo

Jeanne Romano 12/19/2024

THE COURT REPORTER:  It is hereby stipulated and agreed by and between counsel for all parties present that this deposition is being conducted remotely by videoconference, and that the court reporter, witness, and all counsel are in separate remote locations and participating via Zoom under the control of Bee Reporting Agency, Inc.

It is further stipulated that this videoconference will not be recorded in any manner, and that any recording without the express written consent of all parties shall be considered unauthorized, in violation of law, and shall not be used for any purpose in this litigation or otherwise.

Before I swear in the witness, I will ask each counsel to stipulate on the record that I, the court reporter, may swear in the witness even though she is not physically in the presence of the witness, and that there is no objection to that at this time, nor will there be an objection to it at a later date.

MS. LEONARDO: So stipulated.

MR. GILMARTIN: So stipulated.

Free State Reporting, Inc. 410-974-0947

Jeanne Romano 12/19/2024

THE COURT REPORTER: Counsel, can you represent that to the best of your knowledge and belief, the witness appearing today via web conference is, in fact, JEANNE ROMANO?

MR. GILMARTIN: Yes.

Jeanne Romano 12/19/2024

J E A N N E   R O M A N O, having first been duly sworn by the Notary Public, was examined and testified as follows:

Q.   Please state your name for the record.

A.   Jeanne Romano.

Q.   Where do you reside?

A.   9 Lilac Lane, Levittown, New York 11756.

MR. GILMARTIN:  Before we proceed, I'd like to state for the record that Ms. Romano is 85 years old.  She's subject to the kind of memory issues common to people of her age.  So you can proceed.

MS. LEONARDO:  Sure.

EXAMINATION BY

MS. DIANE LEONARDO, ESQ.:

Q.   Good morning, Ms. Romano.  My name is Diane Leonardo.  I represent the United States.

I'm going to be asking you some questions about the claim you have made with regard to the property located at 8154 Via Bolzano, Lake Worth, Florida.

Ms. Romano, your attorney has just mentioned that you may have memory problems.

Free State Reporting, Inc. 410-974-0947

Jeanne Romano 12/19/2024

J. ROMANO

Have you been diagnosed with any memory problems?

A.    No, I wasn't diagnosed.  But sometimes I forget things.

Q.    Okay.  Do you take any medications?

A.    No medications.

Q.    Do you currently reside in your own home?

A.    Yes, I do.

Q.    How long have you resided there?

A.    About 57 years.

Q.    Approximately, what year did you buy that home?

A.    57 years ago is how much.  '64.

Q.    Let me just also say this.  I understand your daughter is in the room with you, is that correct?

A.    Yes, that's correct.

Q.    Is there anybody else in the room with you?  I saw another person on the video. There was another person when you were trying to first log on.

A.    That's my daughter.  She's in three rooms away now.

Jeanne Romano 12/19/2024

J. ROMANO

Q.    Let me say this, you can't ask your daughter questions.  If you don't remember something, just tell me you don't remember something.

A.    I'm not that bad.  I remember.

Q.    I know it's hard.  There is a little bit of a delay.  Please let me finish asking my question first before you respond. Like I said, if you don't recall something, that's fine.  But again, try not to turn to your daughter to ask questions.  Okay?

A.    Okay.

Q.    Your daughter's name is what?

A.    Celia Wells.

Q.    Again, since we are doing this by video, if there is a time you can't hear me, let me know.  I will try my best to speak louder or repeat the question.

Again, this is not a memory test. But I was just going to ask you a couple of questions about your prior employment.  I understand you are retired now.  Prior to retiring, where did you work?

A.    I worked at Mid-Island Hospital,

Jeanne Romano 12/19/2024

J. ROMANO

which changed its name to New Island Hospital, and now it's St. Joseph's.

I have a little trouble with my speech because two of my teeth came out.

Q.    You were employed as a nurse?

A.    I was employed as a RN, yes.

Q.    For how long, approximately, did you work as a nurse?

A.    I worked at that institution at about 22 to 23 years.

Q.    Did you work anywhere prior to that institution?

A.    Well, I worked while at that institution.  I worked at A. Holly Patterson on my weekends off, and I worked overtime two times a week.  I worked 12 hour shifts.  Sometimes I worked five days a week and I had my weekends off.  If that happened to be the weekend, I was off, I would work at A. Holly Patterson Home For the Aged.

Q.    What year did you retire?

A.    I retired I think in 2012.

Q.    At the time you retired, do you recall what your approximate salary was?

Free State Reporting, Inc. 410-974-0947

Jeanne Romano 12/19/2024

J. ROMANO

A.   No, I really don't remember that.

Q.   Okay.  So you retired when you were about 72 or 73?  I'm trying to do math.

A.   Yes, correct.

Q.   Do you recall in any year what your highest salary was with your overtime --

A.   I worked there like 23, 24 years. I don't remember that.

Q.   Okay.  Do you receive a pension?

A.   Yes, I do.

Q.   What's your approximate pension payment?

A.   Excuse me?

Q.   What is your approximate pension payment?

A.   A year?

Q.   Yes.  Whatever is easier for you. A year or month, whatever is easier for you.

A.   Okay.  Well, $1,600, $1,700 a month.

Q.   Do you also receive Social Security?

A.   Yes, I do.

Q.   What is your approximate Social

Jeanne Romano 12/19/2024

J. ROMANO

Security payment?

A.    $2,500, $2,600.  It went up a little.

Q.    Do you have children?

A.    I have five children.  One girl, Celia, and four boys.

Q.    What are your children's names other than Celia?

A.    Joseph, Salvatore, Michael, Vincent.

Q.    Do you have a mortgage on the home you live in or it's paid off?

A.    It's been paid off for years.

Q.    What are your approximate real estate taxes now?

A.    About $13,000 a year.  $12,000 a year actually.

Q.    Is your husband deceased?

A.    Yes, he is.

Q.    Approximately, what year did he die?

A.    He died in 2014.

Q.    Do you get any pension from him? Did he have a pension?

Jeanne Romano 12/19/2024

J. ROMANO

A.    He has half a pension.  Half for me and half for him.  Yeah, that's how he signed up.  So I get half of his pension, which is $845.

Q.    Where did he work?

A.    He worked at Brooklyn State Mental Hospital, and then he worked as a car dealer, car dealing, then he worked as a jeweler for the rest of his time for 20 years.

Q.    As a jeweler?

A.    Yes, a jeweler.

Q.    Do you recall what year he retired?

A.    He owns the jewelry store.

Q.    Then did he sell it or something else?

A.    I don't remember that.  I think he sold it.  Yes, he sold it.

Q.    In addition to the house you live in now, Lilac Lane, and the property in Florida, which is what we are here about --

A.    I didn't hear the first question.

Q.    Other than 9 Lilac Lane, do you own any other properties, properties in your name?

A.    I have the house I own, and the

Jeanne Romano 12/19/2024

J. ROMANO

house I was supposed to own.

Q.   That's the Florida property?

A.   Yes.

Q.   I guess to make it easier, it's probably easier if we call it the Florida property.  When I say that, I'm going to be referring to Via Bolzano.

