UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————X

UNITED STATES OF AMERICA,

     v.

MICHAEL ROMANO, *et al.*

       Defendant.

———————————————————X

Case No. 09 Cr. 168 (SJ)

Hon. Dora Irizarry, U.S.D.J.

---

## MEMORANDUM IN SUPPORT OF CLAIMANT JEANNE ROMANO'S MOTION FOR SUMMARY JUDGMENT

---

Matthew Gilmartin
Attorney at Law
Bar No. MG 9267
P.O. Box 38040
Olmsted, OH 44138
(440) 558-9014
(440) 398-0179 Fax
matt7g@att.net

Attorney for Jeanne Romano

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . ii

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . 1

LAW . . . . . . . . . . . . . . . . . 5

    Law of Summary Judgment . . . . . . . . . . . . . . 5

    Law of Forfeiture . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . 9

    Money Was Paid After . . . . . . . . . . . . . . 10
      Mrs. Romano Took Title

    No Assurance that the Funds
      Were Tainted: . . . . . . . . . . . . . . 10

    When Tainted Funds Are
      Treated as a Loan and
      Fully Repaid: . . . . . . . . . . . . . . 11

    Constructive Trust . . . . . . . . . . . . . . 12

CONCLUSION . . . . . . . . . . . . . . . . . 12

**TABLE OF AUTHORITIES**

*Table of Cases*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). . . . . . . . 5, 6

*Bank of Am. v. Bank of Salem*, 48 So.3d 155
   (Fla. Dist. Ct. App. 2010) . . . . . . 7

*Honeycutt v. United States*, 581 U.S. 443 (2017). . . . . . . 11

*Maio v. Clarke*, 255 So.3d 369 (Fla. Dist. Ct. App. 2018) . . . . . . 7

*Mills v. Holcomb*, 389 So. 2d 223 (Fla. 5th DCA 1980),
   *rev. denied*, 399 So. 2d 1143 (Fla. 1981) . . . . . . 12

*Provence v. Palm Beach Taverns, Inc.*, 676 So.2d 1022
   (Fla Dist. Ct. App. 1996) . . . . . . 7

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) . . . . . . 6

*Steinhardt v. Steinhardt*, 445 So. 2d 352 (Fla. 3d DCA) . . . . . . 12

*United States v. Conner*, 752 F.2d 566 (11th Cir. 1985) . . . . . . 12

*United States v. Mosca*, Case Nos. 21-1209(L) *et al.*
   (2d Cir. Oct. 16, 2023), 2023 U.S. App. LEXIS 27382 . . . . . . . . 7-8

*United States v. Schwimmer*, 968 F.2d 1570 (2d Cir. 1992) . . . . . . . . 8

*United States v. Singh*, 390 F.3d 168 (2d Cir. 2004) . . . . . . . . 7

*United States v. Tanner*, 942 F.3d 60 (2d Cir. 2019)A . . . . . . . . 11

*United States v. Watts*, 786 F.3d 152 (2d Cir. 2015) . . . . . . . . 7, 8

*Willis Mgmt. (Vt.), Ltd. v. United States*, 652 F.3d 236
   (2d Cir. 2011) . . . . . . . . 8

TABLE OF AUTHORITIES (continued)

*Table of Statutes, Rules, and
Constitutional Provisions*

*F.R.Civ.P.* 50 . . . . . . . . . . . . 6

*F.R.Civ.P.* 56 . . . . . . . . . . . . 5

18 U.S.C. § 1349 . . . . . . . . . . . . 9

21 U.S.C. § 853 . . . . . . . . . . . . 6, 7

21 U.S.C. § 853(b)(2) . . . . . . . . . . . . 7

21 U.S.C. § 853(n)(2) . . . . . . . . . . . . 6

21 U.S.C. § 853(n)(3) . . . . . . . . . . . . 6, 7

21 U.S.C. § 853(n)(6) . . . . . . . . . . . . 12

21 U.S.C. § 853(n)(6)(A) . . . . . . . . . . . . 7, 8, 10

21 U.S.C. § 853(n)(6)(B) . . . . . . . . . . . . 7

*Other Authorities*

*Sarbanes-Oxley Act of 2002*,
Pub. L. 107-204, Title IX,
§ 902(a), 116 Stat. 745
(July 30, 2002) . . . . . . . . . . . . . 9, 11

Thomas, M.R., *et al., The Laryngectomee
and Swimming* (THE JOURNAL OF
LARYNGOLOGY & OTOLOGY, Vol. 109,
Issue 6, June 1995) . . . . . . . . . . . . . 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
——————————————————X

UNITED STATES OF AMERICA,                          Case No. 09 Cr. 168 (SJ)

    v.