A.   Okay.

Q.   Your attorneys provided us with some of your records.  It's about 190 pages of records.  You provided those to your attorney?

A.   I provided them to Mr. Kaizer, Mr. Levitt, and Mr. Sercarz.

Q.   Do you recall when you provided records to them?

A.   When?

Q.   Yes.

A.   I gave the records to him.

Q.   It's breaking up a little bit.  Do you recall what year you provided records to Mr. Levitt, Mr. Kaizer, or to Mr. Sercarz?

A.   I think in 2008.

Q.   Do you recall what types of records you provided?

Jeanne Romano 12/19/2024

                              J. ROMANO

A.    I'm not sure of that date because it's when we had another incident happened that it was 2008.  I don't really remember when I provided him with the records.

Q.    That's fine.

A.    When I first hired him that's when. But the year, I don't remember.

Q.    When you first hired Mr. Levitt or Mr. Sercarz?

A.    Mr. Sercarz, and then they came along.

Q.    Was Mr. Sercarz the attorney for your son Michael?

A.    Yes.

Q.    Do you recall what you provided to Mr. Sercarz?

A.    I didn't get the question.

Q.    Do you recall what you provided to Mr. Sercarz?  What types of records?

A.    Well, I don't know what you're referring -- the records what?

Q.    So that's my question.  I don't know what you provided to him.  So that's what I'm asking you.  Do you recall if -- --

Jeanne Romano 12/19/2024

J. ROMANO

MS. LEONARDO:  Mr. Gilmartin, you froze for a time.

MR. GILMARTIN:  Do you want me to repeat what I said?

MS. LEONARDO:  We didn't hear you at all.  You were completely frozen.

MR. GILMARTIN:  My client is having problems with her memory.  I was pointing out to counsel for the United States that she answered this question or at least a considerable proportion of the question in her response to Interrogatory No. 2, which you propounded to her.

MS. LEONARDO:  Sure.  I'm going to say this, the witness already said she does not have a problem with her memory.  Asking her questions if she recalled what she provided to him, as I mentioned to you several times, those interrogatories have not been signed.  So I'm asking her questions with regards to the records.

MR. GILMARTIN:  This isn't an objection.  I'm just pointing this out.  Why don't you proceed.  Okay.

Jeanne Romano 12/19/2024

                              J. ROMANO

Q.    So Ms. Romano, again, it's not a memory test.  If you don't recall what you provided, that's fine.  I'm just trying to get an idea if you provided -- let me finish.  Let me finish.  I'm trying to get an idea if you provided bank records or copies of checks or anything like that.

A.    Bank records, maybe some kind of a statement stating about the house, and that's it.  The bank statements and any statement he wanted or any papers that he wanted concerning the house -- you're talking about the Florida house, correct?

Q.    Correct.

A.    Yes, okay.  Now we are on track.  Yes, I provided them, and then to two associates with all the papers.  I asked for them back so I can have the record.  I don't have any record because they didn't give me anything back.  So that's it.

Q.    There is a document your attorney just referred to what we call interrogatories.  I believe you indicated you tried to get records back from Mr. Sercarz?

Free State Reporting, Inc. 410-974-0947

Jeanne Romano 12/19/2024

J. ROMANO

A.   Yes, I questioned him to get the records back.  It's just when I asked them for the records they said they would give it back, and they didn't give me nothing.

Q.   When did you last speak to them about that, Mr. Sercarz?

A.   I don't recall when.  I mean, it's right in the documents and everything when.  I don't remember that.

Q.   Was it in the last two years, last three years, longer than that?

A.   Longer than that.

Q.   You provided to Mr. Gilmartin a bunch of records that I mentioned.  There's some bank records in there and there's a handwritten ledger.  I guess you kept a book of payments.

A.   Yes, I kept it.  It was a handwritten ledger and I kept the record of when I rented the house.  Because in 2014 I rented the house.  So I had a tenant who was like my own son and trusted him.  I trusted him immensely.  He used to send me a check for payment of rent by money order.  So I got the money order, I went to the bank, and put the

Jeanne Romano 12/19/2024

J. ROMANO

rent check, money order right into the bank. This way I had money to pay the Florida house because that's how I paid the rent and the other bills and the taxes.

Q.    Let me just back up a little bit. So did anybody live in the house in 2004?

A.    No, no one was really living in the house in 2004.  I mean, Michael used to check on it.  If he had to go there for a reason or whatever, I don't know, and he checked on the house and stuff like that.  I didn't really go to the house.  Once in a while I visited. That's about it.  Then I rented it.  I decided to rent it.

Q.    When was the first time you rented it out?  Was that in 2014?

A.    Yes, 2014.  I think it was April or something like that.

Q.    So was anybody in the house between -- let's back up.  The house was finished being built in 2004, does that sound right?

A.    Yes, three or four.

Q.    Did anyone live in the house between 2004 and 2014?

Jeanne Romano 12/19/2024

J. ROMANO

A.   No.  Well, Michael used to go on vacation.  That's about it.

Q.   Did any of your other children go --

A.   No.

Q.   -- to the house?

A.   No.

Q.   Did Joseph have a house nearby?

A.   Yes, Joseph had a house nearby.

Q.   The bank records that you gave us, for example, there are records from Astoria Bank.  Do you remember when you had an Astoria bank account?

A.   Excuse me.  I didn't get that.  The records from what?

Q.   Astoria Bank.

A.   Yes.

Q.   For how long did you have an Astoria bank account?

A.   Until they changed their name.  They changed it to Sterling, then they changed their name, and now it's Webster.  Soon I'll be changing my name.

Q.   I didn't think Astoria still

Jeanne Romano 12/19/2024

                              J. ROMANO

existed.

          A.    It wasn't.

          Q.    So was that the main account that
you would use, the Astoria bank account?

          A.    They changed their name.  Yes,
that's the main account I used to pay the house,
and that's still the same account I use on a
different number because by my account was
hacked about a month ago.  I changed the numbers
of my account.  But other than that, I always
used Astoria.  I will call it Astoria.  We will
call it Astoria.  Astoria Bank always was the
place where the -- the bank where I paid the
checks.  Once in a while I used Citibank, but
rarely.  On occasion.

          Q.    When you were still working, were
your paychecks going into the Astoria account?

          A.    Yes.

          Q.    When you started renting the house
out in 2014, is that where you would deposit the
rent checks or money orders?

          A.    Yes.  2014.  I said April.  I think
it was October.  I don't remember.

          Q.    I think your memory is pretty good.

Free State Reporting, Inc. 410-974-0947

Jeanne Romano 12/19/2024

J. ROMANO

A.    Anyway, it was 2014.  I put my payment from my -- when I -- well, I retired.  I retired in 2012 I think I retired.  Anyway, but every payment that I got, all my checks like my Social Security check went in there.  Okay.  No.  My pension check went in there.  Hold on.  Hold on.  I'm getting mixed up.  My Social Security check, that's the higher check, that went in there.  My payment for my retirement, my retirement went into Citibank.  My husband's retirement went into Citibank.