MICHAEL ROMANO,                                    **MEMORANDUM IN SUPPORT**
                                                   **OF MOTION FOR SUMMARY**
          Defendant.                       **JUDGMENT**
——————————————————X

Jeanne Romano, by and through her counsel, herewith tenders this *Memorandum in Support of Motion for Summary Judgment.*

### STATEMENT OF FACTS

Michael Romano owned Wall Street Rare Coins, Atlantic Coin Galleries, and one-half of Northeast Gold and Silver (referred to collectively as "the Companies"). *Memorandum and Order Adopting Reports and Recommendations,* issued April 29, 2021, ECF 556. The District Court held that Michael Romano and other defendants "engaged in a telemarketing scheme whereby they sold coins at highly inflated prices by using falsely represented value of the coins." *Id.* at pp. 2-3. The defendants conspired to devise and execute their fraudulent scheme, which involved calling prospective purchasers and inducing them to purchase coins by falsely representing their quality and falsely promising that the Companies would aid any buyer in reselling the coins at a profit. Defendants then conspired to launder the proceeds of this illegal activity. *Id.* at p. 3.

Between 1990 and 2007, the District Court found, $32,220,617 traveled through the operating accounts of companies that Romano controlled. *Report and Recommendation* (ECF

373) at p. 36. Thus, forfeiture of this amount could be justified. *Id.* at p.2.  The District Court found that Romano had been paid a salary of $6,715,625 over the course of the fraud scheme it said ran from August 25, 2000, to November 24, 2008.  *Id.* at pp. 40-41.

Mrs. Romano and her husband wanted to buy a vacation home that could become a retirement residence. She asked her son to find a suitable Florida residence, and he did so, finding a home under construction in a Lake Worth development. She visited the residence under construction and approved its purchase.

While the Property was being built, Michael arranged for a number of upgrades that he believed his parents would like and that would enhance its value. He believed he had his mother's blessing to order changes in the new home, and he thought he would surprise his parents with some fine upgrades that he had paid for (in the amount of about $143,000).  Michael Romano made no payments for upgrades to the Property until after ownership had passed to Mrs. Romano.

Michael Romano's surprise to his parents in the form of upgrades did not have the intended effect on Mrs. Romano. Instead, they created only unhappiness and discord.

Chief among the unapproved upgrades was a swimming pool. The pool outraged Mrs. Romano because her husband was ill and had undergone a laryngectomy. People with such a disability are to avoid aquatic activities because of the extreme risk that they will aspirate water into their lungs through the stoma in their throats.[1] Mrs. Romano thought Michael had been thoughtless for installing a pool without asking for permission. She believed that the pool would

---

[1]     *See* Thomas, M.R., *et al., The Laryngectomee and Swimming* (THE JOURNAL OF LARYNGOLOGY & OTOLOGY, Vol. 109, Issue 6, June 1995) at pp. 481 – 485, found at https://doi.org/10.1017/S002221510013052X (last accessed March 11, 2025) ("Following laryngectomy patients are usually advised that swimming is no longer possible.").

serve as a constant reminder to Joseph of his disability. She told Michael, "Your father can't even go in the pool. Why would you put something like that in? That's like bringing someone to a restaurant who can't eat. You should have discussed this with me."

Mrs. Romano told Michael Romano that it was her house and that she was going to repay him every cent of the $143,000 he had spent on the upgrades. MRomano Decl. at p. 2.

Mrs. Romano took title to the Property on April 16, 2003. She borrowed $175,000 from Chase Manhattan Bank to pay for the $475,000 property. She used her own savings and money inherited from her mother to pay the balance, minus the $142,600 Michael paid for upgrades he had ordered without her approval.