Q.    In 2004, 2005, 2006, did you have any income, cash income from anything?  Did you get cash for anything?

A.    Yes.

Q.    What type of cash?

A.    I got three IRAs.  When you reach a certain age you have to start collecting.  They give you a certain amount of money that you have to take out, then you pay taxes on it.  That's what I did.  I put that into the account with the house.  So this way I'd have all the money to pay everything.  Because now, you know, I was retiring or retired at that time, and that was

Jeanne Romano 12/19/2024

J. ROMANO

it.  The IRAs.  Go ahead.  Sorry.

Q.  I interrupted you.  Where did you have the IRAs?

A.  The IRAs was from my work.

Q.  About how much --

A.  Two IRAs came from work, and then I bought another one, another IRA.  But that was from -- I don't know what bank it was.  No.  That was from Citibank.  Citibank was the other IRA.  The other two IRAs -- first of the two IRAs came from work, then Citibank I bought.  I had it from there because I remember AIU.  Do you remember AIU?

Q.  Sure.

A.  And they were going -- they didn't want to give me my $45,000 that was in there.  So I went to the manager of the bank, Citibank, and I told him that, and he definitely tried and he couldn't do it.  Then I told him, "Well, we will take this further."  I says, "You have to try harder," so he did, and he got me my $45,000 back and I put that in the bank, Citibank.

Q.  Do you recall, approximately, what year you did that at Citibank?

Jeanne Romano 12/19/2024

J. ROMANO

A.    I really don't recall numbers of years.  I can't even be here sitting talking to you.

Q.    You said you had one IRA that had $45,000.  Do you recall how much were in the IRAs from your work account?

A.    My work account, $90,000 from one. I don't know how much from the other.  Within the same area, $65,000.  I don't know precisely the numbers.

Q.    In addition to some of your bank records there's a very limited number from Astoria Bank or from Sterling Bank.  Do you have any other bank records from those banks?

A.    I gave all my records to Mr. Sercarz and what's the name?

Q.    Kaizer?

A.    Yes, Nicholas Kaizer.  Yes, Nicholas.

Q.    I want to direct your attention to the house in Florida.  Okay?

A.    Yeah.

Q.    There was a contract for sale in 2003, I know we are talking about 20 years ago,

Page000024

Jeanne Romano 12/19/2024

J. ROMANO

that Michael signed.  Does that sound familiar to you?

A.    Say that again, please.  Because you got a little --

Q.    Sure.  There was a contract in 2003 for the purchase of the house, the Florida house, that Michael signed.  Does that sound familiar to you?

A.    That Michael signed?  I'm not sure about that really.

Q.    Okay.

A.    I know he paid -- when we looked for the house, you know, he looked for the house.  We decided to want to have an estate for the children.  So it happened.  He made renovations, and he put up the money for the renovations, and then I paid him back for them.

Q.    We will get back to that.  What time did you buy the house in Florida?

A.    Well, I was looking for -- I was talking to Michael quite a lot about a house because I wanted to be a snow bird.  I kept talking.  He said -- he used to go to Florida a lot.  He says there's a lot of houses there to

Jeanne Romano 12/19/2024

J. ROMANO

look at if you're interested, I said yeah.  So then he came to Florida and everything.  We went to Florida and we looked.  He said this particular house needed a lot of renovations, he said we can do the renovations.  He says, "I'll see if I can loan you some money.  You can do the -- we can do the renovations," so he did.  That was it.  I gave him back the money.  That was it on that.  We went to Kelly's office after a time, after the house was done.  I said well, you know, what if I pass away or something, and so we got -- I forgot what kind of an estate, something with C-O-N, construction.  I don't know if it was construction on whatever kind of estate.  So anyway, we got that.  I went to Kelly's office, Mr. Dominic Kelly's office, and we had that done.  He made an estate.  He said that would be the best thing to do in New York State.  It would be the best thing to do to get this here, this way.  In other words, all his children probably will get some of it or whatever, be partners in it.  I don't know.  I don't remember too far ahead.

Q.    Ms. Romano, slow down a second.

Free State Reporting, Inc. 410-974-0947

Jeanne Romano 12/19/2024

J. ROMANO

You are jumping way ahead.  I'll try to take us back a little bit.

So the house, the Florida house was a new construction, wasn't it?  Was it a brand new house?

A.   Well, we were putting in better bathrooms and stuff like that.

Q.   It was a brand new construction, so --

A.   You can call it that.

Q.   So I'm going to try to show you something.

MS. LEONARDO:  This is from the government's production to the claimants.  I'll send you the exhibits later.

A.   I didn't hear one word you said, Ms. Leonardo.

Q.   I'm putting something on the record.  I don't have a question for you yet.

MS. LEONARDO:  Can you see that?

MR. GILMARTIN:  I can.  This is Matthew Gilmartin.

Q.   Could you see that, Ms. Romano?

A.   No, I cannot.

Jeanne Romano 12/19/2024

J. ROMANO

Q.    Is it too small?

A.    It's too small.  I just can't see it.

MS. LEONARDO:  Just for the record, this is from the government's production to the claimant, which is the contract of sale.  I'll get you the page number in a second.

Q.    Can you see it any better or is that still too small?

A.    I can't see it.  I can't see it. I'm sorry.

Q.    If you can't see it, that's fine.

A.    You can read it to me if you want, but I can't see it.

Q.    It's hard to do it like this.  Do you have any of the purchase paperwork?  Do you have any copies of the purchase for the Florida house?

A.    Everything was given to Mr. Sercarz.

Q.    Did you know that Michael signed the contract for the purchase of that Florida house?

Jeanne Romano 12/19/2024

J. ROMANO

A.    I don't -- I don't recall the incident.

Q.    Okay.  Do you recall if there was a time about a year later that you were added to the purchase of the house?

A.    Yeah, I remember that.  That's when we went to Dominic for the estate.  Yes, I remember that.

Q.    I'm trying to show you another document.

A.    I can't read print.  I can't read that unless I have special glasses on.

Q.    Do you have glasses?

A.    I have a cataract in one eye.  In one eye it can't be done.

Q.    If I showed you a document, are you able to read it?

A.    Not now.  But I read it then.

Q.    Would it sound familiar to you if I told you that you were put on the house in 2004?  Does that sound familiar?

A.    No.  I don't know.  Yeah, 2004.  Right.  It was three or four.  2003 to 4.

Q.    Is it your recollection that

Jeanne Romano 12/19/2024

J. ROMANO

Michael actually signed as the purchaser of the house in 2003 and later on you were added?

A.    I guess.  Yeah, that sounds the right way.  I'm not sure because I don't remember that.  But yes, that would be the direct way to do that.  Right.

Q.    When did you meet with Mr. Pella, the attorney?  Do you remember?

A.    Probably a year or so later.

Q.    Let's do this, do you recall what the purchase price of the house was, the Florida house?

A.    The Florida house was about I think $400,000.  But it was more because we paid or Michael paid 142, $143,000 in renovations. Okay.  So the price of the Florida house plus the renovations, plus my down payment, plus my $175,000 mortgage is what I paid for the house.