Over the ensuring two-year period, Mrs. Romano repaid Michael Romano the $143,000 he had advanced. At the same time, she made extra principal payments on the Property's $175,000 mortgage. She paid off the mortgage and repaid Michael Romano for the unapproved upgrades prior to 2007.

At the time, she had been working substantial overtime as a nurse while holding a second, part-time job, for a number of years. She told her son that "her philosophy was that she was paying more in interest with a bank than she was getting in her account. I recall that she was careful with money and worked two jobs for years, as well as having inherited from her deceased mother's estate."

Other than the $143,000 Michael paid for the unwanted upgrades, he contributed nothing to the home purchase. He was not obligated on the mortgage note, and he never contributed any money toward the mortgage or any expenses related to the Property. In fact, he has had nothing to do with the Property since the time the pool was completed in 2004 or 2005.

3

In 2006, Mrs. Romano was struck by a motorcycle while crossing a street in Amsterdam, cutting short a European vacation.  She spent about 10 days in intensive care in the Netherlands before being brought home on a medical evacuation flight. She recovered physically, but the accident had a profound effect on her thinking.  She started thinking about estate planning and about what would happen when she and her husband had to reside in a nursing home (with which she was very familiar because of her years of employment as a nurse).

In the spring of 2007, Mrs. Romano consulted Domenick Pelle, a longtime family friend and attorney, to discuss estate planning. She wanted to divide her assets among her children to limit the time and expense of probate, as well as to minimize federal and state estate taxes. At the same time, she wanted to retain control of the most valuable assets in the event that she needed to liquidate them to pay for long-term needs she and her husband might face. (Joseph passed away about seven years later).

At the time, Mr. Pelle has been a New York attorney for over 50 years. He has confirmed Mrs. Romano's account of the transaction. He said that he had been involved in a number of similar conveyances over the years and that he had advised Mrs. Romano on this transaction:

> I assured Mrs. Romano that if she conveyed title to a property to her son, with the promise by the son that the property be reconveyed to her without consideration when she demanded it, that the Courts of New York would enforce that promise based upon the familial confidential relationship between a mother and her sons. It is called a constructive trust under New York law. Over the years, I have been involved in a number [of] similar conveyances.
>
> Mrs. Romano said that based on my explanation, and a promise to reconvey by her sons she was conveying the property known as 8154 Via Bolzano, Lake Worth, Florida 33467-5232, to Michael Romano, subject to her being able to regain title if [or] when she wanted reconveyance.

Pelle Decl.

On Mr. Pelle's advice, she gave title to one of her parcels of real estate – her long-time residence on Lilac Lane in Levittown – to her son, Vincent Romano. She assigned the title to the

4

Lake Worth Property to Michael Romano. She made the conveyances with the understanding that if she ever needed to sell these properties to a third party, she could compel her sons to return them to her. Mr. Pelle explained that the properties were being transferred into a constructive trust, and Mrs. Romano's sons understood at the time of transfer that if she asked for the properties back to sell them for her benefit, they would be legally obligated to return them.[2]

Mrs. Romano transferred the properties to her sons for no consideration, and she did not file a gift tax return because of the contingent nature of the conveyances. All of the Property's rental payments are sent to her and deposited in her account. She has continued to pay all homeowners' association fees, upkeep, and taxes. She receives the utility bills at her home in Levittown.

## LAW

***Law of Summary Judgment:*** In ruling on a motion for summary judgment filed pursuant to *F.R.Civ.P.* 56, "the district court is required to resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." (internal quotation marks omitted). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The court should grant summary judgment. if there is no such issue and the moving party is entitled to judgment as a matter of law. *See, e.g., id.* at 247.

---

[2] Mrs. Romano has since demanded return of the Lilac Lane property from her son, Vincent, and she has deeded it to her daughter and granddaughter.

In determining whether there are genuine issues of material fact to be tried, "the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must 'review all of the evidence in the record.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (reviewing entitlement to judgment as a matter of law under *F.R.Civ.P.* 50)); *see Reeves*, 530 U.S. at 150 ("the standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same," requiring the court to "review all of the evidence in the record" (internal quotation marks omitted).