Q.    So you're saying you made a down payment to buy the house?

A.    Yes, I put $65,000 down, and got $175,000 mortgage from Chase Manhattan Bank.

Q.    Where did you get the $65,000 from?

A.    Oh, that was from my accounts.  I

Jeanne Romano 12/19/2024

J. ROMANO

told you, the IRAs and my mother unfortunately God bless her passed away, and I inherited money from them too, about $150,000.

Q.   Do you have any records from those IRA accounts that you took the $65,000 out of?

A.   No, I don't have that now.  Do you know how many years ago that was?

Q.   Okay.  When did your mother die?

A.   She died I think in 2009.

Q.   And she left you money?

A.   Yes, but she didn't have an account for money.  She saved her money and left it in her house and gave me the money.  She worked in a sweatshop 30 years, and taxes were taken out.

Q.   So you're saying your mother left you cash?

A.   Yes, she left me cash.  Right.

Q.   How much cash was it?

A.   I just told you, $65,000.

Q.   Your mother had $65,000 --

A.   No.  $65,000 what I put down on the mortgage.  No.  She left me about I'd say $130,000 to $150,000.  Something like that.

Q.   You are saying your mother had

Jeanne Romano 12/19/2024

J. ROMANO

between $150,000 and $130,000 cash in her house?

A.    Yes.   These are -- my mother was old.  She was my age when she died.

Q.    What was your --

A.    That's old.  Excuse me.

Q.    What was your mother's name?

A.    Elsie.

Q.    What was her last name?

A.    Del'Erario, D-E-L-'-E-R-A-R-I-O. Her father couldn't pronounce Cecilia.  He was foreign.  He came from Europe, Italy.  He couldn't say Cecilia.  So he used to say Odesilia.  So they called her Celia.

Q.    You said she died in 2009?

A.    I think it was -- yeah, 2009, I think.

Q.    Did you deposit that cash anywhere?

A.    No.  She's in the cemetery at St. Charles.

Q.    The money that you got from your mother's house, the $130,000 to $150,000, what do you with that?

A.    It was 130 or 150.

Q.    What did you do with that?  Did you

Jeanne Romano 12/19/2024

J. ROMANO

put it in the bank?

A.   No.  I kept it in a bag hiding.

Q.   Do you still have any of that money?

A.   No.  I don't have any of the money. I put it all in the house.  That was cash because my mother worked 30 years in a sweatshop, which I joined her when I was 14 years old coming home with -- working in a dress shop getting -- in the summer they work on velvet.  I had to walk home from work.  It was in the area.  Of course, with all the velvet with everybody looking at me.

Q.   So let me ask you this, our records show the purchase price of the Florida house was $475,000.  Does that sound right to you?

A.   Yeah.

Q.   When you say "renovations," that's not really renovations, but it's upgrades for different things in the house?

A.   Yes, upgrades.

Q.   Can you turn the camera a little bit?  We only see the top of your head.

A.   She can't see me.  I can't see her.

Jeanne Romano 12/19/2024

J. ROMANO

Sorry. Now I'm only seeing myself.

Q.    The Florida house was about $475,000, right?

A.    Yeah, I guess so. Within that range.

Q.    And you took a mortgage out from Citibank for about $175,000, right?

A.    I took what?

Q.    You had a mortgage from Citibank for about -- sorry.

A.    Chase.

Q.    You had a mortgage from Chase?

A.    Chase, yes.

Q.    You had a mortgage from Chase for about $175,000?

A.    Yes.

Q.    Do you know where the other about $300,000 came from for the purchase price?

A.    Sure I do. I worked three jobs I told you. I worked five days a week, 12 hours. One week I worked five days a week, next week I worked four days a week for 12 hours. However, two days a week that I was off, I worked overtime at the hospital. The days that I was

Jeanne Romano 12/19/2024

J. ROMANO

off, I was called at A. Holly Patterson to go be in charge of the respiratory for the whole building.  Also on my weekends that I had off, I worked at A. Holly Patterson.  Excuse me.  That is because it was eight hours, eight hours with them at A. Holly Patterson.

Q.    Let me ask you this.  what account -- here's what I'm trying to get at, there was $319,000 cash that was due at the signing.

A.    Ms. Leonardo, I totally missed what you said.

Q.    Sure.  So the Florida house went to contract and was sold?

A.    Yes.

Q.    You had to put in another about $300,000 towards the purchase price of that house.  Okay.  So the mortgage was 175, the total purchase price was 475.  So what bank account did that $300,000 come from?

A.    From the bank at Astoria, which turned to Sterling.  Don't forget I had -- say the question again.

Q.    I'll back up a little bit.  I'm focusing now on the period of 2003 to 2004 when

Jeanne Romano 12/19/2024

J. ROMANO

the house was bought.  We will get to the tenant later.  When you had to go to the closing on the house there had to be additional funds that were used to purchase that house.  Is there anything, do you have any records, a check from your Astoria account, do you have anything that shows your money came from the Astoria account to buy that house?

A.    Right.  I gave everything to Mr. Sercarz and Kaizer and Levitt.

Q.    As you sit here today you don't have a copy of a check from your account?

A.    No.  I have no accounts whatsoever because I gave it to them and it was not returned.  I don't know what they did with it.

Q.    So you also said that Michael advanced about $140,000 towards the house?

A.    Yes, and I paid him back.  I told you I worked three jobs for ten years.

Q.    Let me get to that.  One second. Do you know where Michael got the money --

A.    I don't know.  I don't ask people. He worked.  I don't know what he did.  I mean, I don't know what he did.  I don't know how he

Jeanne Romano 12/19/2024

J. ROMANO

saved the money or whatever.  I don't ask grown men what they do with their money.

Q.    He is your son, right?

MR. GILMARTIN:  Objection.  Asked and answered.

MS. LEONARDO:  It hasn't been asked and answered.

MR. GILMARTIN:  She just said she didn't know.

MS. LEONARDO:  I'm asking a different question now.

Q.    He's your son, correct?

A.    Yeah, and I don't know.

Q.    Okay.

A.    He's my son.  I don't ask my grown sons what their salary is or this and that or what they do with it.  It is none of my business.  They are adults.

Q.    Do you know if Michael paid that in cash, check?

A.    I don't know.

Q.    You said you paid him back the $140,000, correct?

A.    Correct.

Jeanne Romano 12/19/2024

J. ROMANO

Q.    How did you pay him back that $140,000?

A.    I gave him sometimes cash, sometimes a check.  Like that.

Q.    Do you have copies of any checks you gave him?

A.    I have nothing.  I don't keep checks for 30 years.  Even though -- the things that I gave Mr. Sercarz, et al, is everything I ever had.

Q.    Where did you get the cash to pay him?

A.    When the IRS sent me my notice that I had to pay taxes, because I have to take my money out, I put it in the checking account, and then I wrote a check for whatever I had to write it to for the house.

Q.    So are there any notes in your ledger that would show that you made cash payments to Michael?

A.    No.

MR. GILMARTIN:  Objection.  The document speaks for itself.