*Law of Forfeiture:*    The procedural rules for third-party claims to potentially forfeitable assets are governed by statute and the *Federal Rules of Criminal Procedure*.

Subsection (n) of 21 U.S.C. § 853 provides that a third party may petition the district court ordering the forfeiture "for a hearing to adjudicate the validity of his alleged interest in the property." 21 U.S.C. § 853(n)(2). Such a petition

> shall set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought.

21 U.S.C. § 853(n)(3). The hearing contemplated by the statute must provide the petitioner with the right to "testify and present evidence and witnesses on his own behalf and cross-examine witnesses who appear at the hearing." 21 U.S.C. § 853(n)(5).

To prevail where the claim is that the claimant has an ownership interest of some sort in the property, the petitioner must show by a preponderance of the evidence that he or she

> has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section.

6

21 U.S.C. § 853(n)(6)(A).[3] The sworn petition must "set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought." *Id.* at § 853(n)(3). "Property" includes "tangible and intangible personal property, including rights, privileges, interests, claims, and securities." *United States v. Singh*, 390 F.3d 168, 189 (2d Cir. 2004), quoting 21 U.S.C. § 853(b)(2).

A petitioner first must establish standing to challenge the forfeiture order by demonstrating a "legal interest in the forfeited property under§ 853(n)(2)." *United States v. Watts*, 786 F.3d 152, 160 (2d Cir. 2015). A constructive trust such as that alleged by Mrs. Romano is a form of interest in property that already has been held by this Circuit in this case to be a cognizable legal interest in a 21 U.S.C. § 853 proceeding:

> Under Florida law, a constructive trust is an equitable remedy that converts a title holder into a trustee when property "has been acquired by fraud, or where, though acquired originally without fraud it is against equity that it should be retained by him who holds it." *Maio v. Clarke*, 255 So.3d 369, 371 (Fla. Dist. Ct. App. 2018) (quoting *Provence v. Palm Beach Taverns, Inc.*, 676 So.2d 1022, 1025 (Fla Dist. Ct. App. 1996)). "[C]ourts may impose a constructive trust where there is clear and convincing proof of (1) a promise, express or implied, (2) transfer of the property and reliance thereon, (3) a confidential relationship, and (4) unjust enrichment." *Bank of Am. v. Bank of Salem*, 48 So.3d 155, 158 (Fla. Dist. Ct. App. 2010) (internal quotation marks and citation omitted).

*United States v. Mosca*, Case Nos. 21-1209 (L) *et al.* (2d Cir. Oct. 16, 2023), 2023 U.S. App. LEXIS 27382, at *5-6.

The Circuit held that "[a]ccepting Jeanne Romano's petition as true, as we must, she plausibly stated the terms of a constructive trust under Florida law, including that it would be

---

[3]    As an alternative, a petitioner may also show that he or she was a bona fide purchaser for value meeting certain other requirements, but that provision – 21 U.S.C. § 853(n)(6)(B) – is not at issue in this proceeding.

"against equity" for Michael Romano to retain possession of the property in order to satisfy part of his forfeiture." *Id.* at 2023 U.S. App. LEXIS 27382, *6-7. *See also United States v. Schwimmer*, 968 F.2d 1570, 1574 (2d Cir. 1992) ("We hold that a constructive trust warrants an amendment of an order of forfeiture… if the District Court finds that the property ordered forfeited is traceable to property held in constructive trust"). To establish a claim to property subject to forfeiture under 21 U.S.C. § 853(n)(6)(A), a petitioner must demonstrate that she "has a legal right, title, or interest in the property... [that] was vested in the petitioner rather than the defendant was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property." 21 U.S.C. § 853(n)(6)(A) (emphasis added). "Subsection 853(n)(6)(A) works hand in hand with the 'relation-back' doctrine embodied in § 853(c), which provides that all property subject to forfeiture based on a criminal offense 'vests in the United States upon the commission of the [offense]." *Watts, supra* at 786 F.3d 166 (quoting 21 U.S.C. § 853(c)).