MS. LEONARDO:  Counselor, this is a

Jeanne Romano 12/19/2024

J. ROMANO

federal deposition.  There are no objections other than attorney/client privilege.  Please refrain from that.  Thank you.

Q.    Ms. Romano, when you would make notes in your ledger, was it your habit to write down things that you paid or people that you paid?

A.    My ledger is from 2014.  That's when I had a tenant, and I recorded every single penny that Warren gave me by money order, and I have -- the ledger shows for itself.  The number of the -- the numbers that were on the money order, when, how much, if there was interest.  Every single thing.  You can ask the lawyer who is sitting right next to you, Tom Root.

Q.    So your ledger goes back.  There are pages from 2006.

A.    It goes back to 2014.

Q.    There are some pages that I believe refer to 2006.  Let me take a look.

A.    Well, if there are, it's my personal thing I took out of there.

Q.    Let me see if I can pull this up.

Free State Reporting, Inc. 410-974-0947

Jeanne Romano 12/19/2024

J. ROMANO

By the way, in the documents that your attorney provided to us -- sorry.  Can you hear me?

A.    Just a moment, please.

MR. GILMARTIN:  Isn't there a button you can touch on the phone so she can see people?

A.    Now I see you guys.

Q.    In the documents that you provided to Mr. Gilmartin there are checks from 2009.  Do you know where those came from?

A.    What do the checks say?  Usually there is something on the check.

Q.    Sure.  For example, there's some bank statements.  There is one from it looks like November 2, 2006, which was to Chase Home Finance.  Which I assume is the mortgage for the Florida house.

A.    For what?  Chase?  I didn't hear.

Q.    For Chase, the Chase mortgage for the Florida house.

A.    Say the whole question again.

Q.    So in the more recent documents that your attorney provided to us, Mr. Gilmartin, there are checks from 2006,

Jeanne Romano 12/19/2024

J. ROMANO

there's some bank statements.  Do you know where you got those records from to provide them to Mr. Gilmartin?

A.    Yes, I wrote it.  It's the same handwriting.  I wrote it.  It's Jeanne Romano on the check.

Q.    Right.  My question is, where --

A.    I don't understand your question.

Q.    Where did you get this batch of documents to give to Mr. Gilmartin?

A.    What batch much documents?  From 2006?

Q.    Yes.  There are some checks and bank statements from 2006.

A.    What do they say?

Q.    For example, your Astoria Bank account we talked about, and there's a bank statement, and there are a bunch of checks part of your bank statement.

MR. GILMARTIN:  Excuse me.  Can you possibly identify the Bates stamp you are referring to?

MS. LEONARDO:  We put Bates stamp number on it.  So --

Jeanne Romano 12/19/2024

                          J. ROMANO

                MR. GILMARTIN:  We see Bates

          numbers on our documents.  Down on the

          bottom right hand.

                MS. LEONARDO:  Where it says Jeanne

          Romano production.

                MR. GILMARTIN:  Yes.

                MS. LEONARDO:  I believe it's page

          28.

          Q.    All I'm asking you, Ms. Romano,

     there are some bank statements from 2006 that

     you provided to your attorney.  Where did you

     get those from?  Did you have those in your

     house or something else?

          A.    There were some statements from

     2006 that I provided to my attorneys?

          Q.    Yes.

          A.    Which attorneys?

                MR. GILMARTIN:  She's referring to

          me, Ms. Romano, Matthew Gilmartin.

          A.    I don't remember that.  I don't

     remember.  I don't remember that.

          Q.    It's really just records from 2006,

     then it jumps to more recent.

          A.    How many records from 2006?

Jeanne Romano 12/19/2024

J. ROMANO

Q.    I haven't counted them.

A.    Ask the attorneys.  He's there.

Q.    I'm asking you questions, Ms. Romano.  If you don't recall, you don't recall.

There are some from 2010 also from your Astoria Bank account.  Again, my question is, do you know where that would have come from, where you got those records from more recently?

A.    Can I talk to my attorney, please?

Q.    Not in the middle of a question.  No.

A.    Oh, okay.

Q.    Do you know where your records from --

A.    I don't recall that then --

Q.    All right.

A.    -- without a question.

Q.    With regard to your ledger --

A.    She froze here.

Q.    Can you hear us or no?  I haven't asked a question yet.  Can you hear me?

A.    Yes, I could.

Q.    Okay.  For example, in your ledger

Free State Reporting, Inc. 410-974-0947

Jeanne Romano 12/19/2024

J. ROMANO

there are notations from 2006.

A.     There's no what?

Q.   There are notations in your ledger.

A.     Locations?

Q.     Notations you handwrote in your letter.

A.     Notations, notations.  I'm a little deaf too.  Notations.

Q.     Correct.  Your handwriting in your ledger --

MS. LEONARDO:  For to the record, counsel, with your Bates numbers, I believe it's 78.

Q.     So you had a number of notations in there on things that were paid from 2006.  Okay?

A.     I don't understand the question.

MR. GILMARTIN:  Let Ms. Leonardo finish the question.

Q.     Let me finish the question.  So would you have made any notes in your ledger that you paid your son back or you paid him back cash?

MR. GILMARTIN: Objection.  The document speaks for itself.  I withdraw

Free State Reporting, Inc. 410-974-0947

Jeanne Romano 12/19/2024

                          J. ROMANO

          it.  Sorry.  Go ahead.

                    Answer it, Ms. Romano.

          A.    Listen, I need that question again

   because I forgot.

          Q.    So the ledger that you provided to

   your attorney, which was provided to us, has

   different dates, different payments, different

   amounts to different people.  Would you have

   made them --

          A.    No.  I don't know different

   amounts, different people, or anything like

   that.  I gave him a ledger that he -- for the

   payments that I got for the house.  Every single

   money order, every single payment, and also for

   the water.  That's what you're talking about

   because I'm not seeing it?  So how do I know.

          Q.    Let me try to share a page with

   you.

          A.    Yeah, go ahead.

          Q.    Can you see that?

          A.    Do you have a magnifying glass?

          Q.    I don't know if I can make it any

   bigger than this.

          A.    Look, I don't think I can see any

Jeanne Romano 12/19/2024

J. ROMANO

better than I do.  I only have --

MR. GILMARTIN:  Ms. Leonardo, may I suggest you take the line that you're referring to like the enlarged letters "Pristine Pool."

Just answer Ms. Leonardo's question.

A.   Okay.  I know what she's talking about.  Okay.

MR. GILMARTIN:  We just lost her.

A.   Does it say "pool"?  I asked her for a name.  Okay.  Pristine Pools.  That's when we had -- that's when the pool was in progress. I paid the pool.  77.  Do you understand?  I needed what the title was.  I have it written "Pristine Pool."

Q.   Ms. Romano, this is my only question, this is your ledger, is that right?

A.   Yes, this is my ledger.

Q.   Is this your handwriting?

A.   Yes, it is.

Q.   Was it your practice to write down things that you paid?

A.   Yes, it was.

Jeanne Romano 12/19/2024

J. ROMANO

Q.    To keep track --

A.    However, I only started doing it when I started renting the house.  There was a lot of incidents that people that rented houses didn't get paid for services they rendered and they got bills.  So that's when I started to write these things down.