Because rights to forfeitable property vest in the Government "immediately upon the commission of a criminal act, a third party may prevail under § 853(n)(6)(A) only by establishing that he [or she] had a legal interest in the forfeited property before the underlying crime was committed." *Watts, supra* at 786 F.3d 166. That would seem to exclude a constructive trust, which courts impose only after the elements – including wrongdoing – are met. However, a constructive trust is imposed upon the *occurrence* of the wrongdoing, not the discovery or announcement of it. Therefore, the property subject to the trust "was never truly the defendant's property and is not subject to forfeiture to the United States in the first instance." *Willis Mgmt. (Vt.), Ltd. v. United States*, 652 F.3d 236, 244 (2d Cir. 2011).

The nature and extent of Mrs. Romano's interest are to be determined under state law. *Watts, supra* at 786 F.3d 161.

8

**ARGUMENT**

The undisputed facts establish that Michael Romano was convicted of violating 18 U.S.C. § 1349, conspiracy to commit mail and wire fraud beginning in 1990 and extending until November 2008. However, conspiracy to commit mail or wire fraud was not criminal until July 30, 2002, with the passage of the *Sarbanes-Oxley Act of 2002*, Pub. L. 107-204, Title IX, § 902(a), 116 Stat. 745 (July 30, 2002). Title IX of that *Act,* § 902(a) (116 Stat. 805), added a new section to Title 18:

> **§ 1349. Attempt and conspiracy**
> Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

Prior to July 30, 2002, a conspiracy to violate Chapter 63 of Title 18 (§§1341-1351) was not a separate offense.

Mrs. Romano purchased the Property in 2003, obtaining title on April 16, 2003. She borrowed $175,000 from Chase Manhattan Bank to pay for the property, giving that Bank a mortgage on the property. She paid the remainder from her own funds. Michael Romano subsequently provided $142,630 for upgrades to the Property that he intended as a gift to his parents.

However, for reasons having nothing to do with his subsequent indictment in 2009, Mrs. Romano rejected the gift. The upgrades had already been bought and paid for, so she could not unring the bell on that.  But she could order her son to have no more to do with the Property – (which she did) and convert the gift into a loan (which she also did).

9

Mrs. Romano paid off the Chase mortgage and repaid Michael Romano's $142,630 loan well prior to 2007. She has managed the property herself since its completion, paying all bills and collecting all rents.

On advice of her long-time family attorney, in 2007 she gave title to the Property to Michael Romano. The conveyances were made with the agreement that if Mrs. Romano ever needed to sell these properties to a third party, she could demand return of the Property.

Nothing remains in this case but to determine (1) whether the fact that the funds Michael Romano provided for upgrades were paid prior to Mrs. Romano obtaining title to the Property; (2) whether the funds paid for the upgrades were tainted at all, because those were earned prior to the offense of conviction becoming a crime; (2) whether an unsecured loan made with tainted funds that is fully repaid renders the property to which the loan principal was applied forfeitable and (3) whether Mrs. Romano was the beneficiary of a constructive trust on the Property that was superior to any interest asserted by the government.

(1)    **Money Was Paid After Mrs. Romano Took Title:**    As an initial matter, none of the money paid by Michael Romano was paid until after Jeanne Romano took possession. Thus, Mrs. Romano's interest in the property was superior to that of the Government, even if all of the money paid by Michael Romano for upgrades represented proceeds of criminal activity. *See* 21 U.S.C. § 853(n)(6)(A) (petitioner's right must vest prior to superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property."

(2)    **No Assurance that the Funds Were Tainted:**    At the time he paid for the upgrades, Michael Romano was spending money he had earned since 1990, as the government

10

has repeatedly argued. However, there has not ever been a showing whether the funds were pre-*Sarbanes-Oxley* or post-*Sarbanes-Oxley*.

The issue has been raised in Michael Romano's § 2255 *Motion* and is awaiting decision by this Court. The outcome of that proceeding will raise the question of the efficacy of the total forfeiture and – in this matter – whether Michael Romano's payments for upgrades were tainted to begin with.