Q.    So this says 2006.  You weren't renting the house in 2006?

A.    Well, okay.  So that was for me. That's when I had the house and nobody was there and that's when I paid the pool.  Because that's why I said that he might have -- Michael might have been at the pool or something like that.  I would say he might have been at the pool.  He used to visit the house.

Q.    Here's my question, did you make any notes whatsoever that you gave your son cash to pay him back?

A.    No, I did not.

Q.    Okay.  I'm showing you your ledger, your handwriting.

A.    Yes.  That's when I was the sole operator of that house.

Jeanne Romano 12/19/2024

                              J. ROMANO

          Q.    Okay.

          A.    I wanted the pool there, you know,
    in case somebody came over.  Michael or somebody
    else.  I don't know.  His friends, who knows.  I
    don't know.

          Q.    So when you started renting the
    house in 2014, what did you charge for rent?

          A.    2014, I think it was like $960
    something for the whole house.

          Q.    How big is the house?

          A.    Just to pay the taxes because I had
    to pay the taxes of the house.  So that was for
    that.

          Q.    In 2014, what were the taxes at the
    Florida house?

          A.    In what?

          Q.    Back in 2014, what were the taxes?

          A.    Sorry.  Go ahead.

          Q.    In 2014, what were the taxes at the
    Florida house?

          A.    In 2014, it appeared that it was
    $970 maybe or something like that a year.

          Q.    A year?

          A.    Yeah.

Jeanne Romano 12/19/2024

J. ROMANO

Q.    How much were you charging for rent?

A.    $1,000 a month.  No, less than $1,000 because it started like that.  It was like about -- it's right in the ledger if you will see what I rented the house.  It has that. It has the taxes of the house that year too. There's a page for the taxes of the house, there's fees page for the HOA, there's a page for rent, and if the rent went up I put that down too.

Q.    Ms. Romano, I'm just asking if you recall, not looking at your ledger, do you recall what the taxes were in 2014?

A.    I just answered the question, Ms. Leonardo.

Q.    You just said it was in the ledger.

A.    I answered the question.  Look at the ledger and you'll see the number of the taxes.

Q.    I'm asking you.

A.    I don't remember.  My answer is I don't remember.

Q.    Okay.  Do you know as of today what

Jeanne Romano 12/19/2024

J. ROMANO

--

A.    I answered it.

Q.    Do you know as of today what the taxes are?

A.    Today?  The taxes now?

Q.    Yes.

A.    I just paid about $990.  About $10,000, $9,963 something.  I just paid them. That's what it is now, $9,000.

Q.    What are you charging for rent this year?

A.    Rent this year, I'm charging $1,700 a month.

Q.    Is it to the same tenant that you've had since 2014?

A.    Excuse me.  Yes.  He's there all this time.  He's like another son to me.  I've known him since he was an infant.

Q.    Hang on a second.  Sorry.  Did you take make any notations in your ledger about any check payments you made to Michael?

A.    Sorry?  You got chopped up.

Q.    Do you note in your ledger anywhere where you wrote checks to Michael for repayment?

Jeanne Romano 12/19/2024

                              J. ROMANO

        A.    Which made what?  I didn't get the
last sentence.

        Q.    Do you have any records of the
checks --

        A.    I didn't have to make any checks
ever to Michael.  Ever, ever.

        Q.    I thought you said earlier you
wrote him checks.

        A.    You mean to pay back the $140,000?
I thought I did.  So I probably -- that's
probably a no.

              MR. GILMARTIN:  Ms. Leonardo, in
        about 10 minutes, can we take a bathroom
        break?

              MS. LEONARDO:  Sure.

              MR. GILMARTIN:  That will be around
        12:00.

        Q.    The $140,000 you repaid to Michael
was solely in cash?

        A.    I don't remember.

        Q.    I have to go back to this too.  I'm
unclear about this.  If I'm repeating myself, I
apologize.

              So you said that you paid $65,000

Jeanne Romano 12/19/2024

J. ROMANO

towards the down payment of the Florida house, is that right?

A.    Yes, $65,000.

Q.    Michael paid about $140,000, is that right?

A.    I paid him back every dollar.

MR. GILMARTIN:  Just answer Ms. Leonardo.

THE WITNESS:  Okay.

Q.    If you can just listen to the question.  I understand what you're saying.  I'm just trying to add up numbers.

A.    Okay.

Q.    So you claim you paid $65,000 towards the purchase of the house, right?

A.    Correct.

Q.    Okay.  Michael put in let's say 140, it's 142.  Let's say 140.  So that comes up to $205,000.

A.    Yes.

Q.    Then $175,000 for the mortgage.

A.    175 was the mortgage, 65 was the down payment.

Q.    So that adds up to about $380,000.

Jeanne Romano 12/19/2024

J. ROMANO

So 65, plus 140, plus 175.

A.    There were other incidents that I don't know.  Paying the lawyer to do things, all kinds of things.  Okay.

Q.    Here's my question, the purchase price of the house was about $475,000.  We now accounted for $380,000.  Where did the other money come from to make up to $475,000?

A.    Okay.  It came from -- I'll go back again too.  The IRAs.  Every year I got $16,000 to $15,000, and I had to pay taxes on.  I'm adding them altogether.  I had to pay tax on all that.  I put the money right into the bank into my checking account and gave them extra additional payments towards the house so I get it off my back quicker.  So I worked day and night, and I had five smaller kids that my husband, God bless him, all he did for them.

Q.    Ms. Romano, that's not my question. I understand what you're saying with regards to making additional payments to the mortgage.

But when you walked in to buy that house or when Michael walked in to buy that house you had to give the builder $475,000.

Free State Reporting, Inc.  410-974-0947

Jeanne Romano 12/19/2024

J. ROMANO

Following me?  We only accounted for $380,000. Where did the other money come from to make up the purchase price?

A.   I told you.  My mother left me money, and I worked a hundred hours a week with three jobs.  I told you that.

Q.   Let me do the numbers with you again.  When the house was bought your mother wasn't dead yet, right?

A.   I don't understand.

Q.   I didn't hear you.

A.   You said was --

Q.   I didn't hear what you said.

A.   You said you got 380, where's the other money?

Q.   Correct.

A.   I don't remember that.

Q.   Okay.

A.   I don't remember the other money. All I know is -- or do I remember?  Or do I remember?  Okay.

Q.   Well, so that's the question.

A.   The lawyers had to get paid.  So maybe some of it went to the lawyers.  I don't

Jeanne Romano 12/19/2024

J. ROMANO

remember.

Q.   So there's $95,000 roughly that is not accounted for.  That's my question.  Do you know --

MR. GILMARTIN:  I object. Ms. Romano said it was from her jobs and her mother's inheritance.