**(3)    When Tainted Funds Are Treated as a Loan and Fully Repaid:** The concept is straightforward: criminal forfeiture "'merg[es]' an *in personam* element with the traditional *in rem* nature of forfeiture, with the goal of making it 'easier for the Government to hold the defendant who acquired the tainted property responsible… by allowing the Government to seek 'substitute property' under § 853(p) when the defendant no longer possesses the criminal proceeds. *United States v. Tanner*, 942 F.3d 60, 68 (2d Cir. 2019), quoting *Honeycutt v. United States*, 581 U.S. 443, 453 (2017). All of this turns on seizing the proceeds criminal misconduct. When an offender turns the proceeds of his offense over to an innocent third party – especially when the proceeds are as fungible commodity as money – and the third party repays those proceeds to the malefactor, then the offender again holds the property that belongs to the government by dint of the offense.

Here, Michael Romano had returned to him every dime that he had advanced for the upgrades. The notion that the money returned to Michael Romano belonged to the government as well as all of the Property, because it had been enhanced by upgrades bought with the borrowed money, turns the proceeds into legal skunk musk that clings to and taints everything that it touches.

11

The goal of forfeiture is to "hold the defendant who acquired the tainted property responsible…" *Tanner, supra.* Criminal forfeiture is "a form of punishment imposed by the jury to divest the criminal defendant of the profits of the illegal activity for which he has been convicted." *United States v. Conner*, 752 F.2d 566, 576 (11th Cir. 1985). Seizing money from Michael Romano, which included the money he had been repaid, accomplished that. Taking the Property only punishes Mrs. Romano.

(4)    ***Constructive Trust****:*    Mrs. Romano surrendered legal title for an equitable interest in the Property.  The law of the case recognizes that she has made a plausible claim that a constructive trust exists. She has shown by clear and convincing evidence that there was an express promise, that the Property was conveyed in reliance on the promise, that a confidential relationship existed between mother and son, and that it would be unjust to enrich Michael and the government by taking from Mrs. Romano what she had completely bought, paid for, and managed for over 20 years.  *Provence v. Palm Beach Taverns*, 676 So. 2d 1022, 1025 (Fla. Dist. Ct. App. 1996), citing *Steinhardt v. Steinhardt*, 445 So. 2d 352 (Fla. 3d DCA); *Mills v. Holcomb*, 389 So. 2d 223 (Fla. 5th DCA 1980), *rev. denied*, 399 So. 2d 1143 (Fla. 1981).

## CONCLUSION

Nothing suggests that the transactions surrounding the Property are anything other than what they appear. Mrs. Romano, a hard worker her whole life, wanted to buy a retirement home in the Florida sun. Michael Romano, whose fraud offenses at his coin business were unknown to his mother, tried to help. When his help devolved into a family feud, Mrs. Romano repaid him and told him to butt out.

A few years later, after a horrific accident caused Mrs. Romano to confront mortality, she planned her estate with the advice of counsel. The conveyance, while perhaps uncommon, was

12

done in a manner that left Mrs. Romano with equitable rights to revoke the conveyance anytime she wished, thus maintaining the superiority of her interest.

WHEREFORE, Petitioner Jeanne Romano's petition should be granted, and her interest in the Property should be recognized as superior to that of the government, and the Property should be turned over to her.

/s/ Matthew Gilmartin

Matthew Gilmartin
Attorney at Law
Bar No. MG 9267
P.O. Box 38040
Olmsted, OH 44138
(440) 558-9014
(440) 398-0179 Fax
matt7g@att.net

Attorney for Jeanne Romano

13

CERTIFICATE OF COMPLIANCE PURSUANT TO LOCAL CIVIL RULE 7.1

I, Matthew Gilmartin, certify that this Memorandum in Support of Claimant Jeanne Romano's Motion for Summary Judgment dated April 4th, 2025, complies with the Individual Practice Rules and Rule 7.1 of the Local Rules of the United States District Court for the Southern and Eastern District of New York, in that it does not exceed 8,750 words.

Dated: Olmsted Falls, Ohio

    April 4th, 2025

               By:/*s/ Matthew Gilmartin*
                   Matthew Gilmartin
                   Attorney for the Claimant
                   Jeanne Romano