MS. LEONARDO:  No.  Let me clarify that.  Stop.  Let me clarify.  She testified they took the money from the IRAs to pay down the original principal on the mortgage.  2004 her mother wasn't dead yet.  That's what we are trying to get at. On a purchase price of --

A.   I saved my money.  I saved my money and my husband gave me money.  Yes, that's what I saved.

Q.   Other than --

A.   I didn't have a car.  I didn't do anything.  They drove me to work.  I didn't have the expenses.  I saved my money.

Q.   So you're saying you got the mortgage for the house for 175, the $65,000 from your IRAs that you don't have a record of,

Free State Reporting, Inc. 410-974-0947

Jeanne Romano 12/19/2024

J. ROMANO

correct?

A.   I don't.  No, it was -- I don't know where exactly.  It could have been from the IRA.  It could have been my mother.  Do you know how many years ago this is from?  2004.

Q.   I'll ask another question, Ms. Romano.  So you knew in 2008 that your house, that the government was trying to seize your house, right?

A.   Yes.

Q.   When your son was arrested, when all of your sons were arrested, right, you knew that the government was trying to seize your property?

A.   I don't know what you're talking about.  But yes.

Q.   In 2008 you knew that, but you don't have records of some of these things.  That's what I'm trying to get at.

A.   The record, yeah, go look in the bank.  Go to the bank.  You're the federal government, go to the bank.  Ask them for every single dime that I paid over there and you'll see.  Just like I gave the statements to

Jeanne Romano 12/19/2024

J. ROMANO

Mr. Sercarz and what's his name, Levitt and Kaizer.

Q.   As you sit here today you provided some records to your new attorneys, right?

A.   I can't hear you.  Sorry.

Q.   All right.  As you sit here today you provided some records from 2006 to your attorneys, your new attorneys, correct, Mr. Gilmartin?

MR. GILMARTIN:  Yes.

A.   I'm sorry.  You chopped up.  I don't understand.

Q.   More recently, put aside Mr. Sercarz, Mr. Levitt, Mr. Kaizer, forget about them, more recently you provided some records to Mr. Gilmartin, your new attorney, right?

A.   I didn't provide any records to Mr. Gilmartin that I know.  Just the records I gave him I told you from 2014.

MS. LEONARDO:  Do you want to take a break now?

MR. GILMARTIN:  Yes, please.

MS. LEONARDO:  We will take 20

Jeanne Romano 12/19/2024

J. ROMANO

minutes or --

MR. GILMARTIN:  20 minutes is fine.

MS. LEONARDO:  Thank you.

THE WITNESS:  Less than 20 minutes.
She has to go to work.

MR. GILMARTIN:  We will do 10
minutes then.

MS. LEONARDO:  Okay.

(Recess was taken.)

Q.    I'm going to try to show you
another document.  It's the petition that you
filed with regard to the property.  I'm just
going to ask you a couple of questions of what's
in there.  Let me see if I can show this.  Can
you see what I have on the screen?

A.    No.  It's just the title.  That's
all.  It was just your title on the screen.

MR. GILMARTIN:  I see your
signature.

Q.    Do you see your signature?

MR. GILMARTIN:  And the date.

A.    I don't see a signature.  Now I see
my signature.  Hold on.

MR. GILMARTIN:  Your picture is

Jeanne Romano 12/19/2024

J. ROMANO

blocked by something, Ms. Romano.  Get your thumb away or your hand.

Q.    So what I'm showing you is called your petition.  There's a verification that's dated April 14, 2014.  Do you see that?  Do you see your signature?

A.    Yes.

MR. GILMARTIN:  Ms. Romano, can you unblock your camera, please?  There we go.

THE WITNESS:  Is that okay?

MR. GILMARTIN:  We see a piece of skin.  Is that your hand?  There you go.  Good.  Go ahead.

Q.    Do you see your signature?  That's your signature?

A.    Yeah, yes.

Q.    I'm just going to ask you a couple of questions.  You don't have to read them.  I'll ask you the questions from this document.

MS. LEONARDO:  I'll mark this as Exhibit A, which is Ms. Romano's second petition.  This is identical to the one she submitted in 2014.

Q.    You see your signature at the

Free State Reporting, Inc. 410-974-0947

Jeanne Romano 12/19/2024

J. ROMANO

verification that says "The forgoing facts and claims are true and correct and submitted under penalty of perjury"?  Do you see that?

A.    Yes.

Q.    That's your signature?

A.    Yes.

Q.    All right.  My question is going to be -- I'll refer to, you don't have to read it. I'll start referring to paragraph 11 of that document where you stated that in May 2007 you started to engage in estate planning.  Does that sound familiar?

A.    Yes.

Q.    Is that when you met with your attorney, Mr. Pella?

A.    I don't remember the date.  I can't remember all these dates.

Q.    That's okay.  This is in your petition.  I don't know if that helps you remember.  I'll just ask you questions about it.

A.    Okay.

Q.    In this petition you say that you engaged in estate planning and you transferred the Florida property to Michael, right?

Jeanne Romano 12/19/2024

J. ROMANO

A.    Yes.

Q.    Not specifically what you said to your attorney, although you provided an affidavit, you had a discussion with him about a constructive trust?

A.    Yes.

Q.    What is your understanding of what a constructive trust is?

A.    I'm not sure, but I think it's something that you have to show an interest in the property or something like that, that you pay bills or something.  I don't know if that's right.

Q.    I'm only referring to that because paragraph 17 of that document, Exhibit A, you stated that "I consider my son's title, ownership subject to a constructive trust."  I'm just asking for your understanding.  Do you have an understanding today what that means?

A.    I'm the owner of the property, and he is on the deed or whatever.  He's on the deed, but I'm also the sole owner.  If something happens to me, then he would be in charge of it, I believe.

Jeanne Romano 12/19/2024

J. ROMANO

Q.    Did you have conversations with Michael about transferring the deed back into his name?

A.    No.  I don't remember.  I don't remember discussing that.

Q.    Do you remember discussing estate planning with any of your other children?

A.    Yeah, they knew about the estate planning.  If I pass away they get the house or whoever was named gets the house.

Q.    So you also have in this document, Exhibit A, paragraph 11 you transferred your Levittown home to Vincent?

A.    No, we transferred that over.

Q.    To Vincent?

A.    We transferred that over a while back.  I took Vincent off there.

Q.    But in May 2007, had you transferred your Lilac Lane home to Vincent?

A.    I transferred that over.

Q.    To who?

A.    To my daughter and granddaughter.

Q.    Was that done recently?

A.    Yeah, I think it was done recently.

Jeanne Romano 12/19/2024

J. ROMANO

Yes, it was done after a while.  Yeah, that is.
That's all I could remember.  It was done.  I
know it's done.

Q.    Okay.  Have you transferred any
property to Vincent?

A.    No.

Q.    Have you transferred any property
to Joseph?

A.    No.

Q.    Have you transferred any property
to Salvatore?

A.    No.

MR. GILMARTIN:  Repeat the question
about transferring to Salvatore.  It was
your last question.

MS. LEONARDO:  Yes, she said no.

MR. GILMARTIN:  I didn't hear that.
Sorry.

Q.    So do you live by yourself?

A.    My son lives with me.

Q.    Which son lives with you?

A.    Vincent lives with me.

Q.    Does Michael own his own property?
Does he own his own house?

Jeanne Romano 12/19/2024

J. ROMANO

A.   He owns his own house, I guess.  I don't know.

Q.   Is his house --

A.   What house?

Q.   I'm sorry?

A.   What house?

Q.   Does he own a property at 206 Saddlerock Road or something?

A.   Saddle Lane, yes.

Q.   Does he own that home?

A.   Yes, he does.

Q.   Does anybody live there?

A.   I think it's rented.  I don't know. I don't know for sure.  Things have happened.  I don't know.

Q.   You had in this document that you had mentioned, Exhibit A, that you transferred the property to Michael with the understanding that you can request it back if you needed it?

A.   Yes.

Q.   And have you ever asked him for the property back?

A.   No, never.

Q.   Do you have any tax returns that

Jeanne Romano 12/19/2024

J. ROMANO

reflect the income, your rental income?

A.    I can't hear you.  I didn't know what you said.

Q.    I'm sorry.  Do you have any tax returns that reflect your rental income from the Florida property?

A.    I have the tax -- no, I don't think I do.  I mean, I have the tax returns saying I paid the taxes.  Is that what you're talking about?

Q.    Partially.  Do you report the rent as income on your tax return?

A.    I'm not sure.

MS. LEONARDO:  Counsel, I think we did ask for tax returns with regard to --

MR. GILMARTIN:  We will follow-up on that.

MS. LEONARDO:  Okay.

Q.    I don't know if you still retain this.  Do you have any tax returns from 2004 to 2007 that would show what your income was?

A.    Absolutely not.  I don't know what happened to that.

Q.    Do you do your own taxes or did you

Jeanne Romano 12/19/2024

                              J. ROMANO

have a tax preparer?

          A.    My accountant did.

          Q.    Who is your accountant?

          A.    Unfortunately, she passed away.
She passed away, the first accountant I had.

          Q.    Who does your taxes now?

          A.    Mr. Alonso.

          Q.    Where is he located?

          A.    He works at Gardiners Avenue right
here in Levittown.

          Q.    Gardiners Avenue?

          A.    Yeah, up the road.

          Q.    When you transferred the property
to Michael in 2007, was it your idea, his idea,
somebody else's?

          A.    No.  We decided that together.

          Q.    This was in 2007?

          A.    I don't remember.

          Q.    Do you also in your petition,
Exhibit A, paragraph 12, again, this is ten
years ago you wrote this, but you wrote that you
recall numerous conversations with your children
about estate plans as you sit here today?

          A.    Yes, sure.

Jeanne Romano 12/19/2024

                              J. ROMANO

          Q.    As you sit here today, do you

     remember any of those conversations?

          A.    I'm sorry.  You blocked out.

          Q.    As of today, do you remember any of

     those conversations with your children?

          A.    No, we don't talk about that.

          Q.    2007, did you talk about it more?

          A.    Yeah, when I was buying the house I

     talked about it more.  Now, I don't.  So many

     years have passed by, so many things have

     happened.  I don't talk about it now.

          Q.    So when this petition was filed I

     think it was from a different attorney,

     Mr. Ford, F-O-R-D.  Does that sound familiar?

          A.    I don't remember that.

          Q.    In 2001, were you in a nursing

     home?

          A.    Was I a patient in the nursing

     home?

          Q.    Correct.

          A.    No.  I worked in a nursing home as

     one of my jobs, A. Holly Patterson.

          Q.    Page 5 of Exhibit A there's a

     representation that you were in a nursing home.

Jeanne Romano 12/19/2024

J. ROMANO

Is that not correct?

A.    No.  I worked in a nursing home.

Q.    Have you ever been in a nursing home for an extended period of time?

A.    Was I a patient in a nursing home?

Q.    Yes.

A.    No.

Q.    Did you know in 2007 where your son Michael worked?

A.    No, I don't recall.

Q.    Did he work for Wall Street Rare Coins?  Did you know that was his company?

A.    Yeah, I think it might have been. I don't know.

Q.    Did you ever visit him at work?

A.    No.

Q.    I don't have any other questions except for identification purposes.  I should have asked this initially.  What is your date of birth?

A.    XX/XX/XXXX.

Q.    What is your Social Security number?

MS. LEONARDO:  This will not go in

Jeanne Romano 12/19/2024

J. ROMANO

the record.

MR. GILMARTIN:  Do you remember your Social Security number, Ms. Romano?

THE WITNESS:  Yes.  Do I have to give the whole number?

A.    You have it there, don't you?

Q.    I don't.

MR. GILMARTIN:  Can she give you the last four digits?  I'm not trying to be difficult.

MS. LEONARDO:  It's not going to be in the record.

MR. GILMARTIN:  Give her the whole number.

A.    XXXX.

MR. GILMARTIN:  A little slower.

Q.    Say it again.

MR. GILMARTIN:  All the digits.

A.    XXX-XX-XXXX.

MR. GILMARTIN:  It's XX, correct?

THE WITNESS:  XXX-XX-XXXX.

MS. LEONARDO:  I only ask because the petition asks for it, but it wasn't provided.  I have no further questions.

Free State Reporting, Inc. 410-974-0947

Jeanne Romano 12/19/2024

J. ROMANO

Thank you.

MR. GILMARTIN:  Can we have a 60 second break, please?

MS. LEONARDO:  Sure.

(Recess was taken.)

MR. GILMARTIN:  I have no questions.  But we do not waive the signature on her deposition.

MS. LEONARDO:  That's fine.  I'll send you a copy.  Maybe you can also sign the interrogatories too.

(Whereupon, Defendant's Exhibit A, Petition, was deemed marked for identification.)

(Time noted:  11:55 a.m.)

Jeanne Romano 12/19/2024

A C K N O W L E D G M E N T


STATE OF NEW YORK    )

                SS:

COUNTY OF            )


     I, JEANNE ROMANO, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of December 19, 2024; that the transcript is a true, complete and correct record of what was asked, answered and said during this deposition, and that the answers on the record as given by me are true and correct.



_____
JEANNE ROMANO


Subscribed and sworn to

Before me this _____ day

of _____, 20__.


_____
NOTARY PUBLIC


Free State Reporting, Inc. 410-974-0947

Jeanne Romano 12/19/2024

---------------- I N D E X ------------------

WITNESS                    EXAMINATION BY    PAGE

JEANNE ROMANO         MS. LEONARDO       6-69


----------------- EXHIBITS -----------------

DEFENDANT'S   (DEEMED MARKED)

EXHIBIT A             PETITION              69


oOo


EXHIBIT RETAINED BY COUNSEL

72

C E R T I F I C A T I O N

STATE OF NEW YORK  )
                   )  ss.:
COUNTY OF NASSAU   )

I, JOANNE MAGGIORE, a Notary Public within and for the State of New York, do hereby certify:

That JEANNE ROMANO the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true and accurate record of the testimony given by such witness.

I further certify that I am not related to any of the parties to the action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of December 2024.

_____
JOANNE MAGGIORE